UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

In re FEDEX CORP. SECURITIES          :     Civil Action No. 1:19-cv-05990-RA
LITIGATION                            :
                                      :     CLASS ACTION
———————————————————          :
                                      :
This Document Relates To:             :
                                      :
    ALL ACTIONS.                      :
                                      :     DEMAND FOR JURY TRIAL
——————————————————— x


CONSOLIDATED AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ...........................................................................................4

PARTIES ...............................................................................................................................5

SUBSTANTIVE ALLEGATIONS .......................................................................................7

    The Company and Its Business..........................................................................................7

    FedEx Dramatically Increases Its European Presence by Acquiring TNT.........................8

    Defendants Downplay the Impact of NotPetya on TNT....................................................10

    The Impact of NotPetya Is Belatedly Revealed to the Market ........................................14

DEFENDANTS' DUTY TO DISCLOSE ...........................................................................16

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................17

    September 19-20, 2017 Press Release, 10-Q and
    Earnings Conference Call ................................................................................................17

    December 19-20, 2017 Press Release, 10-Q and
    Earnings Conference Call ................................................................................................22

    March 20-21, 2018 Press Release, Quarterly Report and
    Earnings Conference Call ................................................................................................25

    June 19, 2018 Press Release, Full Year and Quarterly Report and
    Earnings Conference Call ................................................................................................28

    FedEx's Annual Report for Fiscal Year End 2018 .........................................................29

    September 17, 2018 Press Release, Quarterly Report and
    Earnings Conference Call ................................................................................................31

    September 24, 2018 Annual Shareholders Meeting ........................................................33

    November 7, 2018 Robert Baird Industrial Conference ..................................................34

    December 7, 2018 Announcement of Defendant Cunningham's Departure ....................35

    December 18, 2018 Press Release, Quarterly Report and
    Earnings Conference Call ................................................................................................36

**Page**

RELEVANT POST-CLASS PERIOD DISCLOSURES............................................................39

ADDITIONAL FACTS PROBATIVE OF SCIENTER............................................................43

CLASS ACTION ALLEGATIONS ........................................................................................46

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE .............................................................................48

LOSS CAUSATION................................................................................................................49

NO SAFE HARBOR ..............................................................................................................50

COUNT I ................................................................................................................................51

      For Violation of §10(b) of the Exchange Act and
      SEC Rule 10b-5 Promulgated Thereunder
      Against All Defendants.............................................................................................51

COUNT II ...............................................................................................................................52

      For Violation of §20(a) of the Exchange Act
      Against the §20(a) Defendants.................................................................................52

PRAYER FOR RELIEF ..........................................................................................................53

DEMAND FOR TRIAL BY JURY .........................................................................................54

Lead Plaintiff City of Bradford Metropolitan District Council as administering authority to the West Yorkshire Pension Fund ("WYPF" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon the investigation of its counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by FedEx Corporation ("FedEx" or the "Company"), as well as conference call transcripts, media and analyst reports, and interviews with former employees of the Company. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of all those who purchased, or otherwise acquired, FedEx common stock during the period from September 19, 2017 through December 18, 2018, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10-b).  This action asserts claims against FedEx and several current and former officers of the Company ("Defendants," defined in detail *infra*).

2.     This action arises from Defendants' material misrepresentations concerning the "NotPetya" virus and its lasting impact on FedEx's operations.  As is now known, the NotPetya virus devastated FedEx operations in Europe, destroying significant portions of the Company's computer systems, crippling critical operations, and causing a massive loss of business. Defendants concealed and misrepresented these facts.  Within months of NotPetya, Defendants began to claim falsely that the Company had fully recovered, that its operations were functioning normally, and that it remained on track to expand its business significantly in Europe.  Investors suffered enormous losses when NotPetya's true ramifications for FedEx were finally revealed to the investing public.  This action seeks damages on their behalf.

3.      NotPetya is a computer virus that disables infected computer systems permanently and can spread rapidly, infecting and disabling multiple computers throughout a network.  Russian military hackers planted NotPetya in Ukrainian computer systems and the virus spread throughout Europe and beyond in late-June 2017 before the outbreak was halted.

4.      Just over one year earlier, FedEx had materially expanded its presence in Europe by acquiring TNT Express B.V. ("TNT Express" or "TNT"), a Netherlands-headquartered package-delivery company with expansive and well-established operations throughout Europe. The TNT acquisition was the largest in FedEx's history, representing a significant increase in the size and importance of FedEx's European operations.  TNT increased the size of FedEx's workforce by over 25%, the number of vehicles in its global fleet by nearly 50%, and the revenues of its largest business segment by nearly a third – virtually all of that growth in Europe.

5.      Given the size of the TNT acquisition, and its material importance to the Company's operations, integrating TNT into the Company was FedEx's most important operational priority.  As the Company stated in every annual report filed during the Class Period, the TNT integration was the "*primary area of focus*" for the Company.[1]  To achieve this top priority, FedEx announced a four-year timeline to integrate TNT and that the Company was "targeting operating income improvement . . . of $1.2 to $1.5 billion" from the TNT integration within that timeframe (the "TNT Income Improvement Target").

6.      In the midst of the integration process, NotPetya infected TNT's computer networks.  As investors learned only much later, NotPetya wreaked havoc on TNT's systems,

---

[1]    Unless otherwise indicated, all emphasis herein has been added.

disrupting the integration of TNT, delaying its progress, and hindering the Company's international revenue growth. But Defendants told the market a very different story.

7. Defendants concealed the true impact of NotPetya, repeatedly telling investors that NotPetya was under control, that its impact had been managed, that the TNT integration remained on track, and that the Company remained poised to reap the benefits of the TNT integration. Within months of the NotPetya outbreak, Defendants announced that "**substantially all TNT Express critical operational systems have been restored**" and expressly reaffirmed the income targets for the TNT integration. Defendants repeated and reiterated similar false reassurances throughout the Class Period – inundating investors with false representations that TNT's systems had been "**fully restored**," that the progress of the integration was actually "**accelerated** in light of the June 2017 cyberattack at TNT Express," and that the Company was "**on track**" to meet its integration goals. Defendants specifically reaffirmed the Company's $1.2 to $1.5 billion TNT Income Improvement Target **more than a dozen times** during the Class Period. These and other statements detailed herein concealed the true extent of harm caused by NotPetya and materially misrepresented its impact on the TNT integration.

8. Investors did not learn the truth about NotPetya's impact on the Company until a series of corrective disclosures issued between June and December 2018. These disclosures caused collective market capitalization losses of nearly $15 billion. In June and September of that year, FedEx announced a significant increase in the Company's ongoing integration costs and an unfavorable turn in its "service mix" – a euphemism for losing high-margin business because customers fled to competitors as FedEx's European operations floundered in NotPetya's aftermath. In early December 2018, FedEx announced the sudden "separation agreement" (*i.e.*, the firing) of Defendant David L. Cunningham – the chief executive officer of the relevant business segment.

Just days later, on December 18, 2018, FedEx finally admitted that, despite Defendants' serial reassurances, the Company **would not achieve the $1.2 to $1.5 billion** TNT Income Improvement Target – due, at least in part, to the NotPetya attack a year and a half earlier.

9.      These revelations stunned investors and analysts alike.  As one analyst put it: "FedEx management until today clearly articulated to the investor community that: 1) TNT was fully operational following the cyberattack; and 2) aggressive profit improvement plans were 'confidently' on track[.] **Perhaps this analyst will be less trusting of management commentary going forward**."  This lawsuit seeks compensation for the damage caused by the material misrepresentations and omissions discussed herein.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12.      Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), including because FedEx's stock is traded on the New York Stock Exchange ("NYSE").

13.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Lead Plaintiff WYPF is a local government pension scheme with assets of over $15 billion.  As of the year-end 2019, Lead Plaintiff had over 291,514 members and 430 employers across the United Kingdom.  Lead Plaintiff, as set forth in its Certification, which is incorporated by reference herein, purchased FedEx common stock during the Class Period and has been damaged thereby.

15.     Defendant FedEx is a global logistics company with headquarters in Memphis, Tennessee and principle executive offices at 942 South Shady Grove Road, Memphis, Tennessee 38120.  The Company's stock is listed on the NYSE under the ticker symbol "FDX."  As of September 13, 2019, there were 260,910,309 outstanding shares of FedEx common stock.

16.     Defendant Frederick W. Smith ("Smith") is the founder of FedEx.  Defendant Smith held the title of President of FedEx Express, a business segment of FedEx, from June 1971 to February 1975.  Between 1977 and January 1998, Defendant Smith served as FedEx Express' Chief Executive Officer ("CEO").  Since 1998, Defendant Smith has served as the Company's Chairman, President, and CEO.  As CEO, Defendant Smith spoke on FedEx's behalf in the Company's press releases and SEC filings and during quarterly earnings calls the Company held with analysts and investors throughout the Class Period.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Defendant Smith certified the accuracy of the Company's Annual Report on Form 10-K filed with the SEC on July 16, 2018.

17.     Defendant Alan B. Graf, Jr. ("Graf") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since January 1998.  From February 1996 through January 1998, Defendant Graf served as the Executive Vice President and CFO of FedEx Express.  As CFO, Defendant Graf spoke on FedEx's behalf in the Company's press releases and SEC filings

and during quarterly earnings calls the Company held with analysts and investors throughout the Class Period.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Defendant Graf certified the accuracy of the Company's Annual Report on Form 10-K filed with the SEC on July 16, 2018.

18.     Defendant David J. Bronczek ("Bronczek") served as the Company's Chief Operating Officer ("COO") and President between February 2017 and February 2019.   On February 14, 2019, FedEx unexpectedly announced that Bronczek was resigning and would be replaced by Defendant Rajesh Subramaniam.   Between January 2000 and February 2017, Defendant Bronczek served as CEO of FedEx Express.  As COO, Defendant Bronczek spoke on FedEx's behalf in press releases and SEC filings and during quarterly earnings calls the Company held with analysts and investors throughout the Class Period.

19.     Defendant Rajesh Subramaniam ("Subramaniam") currently serves as the Company's President and COO.   Between January 2019 and March 2019, Defendant Subramaniam served as President and CEO of FedEx Express, replacing Defendant Cunningham who previously held the role.   Between January 2017 and December 2018, Defendant Subramaniam served as the Company's Chief Marketing and Communications Officer.  From 2013 through January 2017, Defendant Subramaniam served as the Executive Vice President of Marketing and Communications at FedEx Services.  Defendant Subramaniam spoke on FedEx's behalf during quarterly earnings calls the Company held with analysts and investors throughout the Class Period.

20.     Defendant David L. Cunningham ("Cunningham") served as the CEO and President of FedEx Express from February 2017 until December 2018.  Between 2015 and February 2017, Defendant Cunningham served as the Company's Executive Vice President and

COO of FedEx Express.  On December 7, 2018, FedEx abruptly announced that Defendant Cunningham had entered into a separation agreement with the Company and would depart the Company by December 31, 2018.  Throughout the Class Period, Defendant Cunningham spoke on FedEx's behalf during quarterly earnings calls the Company held with analysts and investors.

21.     The Defendants identified in ¶¶16-20 are referred to herein as the "20(a) Defendants."

22.     Defendant Michael C. Lenz ("Lenz") served as the Company's Treasurer and Corporate Vice President during the Class Period.  On November 7, 2018, Defendant Lenz gave a presentation relevant to this case on behalf of FedEx at the Robert W. Baird Industrial Conference.

23.     Defendant Robert B. Carter ("Carter") served as the Company's Executive Vice President of FedEx Information Services and Chief Information Officer.  Defendant Carter spoke on behalf of FedEx during various quarterly earnings calls that the Company held with analysts and investors throughout the Class Period.

24.     The Defendants identified in ¶¶16-23 are referred to herein as the "Individual Defendants."  The Company, together with the Individual Defendants, are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**The Company and Its Business**

25.     FedEx describes itself as a global logistics company that provides a broad portfolio of transportation, e-commerce, and business services.  The Company owns and operates fleets of airplanes and trucks that it uses to ship goods to commercial and residential customers throughout the world.  FedEx operates through the following four business segments: (1) FedEx Express; (2) FedEx Freight; (3) FedEx Ground; and (4) FedEx Services.

26.     FedEx Express is an express shipping company, which serves over 220 countries and territories and is responsible for the majority of the Company's revenue.  For the fiscal year ended May 31, 2019, FedEx Express was responsible for 54% of the Company's total revenue. FedEx Express is the business segment most pertinent to this lawsuit.

27.     FedEx Ground provides low cost shipment services to the United States and Canada.  FedEx Freight provides shipment services for "less-than-truckload" freight packages within the U.S. and Canada.  FedEx Services provides sales, marketing, information technology, communications, customer service, technical support and billing services to the Company's other transportation segments.

28.     The express package and freight markets are both highly competitive.  Outside of the United States, FedEx principally competes against United Parcel Service ("UPS"), a multinational package delivery and supply chain management company, and DHL International GmbH ("DHL"), a German-based logistics company with a significant European presence. FedEx's other competitors include international logistics companies such as DPD (a subsidiary of France's La Poste's GeoPost), General Logistics Systems (a Royal Mail-owned parcel delivery group), foreign postal authorities, passenger airlines, air freight forwarders, regional carriers, and all-cargo airlines.

**FedEx Dramatically Increases Its European Presence by Acquiring TNT**

29.     FedEx acquired TNT on May 25, 2016 for approximately $4.8 billion in cash.  TNT is an international express transportation, small-package ground delivery and freight transportation company headquartered in Hoofddorp, The Netherlands.  The acquisition represented a significant expansion of the Company's international presence and operations, particularly in Europe and surrounding areas.  Defendant Bronczek commented on the TNT acquisition stating: "May 25,

2016 will be a profound moment in the history of these two great companies.  Together, we will transform the global industry, connecting even more people and possibilities around the world."

30.     TNT generated approximately $6.8 billion in revenue annually prior to the merger. TNT's delivery services are focused in Europe, the Middle East, Africa, Asia-Pacific and South America.  TNT concentrates on providing shipping services to large and multinational companies in the industrial, automotive, high-tech and healthcare industries.  While the majority of TNT's shipments are between businesses, TNT also offers business-to-consumer services to select consumers.  TNT's shipping and delivery services are delivered through a combination of physical infrastructures such as hubs, depots and vehicles as well as electronic delivery systems.

31.     With the May 25, 2016 acquisition, TNT became a part of the FedEx Express segment of the Company.  For fiscal 2017, the year ended May 31, 2017, TNT's results were announced both as an individual reportable segment and combined with the results of FedEx Express.  In the first quarter of fiscal 2018, the period ended August 30, 2018, FedEx reported the results of FedEx Express and TNT within a single reporting segment, FedEx Express.

32.     The TNT acquisition is the largest in the Company's history.  FedEx's acquisition of TNT rapidly grew the Company's international revenue from 24% of FedEx's total reported revenue for fiscal 2016 to 33% of total reported revenue for fiscal 2017.  The transaction also dramatically increased FedEx's market share in Europe from 5% to 19%.  This made FedEx the second largest logistics operator in Europe.

33.     Given its importance, FedEx provided investors with specific guidance to measure the value added by the TNT acquisition.  In a March 21, 2017 press release announcing results for the quarter ended February 28, 2017, FedEx stated that by fiscal year 2020, the Company's

integration of TNT would increase FedEx Express's operating income by $1.2 billion to $1.5 billion.

34.     On the March 21, 2017 earnings call that followed this announcement, Defendants touted the acquisition of TNT. Defendant Graf emphasized that the Company continued "to have a great degree of confidence in the TNT acquisition, and the value to the enterprise" and described the integration as "going extremely well." Defendant Graf further explained the expected synergies from the transaction stating, in pertinent part:

> We believe that the combination of the businesses is more than just an integration of the businesses, and we're positioning ourselves to leverage combined businesses in a very powerful way. ***We see the combination of these two businesses as transformative, and expect significant synergies from the integration.***

35.     In turn, Defendant Bronczek underscored the importance of the TNT acquisition stating, in pertinent part:

> The TNT acquisition, as I'm sure you know, is the largest in FedEx's history. And we have discussed this with you, previously; ***this provides extensive benefits to FedEx, including; rapidly accelerating our European and global growth around the world; substantially enhancing our global footprint***; and leveraging TNT's lower cost road networks in Europe, Middle East, and Asia, producing improved results for the entire Corporation.

Defendant Bronczek emphasized that the Company's ability to meet the TNT Operating Income Improvement Target by 2020 was dependent on a successful integration of TNT into FedEx. Defendant Bronczek stated that "the integration is a key driver to FedEx Express FY20 operating income improvement target, of between $1.2 billion and $1.5 billion."

**Defendants Downplay the Impact of NotPetya on TNT**

36.     On June 28, 2017, FedEx announced that TNT had been impacted by the NotPetya virus. In announcing the attack, FedEx assured the public that there had been no data breach and

that the attack was limited to TNT.  FedEx stated that "the operations of all other FedEx companies are unaffected and services are being provided under normal terms and conditions."

37.     At the start of the Class Period, on September 19, 2017, the Company issued a quarterly earnings press release for the quarter ended August 31, 2017, and Defendants provided an update on the Company's operations in the wake of NotPetya.  The Company disclosed that the attack impacted the results for the quarter by approximately $300 million.  During the Company's earnings call to discuss FedEx's quarterly results, Defendant Bronczek explained that TNT's "international business that's significant around the world is what got affected the most.  So that's high-yielding customers."

38.     Defendants nonetheless quelled market concerns regarding the impact of NotPetya, representing that service levels had already been largely restored.  For example, the Company indicated that "most TNT Express services resumed during the quarter and ***substantially all TNT critical operations have been restored***."  The market reacted to the positive news of the Company's purportedly successful recovery from NotPetya, and the price of FedEx's stock increased by $4.50 per share, or 2.1%, to close at $220.50 per share on September 20, 2017.

39.     During the Company's December 19, 2017 earnings call to discuss FedEx's financial results for the quarter ended November 30, 2017, Defendants again reiterated to the market that TNT had recovered from NotPetya.  In particular, Defendant Bronczek represented that TNT was "seeing strong service levels, and ***operations are back to normal*** after the June cyberattack."  The market again reacted positively to Defendants' characterizations of the Company's recovery and the price of FedEx's stock increased by $8.53 per share, or 3.5%, to close at $251.07 per share on December 20, 2017.

40.     In contrast to the Company's assertions that operations had been "restored" and were "back to normal," a confidential witness who worked as a Senior Business Relationship Manager at TNT from June 2015 to April 2019 (the "CW") described the severe and continuing impact that the NotPetya virus had on TNT's business and operations.[2]   According to the CW, NotPetya crippled TNT's operations within seconds and wiped out 75 critical systems, 37,000 PCs (desktop computers) and between 4,000 and 9,000 Windows servers.  The CW stated that, at that point, "*the progress of the integration took a stop*."   The CW explained that the original integration plan was a four year plan, but that the integration was not completed in time because of NotPetya.  Further, according to the CW, to address the continuing threat posed by the virus, FedEx severed the link between the TNT computer network and the FedEx Express computer network by installing a firewall between the two operating systems.  This firewall impeded the progress of the IT integration of the two businesses.  The CW recounted that recovery of the systems disabled by NotPetya took approximately 6 months to complete and approximately 25% of the affected programs were never restored.

41.     The CW also explained the particularly severe impact that NotPetya had on TNT's international operations.   According to the CW, NotPetya disabled approximately 75 global systems critical to TNT's ability to conduct business internationally.  For example, the CW noted that TNT's "custom clearance system," which was responsible for the international freight and package delivery service, generating packaging invoicing, and obtaining custom-clearance

---

[2]    The CW previously served as the Senior Business Systems Manager at TNT from July 2014 to July 2015.  The CW worked from TNT's United Kingdom headquarters.  The CW's account is based on information from various meetings with TNT senior executives who were involved in the recovery and the TNT integration.  During the integration of TNT, the CW reported to a managing director at TNT.

approval for various countries, could not function because of NotPetya.  As a result, TNT's international shipments were largely disabled for at least 6 months.  The CW also reported that local delivery services were delayed during this time.  According to the CW, TNT lost substantial business to competitors because TNT could not track customers' packages without a functioning custom clearance system.  The CW noted that although it was difficult to estimate the exact number of customers that TNT lost as a result of NotPetya, the CW estimated that approximately 10% of the Company's high-margin business (customers that generated between a 10% and 13% margin for TNT) abandoned TNT in favor of competitors.  According to the CW, because of the high profit margin generated by these customers, this loss had a significant impact on TNT's sales.  The CW reported that TNT's international services comprised approximately 50% of TNT's total revenue.

42.    With respect to the Company's TNT Income Improvement Target, the CW stated that there was significant doubt within the Company about its ability to meet the target by 2020. The CW noted that the difficulty in achieving this target was, in part, due to the complexity of the integration, which involved integrating systems in numerous countries and ensuring compliance with various local and legal requirements.  Moreover, the CW reported that the benefits of the TNT acquisition were delayed because programs that would allow U.S. customers to use TNT ground operations had not "matured."  The CW stated that these programs were still not "matured" by the time the CW left in April 2019.

43.    Consistent with the CW's account, the costs associated with the integration have been significantly greater than initially disclosed by the Company.  Indeed, FedEx currently estimates that the integration will cost $1.7 billion – ***more than double*** its initial estimate of $800 million.

**The Impact of NotPetya Is Belatedly Revealed to the Market**

44.     On June 19, 2018, Defendants issued a press release announcing the Company's results for the quarter ended May 31, 2018 and reported $136 million in integration expenses for the quarter and $477 million in integration expenses for fiscal 2018 – an uptick of nearly 30% in integration expenses from the prior quarter.  This news began to signal to the market that there were significant problems with the TNT integration beyond those previously disclosed, and this reflected the impact of some of those previously-undisclosed risks.  On this news of increased TNT integration expenses, FedEx's stock price declined by $6.96, or 2.7%, to close at $251.43 on June 20, 2018.

45.     On September 17, 2018, Defendants issued a press release announcing the Company's results for the quarter ended August 30, 2018 and again reported greater expenses associated with the integration of TNT.  On the same day, the Company held an earnings call to discuss these results during which Defendant Graf disclosed that the Company was experiencing a negative service mix, explaining that the Company's operating income was "partially offset by [a] ***shifting service mix*. . . ."**  On this news, FedEx stock price fell by $14.15, or 5.5%, to close at $241.58 on September 18, 2018.

46.     On December 7, 2018, Defendants announced that Defendant Cunningham had entered into a separation agreement with the Company and would depart the Company by December 31, 2018.  Analysts understood Defendant Cunningham's unexpected departure to reflect the poor performance of the FedEx Express segment and noted that the announcement cast doubt on the viability of the TNT Income Improvement Target for 2020.  For instance, on December 11, 2018, Stephens Inc. issued a report discussing Defendant Cunningham's departure, commenting in pertinent part: "[w]hile skepticism has been growing around FDX's ability to hit

its profit goals at [TNT] Express in FY20, many investors are taking the leadership change to mean that FDX will lower its FY19 guidance and long-term Express profit outlook next week."  On the news of Defendant Cunningham's abrupt departure, FedEx stock dropped by $13.31 per share, or 6.2%, from an opening price of $214.70 to a closing price of $201.39 per share on December 7, 2018.

47.     On December 18, 2018, FedEx reported the Company's results for the quarter ended November 30, 2018 and belatedly disclosed the damage the NotPetya virus had caused to the Company and, in particular, to the FedEx Express/TNT segment.  On that date, FedEx announced lower-than-expected international revenue and a negative change to FedEx's business mix due to low growth in high-margin yielding services.  The Company also disclosed that the Company's long-asserted TNT Income Improvement Target would not be met by 2020.  The Company explained that "lower-than-expected express package volume due to European weakness that accelerated during the quarter and is expected to continue, and *a change in service mix following the June 2017 cyberattack on TNT*, will delay the anticipated realization of these benefits."

48.     Analysts expressed dismay at the Company's belated revelation of the significant problems resulting from the NotPetya virus that were impacting TNT Express and causing the Company to report reduced revenues and miss the TNT Income Improvement Target.  On December 19, 2018, Barclays Equity Research noted that before the December 19th disclosure, FedEx had represented that "TNT was fully operational following the cyber attack" and that the "*aggressive profit improvement plans were 'confidently' on track.*"  Given the unexpected cut, the Barclay Equity Research analyst indicated that perhaps he would be "*less trusting of management commentary going forward.*"

- 15 -

49.     On the news of the negative developments, the price of FedEx stock declined precipitously by $22.50 per share, or 12.2%.  FedEx stock closed at $162.51 per share on December 19, 2018.

## DEFENDANTS' DUTY TO DISCLOSE

50.     Defendants have a duty to not "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10-b-5.

51.     In addition, pursuant to Item 303 of SEC Regulation S-K [17 C.F.R. §229.303], an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations.  Such disclosures are required to be made by an issuer in its SEC Form 10-K and 10-Q filings.

52.     Throughout the Class Period, Defendants knew of adverse trends and/or uncertainties impacting the FedEx Express/TNT segment that were likely to have a material impact on FedEx's business.  Specifically, Defendants were aware that TNT's operations were effectively disabled in the wake of NotPetya, which caused and would continue to cause a material reduction in TNT's high-margin customers, revenue, and growth.  Further, Defendants were aware that these adverse trends and/or uncertainties were likely to have a material effect on the Company's financial condition.  Relatedly, Defendants knew of adverse trends and/or uncertainties relating to the increased costs to remediate the impact of NotPetya and effectuate the integration of TNT.

- 16 -

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

**September 19-20, 2017 Press Release, 10-Q and Earnings Conference Call**

53.     The Class Period begins on September 19, 2017.  On that date, FedEx issued a press release reporting lower than expected financial results for the quarter ended August 30, 2017. According to the Company, FedEx's quarterly results were reduced by the "significant" impact of NotPetya, which lowered operating income by $300 million.[3]  Defendants assured the market, however, that although TNT was "significantly affected" by NotPetya, "[m]ost TNT Express services resumed during the quarter and substantially ***all TNT Express critical operational systems have been restored***."  Further, the Company reaffirmed the TNT Income Improvement Target stating, in pertinent part: "[w]e are confident of our prospects for long-term profitable growth, and we reaffirm our commitment to improve operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017."

54.     On September 19, 2017, the Company also held an earnings call with analysts and investors to discuss its financial results for the quarter ended August 30, 2017.  Defendants Graf, Bronczek, Cunningham, Subramaniam, Smith, and Carter participated in the call.

55.     During the earnings call, Defendant Bronczek discussed the recovery from NotPetya and underscored the Company's international growth stating, in pertinent part: "[i]n particular, international export package revenue for the segment [FedEx Express] grew 4% in the quarter after absorbing the impact of the cyber-attack.  And we have made significant progress on the recovery of the TNT business and IT systems."

---

[3]     The quarterly earnings press releases discussed herein were each filed by the Company with the SEC as an attachment to a Current Report on Form 8-K on the day of their issuance.

56.    Defendant Smith positively described the Company's growth prospects and reaffirmed FedEx's previously announced TNT Income Improvement Target stating, in pertinent part:

> We're confident of our prospects for long-term profitable growth, and we reaffirm our commitment to improve operating income at FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.

57.    Defendant Carter, Vice President of FedEx Information Services, provided additional details regarding the recovery from the NotPetya virus and assured investors that TNT systems were largely "restored" to a "near-normal state, with virtually all critical systems up and available." Defendant Carter stated, in pertinent part:

> Leveraging every other available resource, **we have restored the TNT systems to a near-normal state, with virtually all critical systems up and available**.

58.    In his remarks, Defendant Carter also asserted that the NotPetya outbreak would "expedite" rather than delay the integration of TNT into FedEx Express. Defendant Carter indicated:

> **Our business, operational and IT teams are converting adversity into advantage by revisiting our integration strategy. Integration efforts will be expedited.** This will enable us to reduce dependency on TNT legacy systems and will also broaden services and capabilities through our powerful combined networks.

59.    Defendant Bronczek also represented that "core shipping services are back in place," TNT had "returned to near-normal operations" and that a "significant portion of TNT customer base was retained." Defendant Bronczek commented, in pertinent part:

> Immediately following the attack, we implemented contingency plans that leveraged our global networks to minimize the impacts to customers, including transporting TNT Express packages within the FedEx Express network. **Key assets in the recovery have been the FedEx air network and the TNT European road network, which have allowed us to retain a significant portion of our TNT customer base.** These networks are the cornerstones for growing our business and will be leveraged as we return our volumes to expected levels.

- 18 -

\*       \*       \*

*I am very pleased to announce that our core shipping services are back in place with all TNT Express depots, hubs and operating facilities. . . .  Since then, we have returned to near-normal operations with the restoration of our pickup and delivery systems, carrier handheld technology and intraregional air networks.*

60.     Defendant Bronczek also assured analysts and investors that all critical TNT systems were fully restored to "precrisis levels," and that fixes to "customer-specific solutions" were expected to be finalized and restored to "business-as-usual operations" in time for peak shipping.  Defendant Bronczek represented, in pertinent part:

From a customer perspective, our teams are executing a detailed, thorough and customer-focused plan targeting at restoring customer volumes to our expected levels.  This plan includes leveraging our senior officer team on sales calls to instill confidence with customers so that we can fully meet their expectations.  ***Our service levels within Europe have been restored to precrisis levels.***  And in August, this past month of 2017, our service levels were actually above those a year ago in August of 2016, tremendous work by the operations team.

***With strong service levels and operations returning to near-normal capabilities, our focus now shifts to finalizing the restoration of certain key customer-specific solutions and their systems.  We expect these IT capabilities to be restored by the end of this month, enabling business-as-usual operations with full capabilities across all customer segments just in time for peak shipping.***

61.     On September 20, 2017, the Company filed its Quarterly Report on Form 10-Q, which presented its financial results for the quarter ended August 30, 2017.  In the 10-Q, FedEx reaffirmed the TNT Operating Income Improvement Target stating, in pertinent part:

We are targeting operating income improvement at the FedEx Express segment of $1.2 billion to $1.5 billion in 2020 from 2017 assuming moderate economic growth, current accounting and tax rules and continued recovery from the NotPetya cyberattack. This target includes TNT Express synergies as well as base business and other operational improvements across the global FedEx Express network.

62.     Further, the 10-Q positively described the Company's international growth and service mix and stated, in pertinent part:

International export average daily volumes increased 2% in the first quarter of 2018 due to increased international economy shipments partially offset by the decrease in volume due to the NotPetya cyberattack. International export package yields increased 2% in the first quarter of 2018 due to higher fuel surcharges and *favorable service mix*, partially offset by lower base rates.

63.     The statements referenced in ¶¶53, and 55-62 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

64.     Based on the numerous statements made by Defendants as detailed above, analysts expressed a positive view of the integration of TNT and the progress of the recovery from NotPetya.  For example, on September 19, 2017, a Stephens Inc.'s analyst report commented, in pertinent part:

> With 1Q results, *FDX [FedEx] removed a big unknown from the story* around the impact of the cyber-attack and we believe the decks have been cleared. Encouragingly, 1Q18 core results topped our prior expectations as we believe *underlying trends in the business remain strong*.

The Stephens Inc. report also found encouraging that the Company reiterated the TNT Income Improvement Target.

65.     Likewise, on September 19, 2017, BMO Capital Markets issued an analyst report entitled "Results Showcase Strong Fundamentals; Cyber Attack Impact Transient" confirming that Defendants' positive representations regarding the recovery from NotPetya had their intended

impact on the market.  The report noted that FedEx reaffirmed the TNT Income Improvement Target and concluded that it "*view[ed] the cyber attack issue as transient* and continue to see a path to significant growth in EPS in the coming three years and improvement in free cash flow and ROIC."  BMO Capital Markets also viewed FedEx's accelerated integration plan positively and commented that the Company's plans "may cause pull forward of integration costs planned for later in the plan but should also produce quicker benefits."

66.     On September 19, 2017, Barclays Equity Research issued an analyst report which also indicated that the market had accepted FedEx's positive message regarding its operations in the wake of the NotPetya virus.  The report concluded, in pertinent part: "[g]iven material challenges from network hacking at the recently acquired TNT European business, we take today's results at FedEx with a sigh of relief."

67.     On September 20, 2017, Stephens Inc.'s issued an analyst report entitled "F1Q18 Recap; FY18 Expectations Reset While LT Opportunity Remains Unchanged," which interpreted the Company's reiteration of the TNT Improvement Target as an indicator that the ramifications of the NotPetya virus were not especially significant.  Stephens Inc. commented, in pertinent part: "FDX does not expect any long-term market share loss stemming from lost revenue following the cyber-attack which we find encouraging and believe showcases the potential strength and attractiveness of the combined businesses to customers in the marketplace."  The report also echoed Defendants' assurances that "FDX acted quickly to get TNT's network back operational and as of *now all key systems and operations are back up and running* with the only remaining portion being some customer specific solutions."  Stephens Inc. concluded that "[o]ur sense is that while a significant amount of volume was directed away from FDX initially following the cyber-

attack, a majority of this volume was shifted back to FDX as the network operations were restored, which is encouraging and we believe implies there will not be an on-going market share loss."

68.     On the positive news of the Company's purportedly successful recovery from NotPetya, FedEx stock increased by $4.50 per share, or 2.1%, to close at $220.50 per share on September 20, 2017.

**December 19-20, 2017 Press Release, 10-Q and Earnings Conference Call**

69.     On December 19, 2017, FedEx issued a press release announcing its financial results for the quarter ended November 30, 2017.  FedEx also disclosed that it was projecting earnings of between $11.45 and $12.05 per share for fiscal 2018.  In explaining the Company's increased projection, Defendant Graf stated: "[w]e are increasing our fiscal 2018 forecast, due to enhanced revenue quality, solid demand trends ***and our success in restoring business impacted by this summer's cyberattack***."  The Company also reported that it was accelerating the integration of TNT in light of the NotPetya virus.  The Company stated, in pertinent part:

> The capital spending forecast for fiscal 2018 remains $5.9 billion. ***The company is accelerating the integration process and increasing investments to move TNT Express information technology and operational infrastructure to FedEx infrastructure due to the recent cyberattack at TNT Express***. As a result, the total TNT Express integration program expense through fiscal 2020 is now estimated to be approximately $1.4 billion, up from the previous $800 million estimate, of which $450 million is expected to be incurred in fiscal 2018.

70.     Defendant Graf also positively described the Company's growth and profitability of TNT, and reaffirmed the TNT Income Improvement Target representing, in pertinent part:

> ***We are increasing our fiscal 2018 forecast, due to enhanced revenue quality, solid demand trends and our success in restoring business impacted by this summer's cyberattack*** . . . [w]e expect to see improved results in our fiscal second half, and we reaffirm our commitment to improve our operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.

- 22 -

71.     On December 19, 2017, the Company also held an earnings call with analysts and investors to discuss its financial results for the quarter ended November 30, 2017.   Defendants Graf, Bronczek, Cunningham, Subramaniam, Smith, and Carter participated in the call.

72.     Defendant Smith opened the call by discussing TNT's purportedly successful recovery from NotPetya and reporting that the Company was "on target" to achieve the TNT Income Improvement Target.  Defendant Smith stated, in pertinent part:

> ***We're very proud of the progress the FedEx team has made in recovering from the effects of the cyberattack at TNT****. . . .*  Our plans remain on target to improve operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.  And our goal remains to increase earnings, margins, cash flows and returns, and we are confident we can do so.

73.     Defendant Graf explained that the Company was "accelerating portions of our TNT integration as a result of the cyberattack."   Defendant Graf also reaffirmed the TNT Express Operating Income Target stating, in pertinent part:

> We remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx segment in FY 2020 versus FY 2017, which includes TNT synergies as well as base business and other operational improvements across the entire global FedEx Express network.

74.     Defendant Bronczek represented that TNT's service levels and operations were "***back to normal***," that TNT's volume and cost efficiencies were improving and the "IT recovery process is complete."  Defendant Bronczek explained, in pertinent part:

> First, let me start off with FedEx Express.  They grew their revenues and profits, as Alan just mentioned, despite the impact of the TNT Express cyberattack.  The underlying fundamentals of the business remain very strong, with higher base rates and growth in international package and freight services.  Cost efficiencies are also improving.  For example, we continue to see higher aircraft fleet reliability, which increases our productivity.
>
> ***I'm also very happy to say that at TNT, we are seeing strong service levels, and operations are <u>back to normal</u> after the June cyberattack.  <u>The IT recovery process is complete</u>****.  We have improved our reliability, we have improved our

- 23 -

security, and we are also increasing our investments to expedite portions of the integration process.

75.    Later in the earnings call, Defendant Graf, in response to an analyst inquiry regarding TNT integration expenses, suggested that the NotPetya virus had accelerated rather than delayed the integration of TNT into FedEx Express.  Defendant Graf explained that "as a result of the cyberattack . . . we decided to move much more aggressively on hardening and turning to FedEx platforms . . ."  Along those lines, Defendant Carter added: "on the heels of the cyberattack, we've become much more aggressive about improving the security posture, reliability and *speeding up the integration* of the technology platforms."

76.    On December 20, 2017, the Company filed its Quarterly Report on Form 10-Q, which presented its financial results for the quarter ended November 30, 2017.  The Company again described the recovery from the NotPetya virus in positive terms claiming that services were "fully restored."  The Company further stated, in pertinent part:

> As previously announced, on June 27, 2017, the worldwide operations of TNT Express were significantly affected by the cyberattack known as NotPetya. Immediately following the attack, contingency plans were implemented to recover TNT Express operations and communications systems, and substantially all TNT Express services were fully restored during the first quarter of 2018.  ***All of TNT Express's critical operational systems have now been fully restored, critical business data has been recovered and shipping services and solutions are back in place***.  However, not all customers are shipping at pre-attack volume levels.

77.    The Company further positively described the growth of FedEx Express' international revenue and attributed this growth, in part, to "favorable service mix."  The Company claimed, in pertinent part, that: "International export package yields increased 4% in the second quarter and 3% in the first half of 2018 due to higher fuel surcharges, favorable exchange rates and ***favorable service mix***, partially offset by lower base rates."

78.     The statements referenced in ¶¶69-70 and 72-77 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

79.     Analysts again reacted to Defendants' positive update on the status of the TNT integration into FedEx Express.  For example, on December 19, 2017, an analyst at Wolfe Research noted that "FDX expects the TNT cyber-attack to have a ***minimal impact*** on EPS in 2H." Likewise, an analyst report issued by Oppenheimer Equity Research on December 20, 2017, commented that "FY18 adjusted EPS guidance increased from [$12.70 to $13.30] as ***FedEx's operating smoothly post its TNT cyberattack issues.***"

80.     In response to Defendants' positive characterization of FedEx's recovery from the NotPetya virus, FedEx stock price increased by $8.53 per share, or 3.5%, to close at $251.07 per share on December 20, 2017.

**March 20-21, 2018 Press Release, Quarterly Report and Earnings Conference Call**

81.     On March 20, 2018, FedEx issued a press release reporting its financial results for the quarter ended February 28, 2018.  On the same day, the Company held a conference call with analysts and investors to discuss these results.  Defendants Graf, Bronczek, Cunningham, Smith, Subramaniam and Carter participated in the call.

82.     During the earnings call, Defendant Smith reviewed the Company's financial performance and reiterated FedEx's $1.2 to $1.5 billion TNT Income Improvement Target.

83.     Later in the call, Defendant Bronczek provided a positive update on the TNT integration into FedEx Express stating that "at TNT, we are seeing strong service levels and the integration is accelerating." Defendant Bronczek stated, in pertinent part:

> I also want to provide an update on our TNT integration. As you know, this was the most significant acquisition in our company's history and dramatically improves our global capabilities and competitive posture. *I'm happy to say that at TNT, we are seeing strong service levels and the integration is accelerating.*

84.     Defendant Bronczek further stated that the Company expected to complete the integration one year earlier than previously anticipated (by fiscal 2019 as opposed to by fiscal 2020). Defendant Bronczek stated, in pertinent part:

> A key element of our acceleration plan was to enable the flow of packages between the legacy TNT and FedEx systems prior to full integration. This allows us to direct volumes to the highest service, but the lowest-cost networks. This capability is expected to be in place by May 31 of this year. We are accelerating the migration of the FedEx clearance operations and systems as well, retiring dozens of legacy TNT applications. Our investments in strengthening the IT environment continue on an accelerated pace. We have made significant investments to improve the TNT information security posture, and we'll continue to do so. *The integration of our global sales force, originally expected to be complete in fiscal 2020, is now scheduled to be complete 1 full year early.*

85.     As the call progressed, Defendant Smith specifically represented that the Company was "not seeing decline in Express traffic." Defendant Smith claimed, in pertinent part:

> And let me, again, give enormous thanks to our sales, our customer service, and particularly, our IT professionals that did the most unbelievable job of recovering from this attack, which the U.S. government now says was a government or a government-sanctioned attack on the Ukraine, and TNT was just a side victim of it.

> So the fourth quarter will, I think, begin to show these in a more granular fashion. *But it's -- we're not seeing [a] decline in Express traffic and the fourth quarter we will have recovered most of the NotPetya volume from TNT now.*

- 26 -

86.    Defendant Cunningham also represented that TNT's "network was fully restored and back to business as usual as of the end of 2017."  The content of Defendant Cunningham's remarks is set forth below:

Q4 is, being a seasonally strong quarter, and we've already told you what that's going to be.  *Our TNT network was fully restored and back to business as usual as of the end of 2017.*  The recovery of the business over the last 5 months has been remarkable. And given the value proposition of the TNT road networks, our Freight volumes have been strong and we are experiencing solid growth in these products.

87.    On March 21, 2018, the Company filed its Form 10-Q, which presented its financial results for the quarter ended February 28, 2018.  In the 10-Q, FedEx reaffirmed the Company's guidance stating that it was "targeting operating income improvement at the FedEx Express segment of $1.2 billion to $1.5 billion in 2020 from 2017."

88.    With respect to the recovery from NotPetya, the Company positively represented that "TNT Express's critical operational systems were fully restored."  The Company stated, in pertinent part:

Immediately following the attack, contingency plans were implemented to recover TNT Express operations and communication systems, and *substantially all TNT Express services were **fully restored** during the first quarter of 2018*.  As of the second quarter of 2018, of *all the TNT Express's critical operational systems were **fully restored***, critical business data was recovered and shipping services and solutions were back in place.

89.    The statements referenced in ¶¶82-88 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements

about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

**June 19, 2018 Press Release, Full Year and Quarterly Report and Earnings Conference Call**

90.     On June 19, 2018, FedEx released its fourth quarter and fiscal 2018 results for the period ended May 31, 2018.  The Company reported higher-than-expected TNT integration expenses of $136 million, including restructuring charges ($110 million of which were incurred within the FedEx Express segment) and $477 million in integration expenses for fiscal 2018 ($380 million of which were incurred in the FedEx Express segment).

91.     On the same day, the Company held an earnings call with analysts and investors to discuss its results for the fourth quarter and full fiscal year.  Defendants Graf, Bronczek, Cunningham, Smith, Subramaniam, and Carter participated in the call.

92.     Defendant Smith's introductory remarks highlighted the Company's purportedly "solid revenue growth" and reaffirmed the TNT Income Improvement Target of growing operating income by $1.2 billion in fiscal 2017 to $1.5 billion in fiscal 2020.

93.     Likewise, Defendant Cunningham presented the Company's recovery from the NotPetya virus as successful.  The content of Defendant Cunningham's remarks is set forth below:

> You can see in the results that we experienced year-over-year double-digit revenue growth in our international package and Freight services this past quarter. While higher rates were certainly a major contributor, we're also seeing solid year-over-year growth in freight traffic, a piece of our product portfolio that expanded significantly through the addition of TNT. ***Again, the recovery of the business over the past several months has been remarkable***, and we certainly owe a major thanks to our sales, customer service and IT professionals who have done an outstanding job of recovering from this attack.

94.     For their part, Defendants Smith and Graf further discussed the increased integration expenses.  The content of their comments is set forth below:

**Frederick W. Smith FedEx Corporation - Founder, Executive Chairman & CEO**

So Alan just mentioned that integration costs will be higher than initially expected. You're saying higher than the $1.4 billion guidance from last year. How much? [ ] Alan?

**Alan B. Graf FedEx Corporation - Executive VP & CFO**

***I'd say right now, based on what we're seeing, it's more like $1.5 billion, $100 million more.*** If we find additional opportunities, we'll keep you posted on that. But those are opportunistic as opposed to it's costing us more than we thought.

95.     The statements referenced in ¶¶90 and 92-94 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

96.     Although Defendants positively described the state of the Company's recovery from NotPetya and the Company's ability to meet the TNT Operating Income Target, on the news of the increased TNT integration expenses, FedEx stock declined by $6.96, or 2.7%, to close at $251.43 on June 20, 2018.

**FedEx's Annual Report for Fiscal Year End 2018**

97.     On July 16, 2018, the Company filed its Annual Report on Form 10-K, which presented its financial results for the year-ended May 31, 2018 (the "2018 Annual Report").   In the 2018 Annual Report, the Company represented that the integration of TNT into FedEx Express

- 29 -

was proceeding at a faster pace than initially planned.  The Company claimed that "the integration was accelerated in light of the June 2017 cyberattack at TNT Express, and we have made additional investments to move TNT Express information technology, operations and commercial infrastructure to FedEx platforms."

98.     In the 2018 Annual Report, the Company also addressed the impact of NotPetya and reiterated that "substantially all TNT Express services were fully restored during the first quarter of 2018."  The Company stated, in pertinent part:

> On June 27, 2017, the worldwide operations of TNT Express were significantly affected by the cyberattack known as NotPetya.  Immediately following the attack, contingency plans were implemented to recover TNT Express operations and communications systems, and ***substantially all TNT Express services were fully restored during the first quarter of 2018.  As of the second quarter of 2018, all of TNT Express's critical operational systems were fully restored, critical business data was recovered and shipping services and solutions were back in place***.  Our results for 2018 were negatively impacted by the NotPetya cyberattack by an estimated $400 million ($1.19 per diluted share) during the first half of the year, primarily from loss of revenue due to decreased shipments in the TNT Express network, as well as incremental costs to restore information-technology systems.

99.     The Company further represented that it would meet the TNT Income Improvement Target stating, in pertinent part: "we are targeting operating income improvement at the FedEx Express group of $1.2 billion to $1.5 billion in 2020 from 2017, assuming moderate growth and current accounting rules."

100.    The statements referenced in ¶¶97-99 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and

(iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

**September 17, 2018 Press Release, Quarterly Report and Earnings Conference Call**

101.   On September 17, 2018, FedEx issued a press release reporting results for the quarter ended August 30, 2018.   Commenting on the Company's quarterly results, Defendant Smith stated that the Company was "very optimistic about our prospects for profitable growth and [we] remain confident we will reach our goal to improve FedEx Express operating income by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017."

102.   On September 17, 2018, the Company also filed its Quarterly Report on Form 10-Q, which presented its financial results for the quarter ended August 30, 2018.   In the 10-Q, the Company disclosed that FedEx had incurred "integration expenses totaling $121 million ($98 million, net of tax, or $0.36 per diluted share) in the first quarter of 2019, a $9 million increase from the first quarter of 2018."   Further, the Company disclosed that during the quarter, the FedEx Express segment was responsible for approximately $102 million of TNT integration expenses, a $14 million increase from the first quarter of fiscal 2018.   The Company also disclosed that "changes in service mix following the NotPetya cyberattack negatively impacted operating margins in the first quarter of 2019."

103.   On the same day, September 17, 2018, the Company held an earnings call with analysts and investors to discuss its financial results for the quarter ended August 30, 2018. Defendants Graf, Bronczek, Subramaniam, Smith, and Carter participated in the call.

104.   Defendant Smith's introductory comments described the Company's growth in a positive light and reaffirmed the TNT Income Improvement Target representing, in pertinent part:

"[w]e're very optimistic about our prospects for profitable growth and remain confident we'll reach our goal to improve FedEx Express operating income by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017."

105.    During the question/answer portion of the earnings call, Defendant Subramaniam addressed an analyst's question regarding "opportunities for share gains with the combined TNT-FedEx network."   In his answer, Defendant Subramaniam, who then served as the Company's Chief Marketing and Communications Officer and Executive Vice President, claimed that FedEx was "progressing well on the integration, and customers are already beginning to see this value."  Defendant Subramaniam explained, in pertinent part:

> And that opens up large international market segments which we are now extremely well positioned to gain significant share. And the good news here is we are well on our way to unlocking the value, and we are pleased with the progress. As Dave talked about, *we are progressing well on the integration, and customers are already beginning to see this value*. And all I can say here is that the sales and marketing teams all over the world are very excited to [] see the progress and really provide new value for our customers.

106.    In comments during the same call, Defendant Graf acknowledged that TNT was experiencing a less profitable service mix.  Defendant Graf stated, in pertinent part:

> While strong international volume growth reflects our recovery from the TNT cyberattack last year, *the impact of operating income was partially offset by shifting service mix* and the timing of variable compensation, aircraft maintenance and merit increases. As we continue to grow package volume, our revenue and overall operating income will benefit. We remain committed to achieving the $1.2 billion to $1.5 billion in operating income improvement at Express.

107.    The statements referenced in ¶¶101-102 and 104-106 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate

- 32 -

internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

108.   On the news of the Company's increased integration costs and its shifting service mix, FedEx stock fell by $14.15, or 5.5%, to close at $241.58 on September 18, 2018.

**September 24, 2018 Annual Shareholders Meeting**

109.   On September 24, 2018, FedEx held its Annual Shareholders Meeting.  During the meeting, Defendant Smith represented that the Company was "on track" to achieve the TNT Income Improvement Target.  Defendant Smith made additional positive statements regarding revenue growth at FedEx Express, as well as the progress of the TNT integration, stating, in pertinent part:

> FedEx Express posted solid revenue growth and is on track to reach our target, $1.2 billion to $1.5 billion improvements in operating income in fiscal 2020 versus 2017.
>
> *          *          *
>
> We can now report **we're seeing strong TNT service levels**, and our integration of TNT is progressing rapidly. Great thanks to the teams that worked around the clock and around the world to restore and better secure both the technology systems and our customers' trust in us. **We're emerging from this huge challenge stronger than ever.**

110.   The statement referenced in ¶109 above was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and

(iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

**November 7, 2018 Robert Baird Industrial Conference**

111.    On November 7, 2018, Defendant Lenz gave a presentation on behalf of FedEx at the Robert W. Baird Industrial Conference.   In discussing the Company's growth prospects, Defendant Lenz continued to affirm the TNT Income Improvement Target for 2020 and discussed the importance of the TNT integration in meeting that target.   Defendant Lenz explained, in pertinent part:

> And as we get into the home stretch of completing the TNT integration here by May of 2020, that's going to drive tremendous value in terms of what we can leverage there. And that's a key element of the target we've got out there of improving our Express business' operating income by $1.2 billion to $1.5 billion in our fiscal year '20 versus the fiscal year '17 baseline.

112.    As the conference progressed, Defendant Lenz emphasized that TNT had been able to retain its customers despite the NotPetya outbreak.  As Defendant Lenz stated:

> Yes, the -- one of the aspects of what gives us confidence in our value of the capabilities that the TNT assets will provide, and in particular, when you put them together with our unmatched global network is, so 5, 6 years ago, UPS tried to acquire TNT, and that was ultimately prohibited by regulatory authorities. Well, of course, we were in trying to take their customers along the way there, amidst the disruption and uncertainty.  And we couldn't take TNT's customers because they were loyal, and the value of what TNT was able to do was significant.  ***Well, similarly now we're experiencing that well -- as well, that despite the cyberattack, the customers stuck with us.  So that's what gives us the confidence and basis that look, this is going to drive even value beyond the immediate of what we're targeting here FY '20.***

113.    The statements referenced in ¶¶111-112 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) TNT's international service was

largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (iv) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

**December 7, 2018 Announcement of Defendant Cunningham's Departure**

114.    On December 7, 2018, FedEx disclosed that Defendant Cunningham, CEO of FedEx Express, had entered into a separation agreement with the Company on December 3, 2018 and would depart from the Company by December 31, 2018.  The Company announced that Defendant Cunningham would be replaced by Defendant Subramaniam as CEO of FedEx Express.

115.    Analysts immediately inferred that Defendant Cunningham's unexpected "retirement" was the result of the poor performance of the FedEx Express segment.  Along those lines, on December 11, 2018, Stephens Inc. issued a report discussing Defendant Cunningham's departure noting that "while skepticism has been growing around FDX's ability to hit its profit goals at Express in FY20, many investors are taking this leadership change to mean that FDX will lower its FY19 guidance and long-term Express profit outlook next week."  The report explained, in pertinent part:

> With the rubber meeting the road over the next six months from an integration stand-point at TNT, it may have become clearer to FDX management that its F2H19 guidance (which anticipated a sharp improvement in TNT synergies) and FY20 targets were going to be difficult to achieve.  *As a result, we now expect FDX to revise its Express profit improvement timeline next week when it releases F2Q results and adjust its FY19 adj. EPS guidance modestly lower*.  We do not expect the total amount of EBIT growth ($1.2 bil. - $1.5 bil.) to change, but we would anticipate FDX now expecting this level of improvement by FY21, or 12 months later than originally expected.

- 35 -

116.    Echoing these concerns, on December 12, 2018, Credit Suisse Equities issued an

analyst report questioning the Company's ability to meet the TNT Income Improvement Target.

The report commented, in pertinent part:

> With this as the backdrop, Friday's news that Express CEO Cunningham is out - in
> the middle of peak season nonetheless – was particularly unsettling. One can only
> think this is bad news; otherwise the company would have announced it during its
> earnings release on Dec 18. Or, if something more unsavory in nature, surely an 8-
> k would have been disseminated (right?). With no further information from the
> company, ***the logical conclusion by the market appears to be: kiss the $1.2B-
> $1.5B target (and $20 of EPS in '20) good-bye.***

117.    On the news of Defendant Cunningham's unexpected departure, FedEx stock

dropped by $13.31 or 6.1% from an opening price of $214.70 to a closing price of $201.39 on

December 7, 2018.

**December 18, 2018 Press Release, Quarterly Report and Earnings Conference Call**

118.    On December 18, 2018, after the close of trading, FedEx reported weak results for

the quarter ended November 30, 2018.  Specifically, FedEx reported that "operating results [at

FedEx Express] were negatively impacted during the quarter by lower-than expected international

revenue, especially in Europe and Asia, higher growth in lower-yielding services across the

network and the timing of aircraft maintenance."  Further, FedEx  finally admitted that it would

not meet the TNT Express Income Improvement Target by 2020.  FedEx explained, in pertinent

part:

> Management still expects to realize the benefits from TNT Express that were
> anticipated when the company was acquired. However, lower-than-expected
> express package volume due to European economic weakness that accelerated
> during the quarter and is expected to continue, and a ***change in service mix
> following the June 2017 cyberattack on TNT Express, will delay the anticipated
> realization of these benefits. As a result, the target to increase FedEx Express
> operating income by $1.2 billion to $1.5 billion over fiscal 2017 results will not
> be achieved in fiscal 2020.***

119.    On December 18, 2018, FedEx also held an earnings call with analysts and investors to discuss the Company's financial results for the quarter ended November 30, 2018. Defendants Graf, Bronczek, Smith, and Subramaniam participated on the call.

120.    Defendant Smith opened the call by reiterating that the Company would not achieve the TNT Income Improvement Target by 2020.  Discussing FedEx's weak results for the quarter, Defendant Bronczek attributed the poor results to lower package volumes and less parcel volume and more freight.  Defendant Bronczek explained that "[f]ollowing TNT's recovery from the cyberattack, we have seen an accelerated shift of our production mix to more freight than parcel, putting pressure on our system and of course, our costs."

121.    Defendant Graf also belatedly admitted that the integration of TNT into FedEx Express would not be completed by 2020 or earlier, as previously indicated.  Defendant Graf explained, in pertinent part:

> We continue to expect the aggregate integration program expense, including restructuring charges at TNT Express through 2020 to be approximately $1.5 billion and expect to incur approximately $450 million of these costs during 2019.  However, based on the timing of the completion of integration activities, including any international voluntary employee buyout program, *we may incur additional integration cost after 2020*.

Defendant Graf informed investors that the integration of TNT into FedEx Express was slowed rather than expedited by NotPetya and that the TNT Income Improvement Target was not achievable by 2020.  Defendant Graf stated, in pertinent part:

> The timing and amount of integration expenses and capital investments in any future period may change as *we continue to execute the integration of TNT*.  We expect to realize the benefits of the TNT acquisition that were anticipated when the company was acquired, *although at a more moderate pace* caused by reductions in base business levels due to increasing economic weakness during the second quarter and *a change in service mix following the NotPetya cyberattack*.  As a result, we now expect *the operating profit improvement goal of $1.2 billion to $1.5 billion* for Express over fiscal year '17 *will not be realized in FY '20*.

- 37 -

122.    Along those lines, Defendant Bronczek also described the challenges to integrating

TNT into FedEx Express and made clear that the long-touted benefits of the integration would be

delayed.  Defendant Bronczek stated, in pertinent part:

> *Our businesses are heavily dependent on IT solutions for the integration*.  For
> example, these require harmonizations of our services and then corresponding
> redesign of our multiple customer platforms, including, of course, fedex.com and
> our customer automation tools.  *Our original integration planning contemplated
> the long lead time required to build these IT solutions* and accordingly, the
> benefits of these efforts would occur towards the end of the integration.  While
> *changes in our revenue mix and softness in volume have impacted the timing* of
> the realization of the financial benefits, we remain confident in the long-term value
> of the combination and synergies to be realized through a single pickup and delivery
> network, single air and road network, back-office efficiencies, and of course,
> mainly our revenue growth.

123.    In response to an analyst's question related to the Company's negative service mix,

Defendant Bronczek finally disclosed that TNT's high margin parcel business had suffered in the

wake of NotPetya.  Defendant Bronczek acknowledged, in pertinent part:

> There is no question about the fact that I mentioned -- made in my comments that
> one of the things that TNT really did very well, and we continue to do well with
> TNT inside FedEx, is *the freight product and their specialty freight product*.  So
> *after the cyberattack that product came booming back* because no one is better
> than we are in that product.  So *that product, of course, has a little bit different
> mix, a little bit different cost structure to it*.  We're focusing on our parcels as well.
> As you pointed out, the questioner pointed out, our volumes are growing, they're
> just not growing as fast as what we would like them to grow.  And with the economy
> being depressed somewhat, we're still dealing with that.  But that's the point, we're
> still focused on parcel and freight and we're still growing.

124.    On the news of the Company's reduced international revenue, the delayed progress

of the integration and FedEx's inability to meet the TNT Operating Income Target, FedEx stock

price dropped by $22.50 per share, or 12.2%, to close at $162.51 per share on December 19, 2018.

125.    In response to these disclosures, analysts drastically reduced their price targets for

FedEx and voiced skepticism about the Company's ability to successfully integrate TNT.  For

example, on December 19, 2018, Barclays Equity Research issued a report entitled "The TNT

Mirage," which lowered FedEx's price target and expressed frustration over the "the rapid change in management guidance regarding the supposed potential of TNT." The Barclays Equity Research analyst further stated, in pertinent part:

> Despite nearly a year of lagging Express segment results following the complete operational shutdown of TNT from a computer virus (missed our margin expectations 4 out of the last 5 quarters), ***FedEx management until today clearly articulated to the investor community that: 1) TNT was fully operational following the cyber attack; and 2) aggressive profit improvement plans were "confidently" on track*** . . . . While we think Express results following the cyberattack clearly indicated mix recovery challenges in the TNT business, management chose to maintain guidance until today's cut. ***Perhaps this analyst will be less trusting of management commentary going forward.***

126.    In that vein, Deutsche Bank Research issued a December 18, 2018 report entitled "F2Q first look . . . bad," which criticized Defendants' lack of transparency with regard to TNT commenting, in pertinent part: "The commentary around Europe is not very satisfying, as it likely reflects significant **underperformance at TNT, on which Mgmt. is still not offering necessary details** (we believe TNT volumes are more heavily skewed towards larger, palletized freight, as opposed to parcel, making the read-through to other global package-delivery companies less meaningful, in our view)."

## RELEVANT POST-CLASS PERIOD DISCLOSURES

127.    The adverse but undisclosed business conditions that were caused by the NotPetya virus continued to impact FedEx's operations in the year following the Class Period.  On February 14, 2019, shortly after Defendants' disclosure that the Company would not meet the TNT Income Improvement Target and that TNT/FedEx Express was floundering, FedEx announced that the Company's management was again being reshuffled and that Defendant Bronczek was resigning from his role as President and COO of the Company, effective February 28, 2019.  The Company reported that Defendant Subramaniam would replace Defendant Bronczek in this role.

128.    News outlets viewed the abruptness of Defendant Bronczek's departure as suspicious.  For instance, a Bloomberg report issued on February 14, 2019 entitled "FedEx Jolts Wall Street With Surprise Exit of CEO's Deputy" quoted Satish Jindel of SJ Consulting Group as stating: "It just doesn't seem normal.  You don't appoint someone to the board and then in two weeks you say he's retiring."   The article also noted the recent abrupt departure of Defendant Cunningham observing that: "Both Bronczek and Cunningham were involved in meshing the operations, an effort that was disrupted by a cyberattack at TNT that spurred customers to leave."

129.    FedEx continued to report bad news.  On March 19, 2019, the Company reported disappointing earnings and revenue for the quarter ended February 28, 2019 and reduced FedEx's full-year guidance for its fiscal 2019.  Further, the Company revealed that the TNT integration costs were now expected to ***exceed*** the previously projected $1.5 billion.  On that news, the price of FedEx stock dropped by $6.75, or 4.2%, from an opening price of $183.82 on March 19, 2019 to a closing price of $175.07 on March 20, 2019.

130.    The commentary of the Company's senior executives during the March 19, 2019 earnings call to discuss the results for the quarter ended February 28, 2019 underscored the problems impacting TNT throughout the Class Period – problems that were known by Defendants but concealed from investors.  During the call, Defendant Graf made clear, with regard to the TNT integration, that the Company was only ***now*** seeing improved service levels as well as the return of legacy customers at TNT.  Defendant Graf stated, in pertinent part:

> I think you heard Raj and Rob talk about what's happening with TNT integration, ***where we're now finally getting service improvements at lower cost***. We're speeding up the network by a day on 40% of traffic. ***Customers are coming back.*** So it's just a matter of time. We have another year of integration to go, but we definitely need a little bit better economic environment in Europe to get the full benefits of TNT. We will get the full financial benefits of TNT. I have no doubt. It's just a matter of when.

- 40 -

131.    Similarly, in response to an analyst's question about whether FedEx had been able to "regain share in the European parcel market following the restoration of TNT service levels in early January," Defendant Subramaniam explained that the high margin parcel business was in the process of improving.  Defendant Subramaniam stated, in pertinent part:

> The short answer to that question is yes. We are seeing -- we are -- higher year-over-year growths every month. We're -- from the last 3 months, we've seen accelerating year-over-year increase in revenue and volume in the European parcel business.  ***And as we have stabilized and improving now our service levels, it's not a surprise.***  Despite the economic headwinds in Europe, we now have a terrific value proposition.  As I said in the opening remarks, we're releasing new value to our customers.  We improved our service and the customers are responding.  ***So we are seeing increased revenue, increased volume in our core parcel business.***

132.    Analysts continued to react negatively to the Company's announcement of disappointing earnings, stalled progress of the NotPetya recovery, and delays in the integration of TNT into FedEx Express.  For example, on March 19, 2019, an analyst report issued by Barclay's Equities lowered the full year 2020 earnings estimate for the Company by 11% citing, in part, "limited visibility on Express margin recovery, [and] a longer integration of TNT."  Likewise, an analyst at Credit Suisse commented on March 20, 2019 that the Company was "Not Out of the Woods Yet on Express/TNT," and that "[g]iven prior execution challenges, ***this will continue to be a 'show me' story rather than a 'tell me' story***."  Finally, JP Morgan reduced its FedEx price target for the ***second*** time in three months, attributing the cut to rapid management turnover and the "***failed TNT integration.***"

133.    The news media also reacted to FedEx's admissions regarding the lasting damage of the NotPetya virus on the Company and the TNT integration.  On March 25, 2019, the Memphis Commercial Appeal published an article entitled "FedEx stresses patience, touts returns in Europe as analysts eye costly acquisition," which quoted Amit Mehrotra, a senior research analyst at Deutsche Bank, who observed that "***(The cyberattack) brought down every single computer***

- 41 -

*globally for TNT . . .   So they were on path to grow profits by $1.2 to $1.5 billion over three*

*years.  That's going to be more like $150 million now as a result of the cyberattack*."

134.     Likewise, Bloomberg Businessweek's report on March 25, 2019 entitled "FedEx's

$4.4 Billion Acquisition of TNT has Been a Dud" concluded that "FedEx Corp.'s European road

trip has turned into a yearslong headache."   The article further described the Company's

December 18, 2018 disclosures and noted that FedEx "was forced to acknowledge that

downtrodden demand in Europe and aftershocks from a 2017 cyberattack on TNT's network would

delay the expected benefits of the deal and cause it to miss profit growth goals for the Express

segment."

135.     On June 25, 2019, FedEx reported weak results for the quarter ended May 31, 2019,

which continued to show the lingering effects of NotPetya.  FedEx stated that these results were

due, in part, to the "continued mix shift to lower-yielding services" at the FedEx Express segment

as a result of the virus.  The Company also informed the market that the integration of TNT would

be more costly than anticipated stating the integration expenses through fiscal 2021 would total an

estimated $1.7 billion.

136.     On December 17, 2019, FedEx announced reduced operating results for the quarter

ended November 30, 2019 and lowered its guidance and projections for fiscal 2020.  Defendant

Graf explained: "[o]ur revised guidance reflects lower-than-expected revenue at each of our

transportation segments and higher-than-expected expenses driven by continued mix shift to

residential delivery services."  In the Company's quarterly report that followed this announcement,

it also reported that it expected the total integration expenses to be $1.7 billion, 112.5% higher

than the Company's estimate of $800 million provided in September 2017.  On the news of the

Company's continued poor performance, the price of FedEx stock dropped by $16.37, or 10%,

from a closing price of $163.23 on December 17, 2019, to a closing price of $146.86 on December 18, 2019.

137.    Analysts and news outlets continued to note the Company's continued negative results.  On December 17, 2019, Sonar Research published an article entitled "Dawn Recedes still further in FedEx's 'night,'" which quoted Deutsche Bank analyst Amit Mehrotra's statement that the recent quarterly results were "breathtakingly bad."  The article further took note of Defendant Graf's remarks stating, in pertinent part: "Alan B. Graf Jr., FedEx's longtime CFO, called the results 'horrific,' a word CFOs rarely utter on quarterly analyst calls."  In discussing the challenges that FedEx faces, the article noted that "***FedEx continues to work through its perpetually challenging integration of European carrier TNT Express . . .  Full physical integration won't occur until fiscal 2022***."

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

138.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding FedEx, their control over, and/or receipt and/or modification of FedEx's materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

139.    Because of their positions within FedEx, the Individual Defendants had access to non-public information about the Company's business, operations, operational trends, financial

statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

140.    The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

141.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed herein and are, therefore, primarily liable for the representations contained therein.

142.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent activity alleged herein could not have been perpetrated during the Class Period without the

knowledge and complicity or, at least, the reckless disregard of the officers at the highest levels of the Company, including the Individual Defendants.

143.    The Individual Defendants were all executive officers of FedEx and, at minimum, would have been aware of key facts related to the Company's operations.

144.    The fraud alleged herein relates to the core business and operations of FedEx such that knowledge may be imputed to Defendants.   The FedEx Express segment generated the majority of the Company's total revenue.   For the fiscal year ended May 31, 2019, FedEx Express was responsible for 54% of the Company's total revenue.   FedEx Express is the business segment most pertinent to this lawsuit.

145.    As explained herein, the operations of TNT, which was the largest acquisition in the Company's history, were a central focus of FedEx and the Individual Defendants throughout the Class Period.   Indeed, in every annual report filed with the SEC on Form 10-K during the Class Period, FedEx stated that the TNT integration was the "***primary area of focus***" for the Company. The growth and profitability of TNT was so critical to FedEx that Defendants issued a specific guidance metric – the TNT Income Improvement Target – to assess the expected benefits of the TNT acquisition.

146.    The Individual Defendants' knowledge of the substantial delays associated with the TNT integration and the severe and continuing impact the NotPetya virus had on the Company's operations is further supported by Defendants' pre-acquisition diligence regarding the state of the TNT business.   On March 21, 2017, during the Company's earnings call for the quarter ended February 28, 2017, Defendant Graf acknowledged TNT's weakness "in IT and in operations," and stated that these weaknesses would require investment on the part of the Company.   Defendant Graf stated, in pertinent part:

> In the nine months following close, we learned a great deal more about the TNT business. ***The business we acquired was severely under-invested, particularly in IT and in operations, which is driving additional investments***. Furthermore, prior to the acquisition, TNT announced a restructuring program with numerous initiatives to improve the business.

In light of Defendants' awareness of the weakness in the IT structure of TNT's legacy systems, Defendants knew that integrating TNT's systems into FedEx Express's purportedly modern operating systems would be difficult and lacked a basis for their positive statements regarding the expedited pace of the integration of TNT into FedEx Express.

147.   FedEx's senior management, including the Individual Defendants, were in regular communication with TNT executives in Europe and took an active role in the integration of TNT into FedEx Express and the recovery efforts.  According to the CW, FedEx Senior Vice Presidents and Vice Presidents traveled to Amsterdam to participate in briefings with TNT on IT issues.  The CW also reported that FedEx provided experts and flew in Microsoft employees to assist in restoring TNT's impacted platforms in the wake of NotPetya.

## CLASS ACTION ALLEGATIONS

148.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of FedEx common stock during the Class Period (the "Class"), excluding Defendants and FedEx officers and directors at all relevant times, as well as their respective family members, legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

149.   The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  FedEx common stock was actively traded on the NYSE.  Record owners and other members of the Class may be identified from records maintained by FedEx or its transfer agent and may be notified of the pendency of this action by mail, using the form of

notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to Lead Plaintiff, FedEx reported more than 260,910,309 million shares outstanding as of September 13, 2019.

150.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

151.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

152.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether Defendants acts as alleged herein violated the federal securities laws;

- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FedEx;

- Whether the price of FedEx stock was artificially inflated during the Class Period; and

- To what extent Class members have sustained damages and the proper measure of damages.

153.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

154.    During the Class Period, the market for FedEx stock was an efficient market for the following reasons, among others:

(a)    FedEx common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, FedEx filed periodic public reports with the SEC and the NYSE;

(c)    FedEx regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    FedEx was generally followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

155.    As a result of the foregoing, the market for FedEx stock promptly digested current information regarding FedEx from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers of FedEx common stock during the Class Period suffered similar injury through their purchase of FedEx common stock at artificially inflated prices and a presumption of reliance applies.

156.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

- 48 -

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

157.   As detailed herein, Defendants' false and misleading statements and omissions maintained artificial inflation in the price of FedEx common stock by misrepresenting and concealing the relevant truth about the impact of the NotPetya computer virus on the operations of TNT and FedEx, as well as the resulting substantial delay to the integration of TNT.  Lead Plaintiff, and other investors, purchased FedEx common stock at these inflated prices and suffered damage when the price of FedEx common stock declined upon the revelations of the relevant truth.

158.   As a result of their purchases of FedEx common stock during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused FedEx common stock to trade at artificially inflated levels throughout the Class Period.

159.   By concealing from investors the adverse facts detailed herein, Defendants presented a materially misleading picture of FedEx's business – specifically, the progress of the integration of TNT, and the impact of NotPetya.  When the truth about the Company was revealed to the market, the price of FedEx common stock substantially declined.  Such share price declines removed all or part of the inflation from the price of FedEx common stock, causing substantial economic losses to investors who had purchased FedEx common stock during the Class Period.

160.   The declines in the price of FedEx common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in FedEx common stock negate any inference that the loss suffered by Lead Plaintiff and other Class

members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' conduct as detailed herein.

161.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' scheme to artificially inflate the price of FedEx common stock and the subsequent significant declines in the value of FedEx common stock when Defendants' prior misrepresentations and the relevant truth were revealed.

162.    In sum, as detailed above, the rapid share price declines described herein served to remove artificial inflation from the price of FedEx common stock, and were direct and foreseeable consequences of the revelation of the relevant truth concealed by Defendants.

## NO SAFE HARBOR

163.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew or had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of FedEx who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### Against All Defendants

164.    Lead Plaintiff incorporates all paragraphs above by reference.

165.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

166.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FedEx stock during the Class Period.

167.    In addition to the duties of full disclosure imposed on the Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to FedEx's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the impact that the NotPetya virus was having and would continue to have on the Company's operations and profitability, so that the market price of the Company's

stock would be based on truthful, complete, and accurate information.  *See* SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

168.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their respective purchases of FedEx stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for FedEx stock and experienced losses when the artificial inflation was released from FedEx stock as a result of the revelations and price declines detailed herein.  Lead Plaintiff and the Class would not have purchased FedEx stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

169.    By virtue of the foregoing, Defendants have each violated §10(b) of the Exchange Act, and Rule 10(b)-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the §20(a) Defendants

170.    Lead Plaintiff incorporates all paragraphs above by reference.

171.    The §20(a) Defendants acted as controlling persons of FedEx within the meaning of §20(a) of the Exchange Act:

(a)    By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the §20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are materially false and misleading;

(b)     The §20(a) Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c)     Because of their positions as senior officers of the Company respectively, the §20(a) Defendants directly participated in the Company's management and were directly involved in FedEx's day-to-day operations. The §20(a) Defendants also controlled the contents of FedEx's periodic SEC reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public. The §20(a) Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

172.     By reason of such conduct, the §20(a) Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff prays for judgement as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Lead Plaintiff as class representative and Lead Plaintiff's counsel as Lead Counsel;

B.      Declaring that Defendants are liable pursuant to the Exchange Act;

C.      Awarding Lead Plaintiff and other members of the Class damages together with interest thereon;

D.      Awarding Lead Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements; and

E.      Awarding Lead Plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

DATED:  January 13, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS

*/s/ Chad Johnson*
CHAD JOHNSON

125 Park Avenue, 25th Floor
New York, NY  10017
Telephone:  212/791-0567
619/231-7423 (fax)
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com

- 54 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
AVITAL O. MALINA
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
amalina@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK W. DANIELS*
NATHAN W. BEAR*
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
patrickd@rgrdlaw.com
nbear@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

---

*Pro hac vice* application to be filed.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 13, 2020, I authorized a true

and correct copy of the foregoing document to be electronically filed with the Clerk of the

Court using the CM/ECF system, which will send notification of such public filing to all

counsel registered to receive such notice.

_____
                    */s/ Chad Johnson*
                    CHAD JOHNSON

                    ROBBINS GELLER RUDMAN
                      & DOWD LLP
                    125 Park Avenue, 25th Floor
                    New York, NY 10017
                    Telephone: 212/791-0567
                    619/231-7423 (fax)
                    chadj@rgrdlaw.com