UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE FEDEX CORP. SECURITIES      :     Case No.: 1:19-cv-05990 (RA)
LITIGATION                        :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Jay B. Kasner
Susan L. Saltzstein
William J. O'Brien
Andrew R. Beatty
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
jay.kasner@skadden.com
susan.saltzstein@skadden.com
william.obrien@skadden.com
andrew.beatty@skadden.com

*Attorneys for FedEx Corporation
  and the Individual Defendants*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS .............................................................................................................6

    A.    Parties to the Litigation..............................................................................6

    B.    FedEx Strengthens Its Global Delivery Network by Acquiring TNT .....................7

    C.    NotPetya, a Cyberattack Orchestrated by Russian State Actors, Disrupts the Businesses of TNT and Other Companies Throughout Europe.........................8

    D.    Throughout the Class Period, FedEx Updates Investors About Its Recovery Efforts and the Impact on Express, Including the TNT Integration (Q1 FY18 – Q2 FY18) ................................................................9

    E.    FedEx Continues to Keep Investors Apprised of Ongoing Recovery and Integration Efforts (Q3 FY18 – Q1 FY19) ..............................................9

    F.    FedEx Revises Its Operating Income Improvement Target and Integration Plans...................................................................................10

    G.    Plaintiff Commences the Action..........................................................11

ARGUMENT................................................................................................................................12

I.    Plaintiff Fails to State a Claim Under Section 10(b) of the Exchange Act and SEC Rule 10b-5............................................................................................12

    A.    Plaintiff's Section 10(b) Claim Should be Dismissed for Failure to Plead an Actionable Misrepresentation or Omission.......................................12

        1.    Statements Concerning FedEx's Restoration of TNT Operations and Services Impacted by the Cyberattack ..................................13

        2.    Statements Concerning the Express Segment's Customer Retention Efforts and International Service Mix.......................................17

        3.    Statements Concerning FedEx's Integration of TNT ..............................20

        4.    Numerous Statements Are Protected Under the PSLRA Safe Harbor and Bespeaks Caution Doctrine.......................................22

        5.    Numerous Statements Are Non-Actionable Opinions.............................25

6.     Numerous Statements Are Non-Actionable Puffery.................................27

7.     There Was No Duty, Under Item 303 of Regulation S-K or Otherwise, to Disclose Any Purported Omissions....................................28

B.     Plaintiff's Section 10(b) Claim Should be Dismissed for Failure to Plead a Strong (or Plausible) Inference of Scienter.........................................................29

1.     No Attempt is Made by Plaintiff to Plead Motive ...................................30

2.     Plaintiff Fails to Plead Conscious Misbehavior or Recklessness ..............30

(a)     Allegations About Corporate Positions and Access Are Conclusory ...................................................................................30

(b)     The Confidential Witness Allegations Are Equally Vague ...........32

(c)     The "Core Operations" Theory Has No Application Here ............33

3.     The More Cogent and Compelling Inference is a Nonculpable One.........34

II.     Plaintiff Fails to State a Claim For Control Person Liability..............................................35

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ATSI Communications, Inc. v. Shaar Fund Ltd.*,
    493 F.3d 87 (2d Cir. 2007)......................................................................................6

*In re Australia & N.Z. Banking Group Ltd. Securities Litigation*,
    No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009).......................23

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *appeal filed*, No. 19-1132 (2d Cir. 2019).............25

*Bettis v. Aixtron*,
    No. 16 Civ. 00025 (CM), 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016)..........................23

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014).....................................................................................28

*In re CRM Holdings, Ltd. Securities Litigation*,
    No. 10 Civ. 975(RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012), *appeal filed*,
    No. 12-2370 (2d Cir. 2012)......................................................................................31

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................................................5, 29

*In re Express Scripts Holdings Co. Securities Litigation*,
    773 F. App'x 9 (2d Cir. 2019) ...............................................................................4, 16

*In re Fairway Group Holdings Corp. Securities Litigation*,
    No. 14 Civ. 0950 (LAK)(AJP), 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)................32

*In re Ferrellgas Partners, L.P., Securities Litigation*,
    No. 16 Civ. 7840 (RJS), 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764
    F. App'x 127 (2d Cir. 2019) ....................................................................................23

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen
    Laegernes Invest v. United Technologies Corp.*, 779 F. App'x 69
    (2d Cir. 2019)..............................................................................4, 26, 27, 30, 34

*Gagnon v. Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019)...................................................................31, 34

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).........................................................................31

*Holbrook v. Trivago N.V.*,
  No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019),
  *aff'd sub nom.*, *Shetty v. Trivago NV*, No. 19-0766, 2019 WL 6834250, at *3
  (2d Cir. 2019)..................................................................................................16, 34, 35

*In re Iconix Brand Group, Inc.*, No. 15 Civ. 4860 (PGG),
  2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ....................................................................4

*Intel Corp. Investment Policy Committee v. Sulyma*,
  No. 18-1116, 2020 WL 908881 (Feb. 26, 2020) .............................................................22

*International Association of Heat v. IBM,*
  *Corp.*, 205 F. Supp. 3d 527 (S.D.N.Y. 2016) .................................................................25

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)........................................................................................................12

*Lefkowitz v. Synacor, Inc*.,
  No. 18 Civ. 2979 (LGS), 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019), *appeal
  filed* No. 19-4232 (2d Cir. 2019) ..............................................................24, 26, 27

*In re Lihua International Inc. Securities Litigation*,
  No. 14-CV-5037 (RA), 2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016)............................35

*Lipow v. Net1 UEPS Technologies, Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015)............................................................................12

*Lopez v. CTPartners Executive Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)..............................................................................25

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ..............................................................................13, 25

*Miao v. Fanhua, Inc.*,
  No. 18 Civ. 8183 (PAE), 2020 WL 996602 (S.D.N.Y. Mar. 2, 2020) .............................19

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
  No. 3:09–CV–01740 (VLB), 2013 WL 1188050 (D. Conn. Mar. 23, 2013) ....................33

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)............................................................................18

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).........................................................................................31

*Oklahoma Law Enforcement Retirement System v. Telefonaktiebolaget LM Ericsson*,
  No. 18-CV-3021 (JMF), 2020 WL 127546 (S.D.N.Y. Jan. 10, 2020) .............................28

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)........................................................................................2, 14

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018), *appeal filed*, No. 18-3807 (2d Cir. 2018).............25

*In re Philip Morris International Securities Litigation*,
    No. 18-CV-08049 (RA), 2020 WL 550769 (S.D.N.Y. Feb. 4, 2020) ....................... passim

*In re Pretium Resources Inc. Securities Litigation*,
    No. 18 Civ. 8199 (LAP), 2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)............................27

*Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, Inc.*,
    548 F. App'x 16 (2d Cir. 2013) .......................................................................................23

*In re ProShares Trust Securities Litigation*,
    728 F.3d 96 (2d Cir. 2013)........................................................................................13, 16

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)............................................................................................12

*Ross v. Lloyds Banking Group, PLC*,
    No. 11 Civ. 8530(PKC), 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 546
    F. App'x 5 (2d Cir. 2013) .........................................................................................15, 31

*S.C. Retirement System Group Trust v. Eaton Corp. PLC*,
    791 F. App'x 230 (2d Cir. 2019) ....................................................................................14

*Schiro v. Cemex, S.A.B. de C.V.*,
    No. 18-CV-2352 (VEC), 2020 WL 635705 (S.D.N.Y. Feb. 10, 2020) ............................33

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)..............................................................................19

*In re Seadrill Ltd. Securities Litigation*,
    No. 14 Civ. 9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016)..........................25

*Shetty v. Trivago NV*,
    No. 19-0766, 2019 WL 6834250 (2d Cir. Dec. 16, 2019)................................................31

*Singh v. CIGNA Corp.*,
    918 F.3d 57 (2d Cir. 2019)................................................................................................2

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................................................32

*Stadnick v. Vivint Solar, Inc.*,
    Nos. 14-cv-9283 (KBF), 14-cv-9709 (KBF), 2015 WL 8492757 (S.D.N.Y. Dec.
    10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017).......................................................................20

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)..............................................................................................28, 29

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019), *appeal filed*, No. 19-3468 (2d Cir. 2019)............25

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta,
    Inc.*, 552 U.S. 148 (2008)....................................................................................................3

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)..................................................................................................28

*In re Supercom Inc. Securities Litigation*,
    No. 15 Civ. 9650 (PGG), 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018)..........................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................4, 6

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)..........................................................................................25, 26

*In re Xunlei Ltd. Securities Litigation*,
    No. 18 Civ. 467 (PAC), 2019 WL 4276607 (S.D.N.Y. Sept. 10, 2019) ...........................32

*Yung v. Lee*,
    160 F. App'x 37 (2d Cir. 2005) ...........................................................................................6

## STATUTES

15 U.S.C. § 78j(b)......................................................................................................................12

15 U.S.C. § 78u-4(b)..........................................................................................................2, 3, 4

## RULES

Fed. R. Civ. P. 9(b) ....................................................................................................................3

## REGULATIONS

17 C.F.R. § 229.303 .............................................................................................................28, 29

17 C.F.R. § 240.10b-5................................................................................................................12

Defendants FedEx Corporation ("FedEx" or the "Company"), Frederick W. Smith, Alan B. Graf, Jr., David J. Bronczek, Rajesh Subramaniam, David L. Cunningham, Michael C. Lenz and Robert B. Carter ("Individual Defendants" or "Individuals") (collectively, "Defendants") submit this Memorandum of Law in support of their motion to dismiss the Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF No. 64) ("CAC" or "Complaint").

## PRELIMINARY STATEMENT

This case represents another misguided attempt to transform a company's continuing response to external events—including a state-sponsored Russian military cyberattack called NotPetya and deteriorating global economic conditions—into a violation of the federal securities laws. *See generally In re Philip Morris Int'l Sec. Litig.*, No. 18-CV-08049 (RA), 2020 WL 550769 (S.D.N.Y. Feb. 4, 2020) (Abrams, J.). In May 2016, FedEx, a world leader in transportation, e-commerce and business services, acquired TNT Express ("TNT"), an international express delivery company, and commenced integrating TNT with one of FedEx's main business units, FedEx Express ("Express"). Ten months later, in March 2017, FedEx set a three-year operating income improvement target of $1.2 to $1.5 billion for the combined operations of Express. The target was based on several assumptions, such as "moderate economic growth" and, later, "stability in global trade," and included not only "TNT Express synergies" but also "base business and other operational improvements across the global FedEx Express network"—a network that operated in 220 countries and territories and was comprised of much more than just the newly acquired TNT. As discussed below, Plaintiff inaccurately labels this projection—a central pillar of its Complaint—the "TNT Operating Income Target," creating a defined term that FedEx never used, appears nowhere in the Company's disclosures and is incorrect and misleading.

On the last day of the proposed class period, which runs from September 19, 2017, through December 18, 2018 ("Class Period"), FedEx identified multiple issues that had impacted results

for its prior quarter, including a slowing in Eurozone growth and a slowdown in the Chinese economy exacerbated by trade tensions. FedEx disclosed that it would not achieve the Express operating income improvement target within its projected time frame. FedEx explained that this was due to several developments, including "reductions in base business levels largely due to increasing international economic weakness during the second quarter . . . and a change in service mix following the NotPetya cyberattack." FedEx's stock price dropped and this action followed.

Plaintiff's Complaint misuses this announcement as the springboard for its central thesis: that FedEx engaged in a prolonged conspiracy to conceal the extent to which NotPetya had negatively impacted TNT's operations. But there was no concealment. Indeed, it was precisely the opposite: From the time of the attack, and throughout the Class Period, FedEx disclosed NotPetya's ongoing impact on its finances, TNT's operations and the TNT integration into Express. Like others who have tried to exploit this recent trend towards "event-driven" litigation, *see Singh v. CIGNA Corp.*, 918 F.3d 57 (2d Cir. 2019), Plaintiff ignores or mischaracterizes disclosures, producing a Complaint that is based on hindsight and engages in "Monday morning quarterback[ing]," *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)—as exemplified by its attack on FedEx's projections for an operating income improvement target set for three years into the future. The federal securities laws, though, do not allow plaintiffs to "second-guess [the] inherently subjective and uncertain assessments" of management. *Id.* Rather, they demand that plaintiffs allege the elements of a securities fraud claim and do so in accordance with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). *See Philip Morris*, 2020 WL 550769, at *10. Plaintiff fails that test.

**Failure To Plead an Actionable Misrepresentation or Omission.** Section 10(b) requires Plaintiff to plead not only "a material misrepresentation or omission," *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008), but also the specific basis for its claim with "particularity." Fed. R. Civ. P. 9(b); *see also* 15 U.S.C. § 78u-4(b). Here, Plaintiff contends that after disclosing NotPetya's "significant" impact on TNT's worldwide operations, Defendants exaggerated FedEx's progress in recovering from the attack, thereby concealing the severity of what it depicts as NotPetya's "largely disabl[ing]" (CAC ¶¶ 41, 63, 78, 89) effects. Plaintiff's allegations fall into several categories—to wit, that: (1) TNT's operations "had fully recovered" from NotPetya when they allegedly had not; (2) the TNT integration had been "accelerated" in response to NotPetya, when in fact it purportedly had been "delayed"; and (3) TNT had retained its customer base when allegedly it was losing a "significant" number of its "high-margin" parcel customers. (*E.g.*, CAC ¶¶ 2, 63.) Plaintiff, though, presses this narrative by misrepresenting what Defendants disclosed—either through errors of commission (i.e., incorrectly paraphrasing statements) or omission (leaving out risk warnings and other disclosures that supply context). Defendants' *actual* statements, when viewed as a whole, show that these claimed "misstatements" not only fail to meet the heightened pleading requirements of Rule 9(b) and the PSLRA, but also reflect appropriate transparency to the markets. (*See* Point I(A)(1)-(3), (6)-(7).)

Plaintiff's challenge to the operating income improvement target rests on an equally flawed foundation. Economic projections are quintessential forward-looking statements (bringing them within the PSLRA's safe harbor and the "bespeaks caution" doctrine) and expressions of opinion (making them subject to the demanding strictures of *Omnicare*). Plaintiff stumbles over both requirements. As to the safe harbor and bespeaks caution, Defendants' statements overflowed with

cautionary language—language which disclosed some of the very risks that eventually materialized. Take for instance the following:

> **We may not be able to achieve our profit improvement goal by the end of 2020.** In March 2017, we announced that the FedEx Express group is targeting operating income improvement of $1.2 billion to $1.5 billion in 2020 from 2017. Our ability to achieve this objective is dependent on a number of factors, including the TNT integration progressing as planned, the health of the global economy, stability in global trade, future customer demand and current accounting rules and tax laws. In light of these factors, we may not be able to achieve our goal.

(Ex. 2 at 88.) Plaintiff also fails to plead with specificity, as it must, that Defendants had actual knowledge of any fact, figure or other piece of information that might have cast doubt on the reasonableness of these forecasts. *See* § 78u-4(b). In the end, "[d]efendants' lack of clairvoyance" cannot serve as the predicate for a securities fraud claim. *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (alteration in original) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)). Yet that is all Plaintiff offers here. (*See* Point I(A)(4-5).)

**Failure To Plead A Strong Inference Of Scienter**. Securities fraud complaints must also allege with particularity facts giving rise to a "strong inference" of scienter—i.e., an inference that is "cogent and at least as compelling as any opposing inference [of fraud]." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Here, Plaintiff fails to plead a logical, much less cogent, rationale for why Defendants would have been motivated to defraud investors. This is not a case where corporate officers are alleged to have profited from insider trading. *Cf. In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *16 (S.D.N.Y. Oct. 25, 2017). None of the Individual Defendants are accused of making suspicious trades *at all*. And FedEx bought back roughly $2.2 billion worth of its stock during the Class Period, a fact that "negate[s] a finding of scienter." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d

4

196, 225 (S.D.N.Y. 2018) (citation omitted), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019). (*See* Point I(B)(1).)

Given this lack of motive, the CAC's allegations of conscious misbehavior or recklessness must be correspondingly stronger. *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009). Yet, for all of its rhetoric, the CAC fails to allege specifically scienter as to *each* Defendant, resting instead on group pleading—such as alleging general access to unidentified internal documents—that courts routinely reject. Plaintiff also relies on assertions that purportedly came from its sole confidential source. But conspicuously, this non-management former employee does not contend that he or she spoke, met or even stood in the same room with *any* of the Individual Defendants—or any other FedEx executive whose intent could be imputed to the Company. And even putting aside this infirmity, the CW's allegations—such as the claim that the operating income improvement target had engendered "significant doubt within the Company" (CAC ¶ 42)—are so speculative, vague and opaque as to time and substance as to be worthless. (*See* Point I(B)(2).)

Juxtaposed against these non-specific allegations are Defendants' fulsome disclosures—including FedEx's granular business segment financial reporting for Express and its warnings about the risks and uncertainties stemming from NotPetya, the TNT integration, the health of the global economy, trade stability and other matters. Forced to harmonize this cascade of relevant information with its allegations of fraud, Plaintiff opts in many cases to sweep these disclosures under the rug, hoping Defendants and this Court will not notice. And with good reason. For as courts recognize, defendants who wish to deceive investors typically conceal negative information rather than disclose it. Indeed, FedEx and the Individual Defendants' public statements raise a far more powerful and nonculpable inference: that they were trying to identify and disclose obstacles

as they discovered them. Viewed in their totality, they also show that Defendants were engaged in good faith efforts to estimate, in real-time, how FedEx's ongoing recovery efforts from NotPetya, as well as other rapidly evolving business conditions, might impact the Company's forward-looking expectations for operating income and the TNT integration. (*See* Point I(B)(3).) The defects summarized above also compel the dismissal of Plaintiff's Section 20(a) claim for failure to plead a primary violation and culpable participation. (*See* Point II.)

The fact that FedEx revised these expectations perhaps makes Defendants imperfect prognosticators. But it does not—without particularized facts to the contrary—make them liable for securities fraud. As this Court recently observed, "it is 'not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events.'" *Philip Morris*, 2020 WL 550769, at \*13 (second alternation in original) (citation omitted). That is a distinction that is ingrained into the very fabric of the PSLRA, which was enacted to put an end to the practice of pleading "fraud by hindsight." *Id.* Plaintiff has lost sight of this bedrock principle, and accordingly, its CAC must be dismissed with prejudice.

## STATEMENT OF FACTS[1]

### A.     Parties to the Litigation

Defendant FedEx "provides a broad portfolio of transportation, e-commerce and business services through companies competing collectively, operating independently and managed collaboratively, under the respected FedEx brand." (Ex. 1 at 3.) Consistently ranked among the

---

[1] The facts are drawn from the CAC and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322. The Court may also consider "any documents not so incorporated but nevertheless 'integral' to the complaint," *Yung v. Lee*, 160 F. App'x 37, 41 (2d Cir. 2005) (citation omitted), as well as "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Similarly, "the Court may . . . consider . . . information in the public domain" even it if is not referenced in the CAC. *See Philip Morris*, 2020 WL 550769, at \*7 n.3.

world's most admired and trusted employers, FedEx operates through four reportable business segments: Express, FedEx Ground, FedEx Freight and FedEx Services. This action involves allegations relating to Express, which "offers a wide range of U.S. domestic and international shipping services for delivery of packages and freight." (Ex. 2 at 9.) In addition to FedEx, Plaintiff has sued seven of the Company's present or former officers. (*See* CAC ¶¶ 15-24.)[2]

**B.      FedEx Strengthens Its Global Delivery Network by Acquiring TNT**

FedEx announced its plans to acquire TNT on April 6, 2015 (*see* Ex. 3 at 2) and reported the transaction's completion on May 25, 2016 (*see* Ex. 4). At that time, FedEx advised that "the integration process w[ould] begin immediately" but offered no timeline or cost estimate. (*See id.*) In September 2016, FedEx issued its Form 10-Q for Q1 FY17 and projected that the "aggregate . . . program expense" would range from "$700 million to $800 million" over four years and generate $750 million in "synergies." (Ex. 5 at 35.) FedEx emphasized that both figures were estimates and subject to change. (*See id.*) FedEx further explained that the integration process was "complex," noting that "it span[ned] over 200 countries and involve[d] combining our pickup and delivery operations at a local level, our global and regional air and ground networks and our extensive operations, clearance, sales and back-office IT systems." (*Id.*) On March 22, 2017, FedEx issued a revised estimate: total costs were now expected to be $800 million. (*See* Ex. 6 at 36.)

That same day, FedEx replaced its previous "synergies" estimate with an operating income improvement target for Express of $1.2 billion to $1.5 billion, which it expected to achieve three years later in FY20. (*Id.*) Plaintiff unilaterally brands this projection the "TNT Operating Income Improvement Target"—implying that any planned improvements were based solely on anticipated

---

[2] They are Frederick Smith, FedEx's founder and CEO; Alan Graf, FedEx's CFO; David Bronczek, FedEx's former President and COO; Rajesh Subramaniam, FedEx's current President and COO and Express's former CEO; David Cunningham, Express's former CEO; Michael Lenz, FedEx's Treasurer; and Robert Carter, FedEx's CIO; Messrs. Smith, Graf, Bronczek, Subramaniam and Cunningham are also named as "20(a) Defendants." (CAC ¶¶ 15-24.)

synergies from the TNT acquisition. (*See, e.g.*, CAC ¶ 35.) But as FedEx's disclosures made explicit, the anticipated improvements were based on assumptions about the *entire* Express segment—of which TNT only comprised one-third at inception. (*See id.* ¶ 4.) This target included not only "TNT Express synergies," but also "base business and other operational improvements across the global . . . Express network." (Ex. 2 at 67.) It also was based on a host of factors, which included, as of July 2018, "moderate economic growth, stability in global trade and current accounting rules and tax laws"—elements impacting the entire Express business. (*Id.*)

**C.    NotPetya, a Cyberattack Orchestrated by Russian State Actors, Disrupts the Businesses of TNT and Other Companies Throughout Europe**

On June 27, 2017, TNT became the victim of a Russian state-sponsored cyberattack known as NotPetya (the "cyberattack"). (CAC ¶¶ 3, 6.) Within twenty-four hours, FedEx issued a press release announcing that TNT had "been significantly affected," adding that "the financial impact of this service disruption . . . could be material." (*See* Ex. 7.) Approximately three weeks later, on July 17, FedEx advised investors in its annual report that it had "experienced loss of revenue due to decreased volumes at TNT Express and incremental costs associated with the implementation of contingency plans and the remediation of affected systems." (Ex. 8 at 44.) The Form 10-K also included a risk factor that specifically flagged numerous "consequences or potential consequences of the cyber-attack," including, among others: (1) "loss of revenue resulting from the operational disruption immediately following the cyber-attack"; (2) "reputational damage resulting in the failure to retain or attract customers"; and (3) "longer and more costly integration (due to increased expenses and capital spending requirements) of TNT Express and FedEx Express." (*Id.* at 71-72.) FedEx underscored that although it was unable to quantify potential costs at that time, "***it [was] likely that the financial impact w[ould] be material.***" (*Id.* at 71.)

**D.      Throughout the Class Period, FedEx Updates Investors About Its Recovery Efforts and the Impact on Express, Including the TNT Integration (Q1 FY18 – Q2 FY18)**

The Class Period begins on September 19, 2017, when FedEx reported its financial results for Q1 FY18 (June 1 through August 31, 2017). In a succession of disclosures over two days, the Company made clear that NotPetya, which had struck only three months earlier, had "resulted in a significant business interruption and financial impact." (Ex. 9 at 5.) FedEx emphasized, for instance, that it was "continuing to engage in recovery efforts." (Ex. 18 at 46; *see also* Ex. 10 at 2 ("*Most* TNT Express services resumed during the quarter and *substantially* all TNT Express *critical operational* systems have been restored." (emphasis added)).) While "significant progress" had been made on several fronts, FedEx noted that "TNT Express revenues, volumes and profits remain[ed] below pre-attack levels" (Ex. 9 at 5) and that "the attack [had] impacted the results for the [first] quarter [of FY18] by approximately $300 million" (CAC ¶ 37).

Similarly, the Company reported in December 2017 that "not all customers [were] shipping at pre-attack volume[s]," adding that it was "continuing to engage in related recovery efforts." (Ex. 11 at 50.) These lingering effects from NotPetya, FedEx explained, had once again negatively impacted its financial performance, this time by "an estimated $100 million" for Q2 FY18 (September 1 through November 30, 2017). (Ex. 12 at 3.) FedEx also kept the market abreast of its plans for the TNT integration. And the message it communicated was unambiguous: As FedEx announced on December 19, 2017, NotPetya had caused it to raise its forecast for integration expenses from $800 million to $1.4 billion, an increase of 42.8%. (*See id.* at 2.)

**E.      FedEx Continues to Keep Investors Apprised of Ongoing Recovery and Integration Efforts (Q3 FY18 – Q1 FY19)**

These updates continued throughout the Class Period. And crucially, they adjusted over time as the situation evolved—an indicator that Company officials were trying to deliver timely and accurate information to investors, not mislead them. For instance, on March 20, 2018, FedEx

9

disclosed that it was experiencing "a lingering impact" from the cyberattack in the third quarter of FY18. (Ex. 13 at 4.) FedEx also modified its cyberattack-specific risk factor, warning that the "consequences or potential consequences" of NotPetya might also include "sustained lower volumes from pre-existing customers." (Ex. 14 at 53.) FedEx further reported as part of its Q3 FY18 disclosures that integration expenses had once again "increased." (*Id.* at 29.) These adjustments and updates continued in July 2018, when FedEx issued its FY18 Form 10-K. For instance the Company reported that total integration costs were expected to rise from $1.4 to $1.5 billion, while warning of the possibility that this ongoing process could result in "higher than expected" costs. (Ex. 2 at 61, 85.) FedEx also updated its risk factor concerning the Express operating income improvement target, noting that it remained dependent on a number of factors, including developments that might compromise "stability in global trade." (*Id.* at 88.)

On September 17, 2018, in connection with its Q1 FY19 earnings report, FedEx disclosed—as it had throughout the Class Period—that NotPetya was continuing to impact business at Express. In this regard, the Company reported that although "Express segment operating income and margin increased" during the quarter, "changes in service mix following the NotPetya cyberattack [had] negatively impacted operating margin," partially offsetting the improvement in that category. (Ex. 15 at 37.) At the same time, FedEx raised its earnings guidance for FY19 by $0.20 per diluted share. (Ex. 21 at 6.) "The increased guidance range," the Company explained, "[was] due to [a] strong U.S. economy and continued traction on [its] revenue management initiatives." (*Id.*)

F.    **FedEx Revises Its Operating Income Improvement Target and Integration Plans**

On December 18, 2018, FedEx announced that its financial results for Q2 FY19 (September 1 through November 30, 2018) had been impacted negatively by "deceleration in international package volume growth during the quarter as [the Company] saw a significant

10

slowing of the Eurozone economy, as well as continued softness in economic conditions in Asia." (Ex. 16 at 41.) The Company reported that it was facing "difficult global economic conditions" (Ex. 22 at 5) and that its performance was affected by a "change in service mix following the NotPetya cyberattack," which had "intensified during the second quarter of [FY]19" (Ex. 16 at 36, 31). Based on this confluence of factors, among other considerations, FedEx informed investors that its Express operating income improvement target would "not be realized in [FY]20," and warned that "[t]he timing and amount of integration expenses . . . may change." (*Id.* at 36-37.) Plaintiff claims these disclosures caused a 12.2% drop in FedEx's stock price. (CAC ¶ 49.)

## G.    Plaintiff Commences the Action

Seizing on this stock price decline, an initial complaint was filed on June 26, 2019. (ECF No. 1.) Plaintiff thereafter filed the CAC on January 13, 2020. (ECF No. 64.) The CAC accuses Defendants of misleading investors about the degree to which NotPetya had affected FedEx's operations, with a particular focus on the Company's integration of TNT. The alleged misstatements and omissions can be divided into four main categories:

1. FedEx's Restoration of TNT Operations and Services Affected by NotPetya: Plaintiff claims that FedEx and certain Individual Defendants exaggerated the Company's progress in restoring TNT operations in the wake of NotPetya and, in so doing, concealed the "true" extent of the damage caused. (*See, e.g.*, CAC ¶¶ 53, 55, 57, 59-60, 63, 69-70, 72, 74, 76, 78, 85-86, 88-89, 93, 95, 98, 100.)

2. TNT's Customer Retention Efforts and International Service Mix: Plaintiff contends that FedEx and certain Individual Defendants misrepresented the Company's success in retaining TNT's customer base post-cyberattack by, among other things, failing to disclose a purportedly "significant" loss of high-margin parcel customers. (*See, e.g.*, *id.* ¶¶ 55, 60, 62-63, 69, 74, 77-78, 90, 93, 95, 102, 106-07, 109-10, 112-13.)

3. The Pace and Cost of the TNT Integration: Plaintiff claims that FedEx and certain Individual Defendants misled investors about how recovery efforts from NotPetya were impacting the expected cost and completion of the TNT integration. (*See, e.g.*, *id.* ¶¶ 58, 63, 69, 75, 78, 83-84, 89, 94-95, 97, 100, 102, 105, 107, 111, 113.)

4. The Operating Income Improvement Target for Express: Plaintiff alleges that FedEx and certain Individual Defendants had no reasonable basis for the statements they made

11

concerning FedEx's three-year operating income improvement target for Express of $1.2 to $1.5 billion. (*See, e.g.*, *id.* ¶¶ 53, 56, 61, 63, 70, 72-73, 78, 82, 87, 89, 92, 95, 99-101, 104, 106-07, 109-11, 113.)

## ARGUMENT

### I. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

The pleading standards for a claim brought under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, are settled. *See Philip Morris*, 2020 WL 550769, at *10. And here, these standards—specifically, the heightened pleading requirements of Rule 9(b) and the PSLRA—make clear that Plaintiff's burden is steep and, based on the dearth of particularized allegations in the CAC, insurmountable.

### A. Plaintiff's Section 10(b) Claim Should be Dismissed for Failure to Plead an Actionable Misrepresentation or Omission

A plaintiff cannot simply assert that a statement is false: it must go further and "demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *accord Philip Morris*, 2020 WL 550769, at *10.[3] This means that a complaint must detail the "'who, what, when, where and how of the alleged fraud.'" *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 157 (S.D.N.Y. 2015) (citation omitted). In considering whether this threshold has been met, courts are not limited to the carefully curated excerpts that a plaintiff chooses to share from an SEC filing or other challenged disclosure. Rather, a court "must consider the statements at issue 'in light of all [] surrounding text, including hedges [and] disclaimers.'"

---

[3] Plaintiff cannot hold the Individual Defendants primarily liable under Rule 10b-5(b) to the extent that they did not make a challenged statement, as required by *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Here, Mr. Lenz is only alleged to have spoken falsely at a single investor conference (CAC ¶¶ 111-12); while Messrs. Carter (*id.* ¶¶ 57-58, 75), Subramaniam (*id.* ¶ 105) and Cunningham (*id.* ¶¶ 86, 93) are only accused of making false and misleading remarks during earnings calls. Plaintiff pleads no facts connecting these four Individual Defendants, for *Janus* purposes, to any of the alleged misstatements and omissions drawn from FedEx's SEC filings. (*See id.* ¶ 171.) Further, the CAC offers only a single conclusory—and therefore insufficient—allegation that these Individuals engaged in so-called "scheme" liability under Rules 10b-5(a) and (c). (*See* CAC ¶ 166.)

*Martin v. Quartermain*, 732 F. App'x 37, 41-42 (2d Cir. 2018) (alterations in original) (quoting *Omnicare*, 575 U.S. at 190); *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013) ("[W]e review documents holistically and in their entirety.") (citation omitted).

**1.    Statements Concerning FedEx's Restoration of TNT Operations and Services Impacted by the Cyberattack**

Plaintiff alleges that within months of the cyberattack, "Defendants began to claim falsely that the Company had fully recovered, [and] that its operations were functioning normally," when in fact the situation was far more dire than represented. (CAC ¶ 2.) Defendants' *actual* statements, however, were more qualified in nature, emphasizing not only that NotPetya had "significantly affected" FedEx, but also that recovery efforts were ongoing. (*See, e.g.*, Ex. 18 at 46.)

For instance, Plaintiff alleges that on September 19, 2017, FedEx issued a press release to report Q1 FY18 (June-August 2017) earnings and, in the process, reported that "[m]ost TNT Express services resumed during the quarter and substantially *all TNT Express critical operational systems have been restored*." (CAC ¶ 53.) Plaintiff claims that contrary to this statement, "TNT's international service" was not "fully recovered" or "functioning normally" at the time—rather, it was supposedly still reeling from having been "largely disabled for six months due to the NotPetya virus." (*Id.* ¶¶ 2, 63.) But as the press release makes plain, FedEx readily acknowledged that the cyberattack had disrupted TNT's international service. The Company did not assert "full[] recover[y]" (*id.* ¶ 2); rather, it stated that "[m]ost" (i.e., not all) of the services had "resumed" (*id.* ¶ 53). Similarly, FedEx only advised that "*critical* operational systems" had been restored—a description which, by definition, signaled that *non*-critical and *non*-operational systems had *not* been remediated. (*Id.*) Moreover, in the same release, FedEx disclosed not only that the "worldwide operations of TNT Express [had been] significantly affected" by NotPetya, but also (in an excerpt which Plaintiff omits) that "TNT Express volume, revenue and profit still remain[ed]

13

below previous levels." (Ex. 10 at 2.) *See S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) ("Considering [the statement] in full—rather than . . . the edited version that plaintiff provides in its brief—no misrepresentation or omission occurred.")

FedEx issued a Form 10-Q that same day in which it provided equally vivid "hedges [and] disclaimers." *Omnicare*, 575 U.S. at 190. FedEx reported once again that TNT Express had been "significantly affected" by NotPetya, adding that operating income within Express had declined by an estimated $300 million in the quarter due to the cyberattack. (Ex. 18 at 24.) The Form 10-Q also included a freestanding risk factor whose lead paragraph, prominently displayed in boldface type, could not have been more stark:

> ***TNT Express experienced a significant cyberattack in the first quarter of fiscal 2018 and the ongoing impact could negatively affect our results of operations and financial condition in the future, particularly if our continuing recovery efforts do not proceed as expected***.

(*Id.* at 46.) FedEx then elaborated on its "continuing recovery efforts," warning that "while TNT Express *core* shipping services [had] been restored and significant progress [had] been made on the recovery of the TNT Express business and information technology systems, [it was] *continuing to engage in recovery efforts*." (*Id.* (emphasis added).) Similarly, FedEx explained that Express's revenues had "increased 2% in the first quarter of 2018 due to improved base yields, international package volume growth and higher fuel surcharges," but that the growth had been "partially offset by the loss of business from the NotPetya cyberattack." (*Id.* at 27.) No investor reading these passages, which the CAC also omits, would have come away with the impression that FedEx "had fully recovered" from NotPetya, as Plaintiff proclaims. (CAC ¶ 2.)[4]

---

[4] Plaintiff also takes Defendant Carter's remarks out of context by claiming he falsely assured investors during an earnings call for Q1 FY18 (June-August 2017) that TNT systems "were largely 'restored' to a 'near-normal state, with virtually all critical systems up and available.'" (CAC ¶ 57.) To start with, Plaintiff pleads no facts demonstrating— or even suggesting—that "critical" systems were not available at the time Carter made this comment. What is more,

14

Plaintiff engages in more rhetorical sleight-of-hand in challenging later disclosures. Consider Plaintiff's attack on FedEx's Q2 FY18 Form 10-Q dated December 20, 2017 (September-November 2017). The CAC alleges that FedEx misled investors about its recovery from NotPetya by, in Plaintiff's words, "claiming that services were 'fully restored.'" (CAC ¶ 76.) But the Form 10-Q itself did not represent that *all* services had been "fully restored"—only that "critical operational systems have now been fully restored . . . and shipping services . . . are back in place." (*Id.*) There is no allegation that critical operations (which Plaintiff nowhere defines) had *not* been remediated as of December 20, 2017, or that shipping services and solutions were not in place.

The CAC fails to note that in the same document, FedEx warned "that not all customers [were] shipping at pre-attack volume levels," adding that it was "*continuing to engage in related recovery efforts.*" (Ex. 11 at 50 (emphasis added).) The CAC also leaves out FedEx's update on the financial fallout from NotPetya, which acknowledged that its performance had been "negatively impacted" by another estimated $100 million due to the cyberattack. (*Id.* at 28.) Courts need not credit claims premised on such "hide the ball" tactics. *See, e.g.*, *Ross v. Lloyds Banking Grp., PLC*, No. 11 Civ. 8530(PKC), 2012 WL 4891759, at *7 (S.D.N.Y. Oct. 16, 2012) (dismissing claims premised on "selective[] quotes"), *aff'd*, 546 F. App'x 5 (2d Cir. 2013).

These are not the only relevant disclosures that Plaintiff excludes from its CAC. For instance, every Form 10-Q filed during the Class Period included financial reports for each reportable segment, including Express. These reports not only provided a window into the Express segment's performance as a whole, they also broke out revenue for the network's international

---

Plaintiff leaves out Carter's very next statement, in which he emphasizes that recovery efforts were still being undertaken on "key customer-specific solutions and systems." (Ex. 9 at 6.)

15

services (which included TNT). (*See, e.g.*, Ex. 11 at 37-39.) As discussed below (*see* Point I(A)(2)), FedEx also paired this data with an even more granular table of "Package Statistics." (*Id.*)

These layers of empirical data, when combined with the narrative updates and cautionary statements described above, communicated an unmistakable message: recovery efforts were a work-in-progress whose outcome was uncertain—the opposite of Plaintiff's "full recovery" storyline. Given this cascade of hedges, warnings and disclaimers, FedEx was not obligated to adopt Plaintiff's pejorative spin on the degree to which TNT's services had been disrupted. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) ("'[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000))); *ProShares*, 728 F.3d at 103 (rejecting plaintiffs' "efforts to find a meaningful distinction between 'diverge significantly' and 'actual loss,'" and observing that defendants need not adopt plaintiff's "linguistic preference[s]").[5]

The CW's statements do nothing to upend this conclusion and, in fact, are consistent with Defendants' disclosures. For instance, the CW claims that "recovery of the systems disabled by NotPetya took approximately 6 months to complete," i.e., through the end of December 2017. (CAC ¶ 40.) But FedEx was also advising as of December 20, 2017, that it was "continuing to engage in related recovery efforts." (Ex. 11 at 50.) Similarly, the CW contends that "NotPetya disabled approximately 75 global systems," including one that handled "custom clearance." (CAC ¶ 41.) But again, FedEx disclosed that NotPetya had significantly impacted TNT's global systems,

---

[5] *See also Holbrook v. Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *19 (S.D.N.Y. Feb. 26, 2019) ("[P]laintiffs' objections again amount to nothing more than improper quibbles with Trivago's wording."), *aff'd sub nom.*, *Shetty v. Trivago NV*, No. 19-0766, 2019 WL 6834250, at *3 (2d Cir. 2019) (rejecting allegation of falsity where plaintiff's distinction "between Trivago's characterization of the growth ('largely' or 'one of,' on one hand) and his own ('but-for,' on the other) [was] not meaningful").

16

causing it to prioritize the recovery of "critical systems." (*See, e.g.*, Ex. 9 at 6.) It even went so far as to flag the "custom clearance system" cited by Plaintiff's CW (CAC ¶ 41) as posing a particular challenge. (*See* Ex. 9 at 5 ("It is taking longer to restore our international business due to the complexity of clearance systems and business processes.").) [6] And to make sure the big picture was not lost, FedEx emphasized that its "diligen[t] and purposeful approach across a global network reaching more than 200 countries ha[d] added time to the recovery." (*Id.* at 6.)

### 2. Statements Concerning the Express Segment's Customer Retention Efforts and International Service Mix

Plaintiff also accuses Defendants of concealing a so-called unfavorable shift in the service mix for TNT's international operations from higher-margin parcel customers to lower-margin freight customers. (*E.g.*, CAC ¶ 63.) This alleged deception, according to Plaintiff, also masked what it portrays as the root cause of this shift: the alleged loss of "a significant proportion of [TNT's] high-margin customers due to its [alleged] failure to operate internationally." (*Id.*; *see also id.* ¶ 52.) This theory is belied by the Company's actual disclosures on multiple grounds.

First, FedEx disclosed throughout the Class Period that it was engaged in ongoing efforts to restore the TNT customer base and associated shipping volumes to pre-attack levels:

| Source | Disclosure |
|---|---|
| Q1 FY18 Earnings Call (9-19-17 \| Bronczek) | "[O]ur teams are executing a detailed, thorough and customer-focused plan target[ed] at restoring customer volumes to our expected levels." (CAC ¶ 60.)<br><br>Disclosing that TNT's business, with its "high-yielding customers," "is what got affected the most," and predicting "we will get it back in the FedEx fold." (Ex. 9 at 17.) |
| Q1 FY18 Form 10-Q (9-19-17) | "TNT Express revenues, volumes and profits remain below pre-attack levels." (Ex. 18 at 29.) |

---

[6] The CAC omits this cautionary statement. Plaintiff also uses a strategically placed ellipsis to remove a statement from the same call by Defendant Bronczek, in which he reported that TNT had almost been shut down by NotPetya and was forced to use "manual processes" to remain open. (*Compare* CAC ¶ 59 *with* Ex. 9 at 7 ("Our operational teams remained focused on serving our customers and have made a critical decision in the first 24 hours after the attack, to keep our doors open for business despite being reduced to manual processes for pickup, sort and delivery.").)

17

| Source | Disclosure |
|---|---|
| Q2 FY18 Form 10-Q (12-20-17) | "[N]ot all customers are shipping at pre-attack volume levels and we are continuing to engage in related recovery efforts." (CAC ¶ 76; *accord.* Ex. 11 at 50.) |
| Q3 FY18 Earnings Call (3-20-18 | Cunningham) | "The cyberattack continues to have a lingering effect in the [fiscal 2018] third quarter, and our existing customer base has not been fully restored—has not fully restored all volumes as they continue to gain confidence in our ability to provide service and recovery of our business." (Ex. 19 at 16.) |
| Q3 FY18 Form 10-Q (3-20-18) | "[N]ot all customers are shipping at pre-attack volume levels and we are continuing to engage in related recovery efforts." (Ex. 14 at 53.) |
| Q3 FY18 Form 10-Q (3-20-18) | Warning that if its efforts to recover from NotPetya were less successful than anticipated, there could be "loss of revenue due to permanent customer loss or sustained lower volumes from pre-existing customers"; and "reputational damage resulting in the failure to retain or attract customers." (Ex. 14 at 53.) |

Second, the SEC filings on which Plaintiff relies show *on their face* that FedEx disclosed—rather than hid—critical information about the relative performance of the Express network's parcel (i.e., package) and freight services. (*See, e.g.*, CAC ¶ 63.) Specifically, in each Form 10-Q filed during the Class Period, FedEx separately broke out the financial performance of these services, both domestic *and* international, by revenue. (*See, e.g.*, Ex. 18 at 33-35.) FedEx also furnished an array of additional, and even more illuminating, "package statistics" and "freight statistics"—including volume data that offered even greater insight. (*See, e.g.*, *id.* at 34.) These statistics gave investors the objective, empirical data from which to form their own judgments about the service mix within the Express network—including the international services that now included TNT as one of its components. Because "investors are presumed to have the ability to be able to digest varying reports and data," nothing more was required, particularly when viewed in context with the Company's other cautionary disclosures. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("[D]isclosure requirements are not intended to attribute to investors a child-like simplicity." (citation omitted)).

18

Third, when a service mix shift between international package volumes and freight volumes intensified during Q1 FY19, negatively impacting operating margin in the process, FedEx updated investors—negating any inference that Defendants were attempting to deceive investors or that investors in fact had been so misled. (*See* Ex. 15 at 37 ("[C]hanges in service mix following the NotPetya cyberattack negatively impacted operating margin in the first quarter of [FY] 2019."); *see also* Ex. 16 at 36 (updating disclosure for Q2 FY19).) Perhaps recognizing this, Plaintiff suggests that these disclosures should have been made earlier. (*See, e.g.*, CAC ¶ 63.)[7] But its only purported support is the vague and speculative testimony of its lone "CW," who apparently claimed that "TNT lost substantial business to competitors because TNT could not track customers' packages without a functioning custom clearance system." (CAC ¶ 41.)

These allegations are infirm for several reasons. To start, the CAC pleads no facts as to whether the CW's former position at TNT—generically described as a "Senior Business Relationship Manager" (*id.* ¶ 40)—would have placed the CW in a position to accurately track customer defections or the duration of any cyberattack impact on the clearance systems. *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (Caproni, J.) (CW allegations must be detailed enough "to support the probability that a person in the position occupied by the source would possess the information alleged.'" (citation omitted)). But even if it had, the CW is silent as to *when* these alleged customer defections occurred or if the customers returned once the clearance system was restored. *Miao v. Fanhua, Inc.*, No. 18 Civ. 8183 (PAE), 2020 WL 996602, at \*20 (S.D.N.Y. Mar. 2, 2020) (rejecting anonymous allegations, in part, because they were

---

[7] Plaintiff suggests that FedEx waited until the end of the Class Period (December 18, 2018) to disclose that, in its words, "TNT's high margin parcel business had suffered in the wake of NotPetya." (CAC ¶ 123.) But this assertion is flatly contradicted by the disclosures described above, including FedEx's acknowledgment in September 2018 (three months earlier) that "changes in service mix following the NotPetya cyberattack negatively impacted operating margin in the first quarter of [FY] 2019." (Ex. 15 at 37.)

"entirely unmoored in time"). And even the CW could not say how many customers were allegedly lost "as a result of NotPetya" (as opposed to economic weakness, trade wars or other reasons), conceding that such a figure was "difficult to estimate." (CAC ¶ 41.) This lack of precision and certitude is fatal, for as noted earlier, Defendants *disclosed* that Express had lost customers due to the cyberattack. *See Stadnick v. Vivint Solar, Inc.*, Nos. 14-cv-9283 (KBF), 14-cv-9709 (KBF), 2015 WL 8492757, at *14 (S.D.N.Y. Dec. 10, 2015) (rejecting omission concerning customer loss due to installation delays, where former employee "did not directly state what percentage, if any, of those lost customers were due to installation delays"), *aff'd*, 861 F.3d 31 (2d Cir. 2017).

### 3.    Statements Concerning FedEx's Integration of TNT

Plaintiff accuses certain Defendants of representing that the timetable for completing the TNT integration would be "accelerated in light of the June 2017 cyberattack at TNT Express" (CAC ¶ 7), when in fact the opposite was supposedly true—"NotPetya had substantially delayed . . . the integration of TNT into FedEx Express." (CAC ¶ 63.) The CAC further claims that Defendants failed to disclose so-called "adverse trends" resulting from this alleged delay, relating to what it describes as "the increased costs to remediate the impact of NotPetya and effectuate the integration of TNT." (*Id.* ¶ 52.)

Plaintiff's first contention is rooted in a distortion of what was actually communicated to investors: FedEx's disclosures neither stated nor implied that the integration project as a whole would be completed earlier than FY20 or cost less. *See In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *20 (S.D.N.Y. Oct. 10, 2018) ("[T]he proper inquiry requires an examination of defendants' representations, taken together and in context." (citation omitted)). Rather, FedEx stated that NotPetya had driven a reevaluation of the original plan—which had been conceived before the cyberattack—and that, as a result, it was speeding up its integration *efforts* (as opposed to the overall timeline) in several *discrete areas*. This meant, in practical terms,

20

(1) that certain integration projects would be prioritized and completed on a faster track than originally anticipated (i.e., "accelerated"), with an emphasis on the systems most affected by NotPetya, (2) that certain integration expenditures would be incurred in earlier time periods and (3) that the program would be expanded to include additional investments. For instance, FedEx announced that in light of NotPetya, it would now be aiming to "integrat[e] . . . our global sales force . . . 1 full year early." (Ex. 19 at 8.) FedEx announced changes to the timing and scope of information technology projects as well. (*See id.* ("We are accelerating the migration of the FedEx clearance operations and systems as well, retiring dozens of legacy TNT applications.").) There is, notably, not a single allegation in the CAC that these concrete examples of "acceleration" did not occur. These disclosures show that Plaintiff's central thesis—that FedEx promised to reach the end goal of integration more quickly—is unsupported by particularized facts.

There is also no well-pled allegation for Plaintiff's related claim that FedEx failed to disclose "adverse trends and/or uncertainties relating to the increased costs to remediate the impact of NotPetya and effectuate the integration of TNT." (CAC ¶ 52.) In fact, FedEx's disclosures communicated changes in costs as the integration progressed. For instance, in its Form 10-Q dated December 20, 2017 (only three months into the Class Period), FedEx explained that it had made a strategic decision to "increase investments to move TNT Express information technology, operations and commercial infrastructure to FedEx infrastructure due to the recent cyberattack at TNT Express." (Ex. 11 at 34.) Accordingly, the Company reported at that time an upward adjustment in projected costs from $800 million to $1.4 billion, an increase of 42.8%. (CAC ¶ 69; Ex. 11 at 34.) FedEx also advised that in light of this expansion, among other factors, it was *lengthening* its expected time horizon for the project as a whole. Whereas in September 2017 it had been targeting the end of FY20 as the completion date, now it was expecting "[t]he integration

to be *substantially* complete by the end of [FY]20." (Ex. 11 at 34 (emphasis added).) Further, FedEx cautioned that due to the project's complexity, "[t]he timing and amount of integration expenses and capital investments in any future period may change." (*E.g.*, *id.*)

Given the foregoing, it is implausible for Plaintiff to suggest that investors were misled about increased integration costs, or that they were deceived into believing the integration end date was being moved up. If anything, the pleaded facts illustrate that FedEx not only disclosed its actual TNT integration expenses on a quarterly basis (*see, e.g.*, *id.*) (the accuracy of which Plaintiff does not challenge), but repeatedly updated the market as circumstances changed and its plans evolved. These updates, which appear on the face of the CAC and FedEx's Class Period disclosures, not only refute any suggestion of falsity—they decisively cut against any notion that Defendants acted with fraudulent intent (as explored further at Point I(B), *infra*).

### 4.     Numerous Statements Are Protected Under the PSLRA Safe Harbor and Bespeaks Caution Doctrine

"Under the PSLRA's safe harbor, a defendant 'shall not be liable with respect to any forward-looking statement' if (1) [it] . . . is 'identified' as such and 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) the forward-looking statement is 'immaterial,' or (3) the plaintiff 'fails to prove that [a] forward-looking statement . . . if made by a natural person, was made with actual knowledge[8] by that person that the statement was false or misleading.'" *Philip Morris*, 2020 WL 550769, at *16 (quoting 15 U.S.C. § 78u-5(c)(1)).[9] Because

---

[8] The Supreme Court recently observed that legal dictionaries define "actual knowledge" as "[r]eal knowledge as distinguished from presumed knowledge or knowledge imputed to one." *Intel Corp. Inv. Policy Comm. v. Sulyma*, No. 18-1116, 2020 WL 908881, at *4 (Feb. 26, 2020) (alteration in original) (citation omitted).

[9] The "bespeaks caution" doctrine offers similar protection for "forward-looking statements that adequately disclose the risk factors that might cause a different outcome to occur than the one then forecast by the issuer." *Philip Morris*, 2020 WL 550769, at *16 n.7 (citation omitted).

"liability . . . attaches only upon proof of knowing falsity," the "scienter requirement for forward-looking statements is stricter than for statements of current fact." *Id.* (citation omitted).

Here, Plaintiff challenges Class Period statements concerning the operating income improvement target. They include:

> We are targeting operating income improvement at the FedEx Express segment of $1.2 billion to $1.5 billion in 2020 from 2017 assuming moderate economic growth, current accounting rules and U.S. tax laws and continued recovery from the NotPetya cyberattack. This target includes TNT Express synergies, as well as base business and other operational improvements across the global FedEx Express network.

(Ex. 11 at 34; CAC ¶ 61; *see also id.* ¶¶ 70, 72, 99, 104.) These statements were "framed as expectation[s] or projection[s]," and thus were both "plainly forward looking" under the PSLRA, *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013), and "statements about future performance" under the "bespeaks caution" doctrine, *Bettis v. Aixtron*, No. 16 Civ. 00025 (CM), 2016 WL 7468194, at *13 (S.D.N.Y. Dec. 20, 2016).[10] Plaintiff also complains about other statements that were (and are) forward-looking. For instance, several disclosures focus on other aspects of future economic performance (*see* CAC ¶¶ 59, 69, 85, 106); FedEx's expectations for the integration of TNT (*see id.* ¶¶ 58, 84, 105, 111); and its anticipated recovery from the cyberattack (*see id.* ¶ 60).

These forward-looking statements were accompanied by meaningful cautionary language. To start, FedEx's press releases and SEC filings all warned that "forward-looking statements involve risks and uncertainties" and that, accordingly, "[a]ctual results may differ materially from those contemplated (expressed or implied) by such forward-looking statements." (*E.g.*, Ex. 5 at

---

[10] *See also In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018) (the statement "'we remain on track to deliver adjusted EBITDA in line with expectations'[] fall[s] within the PSLRA safe harbor for forward-looking statements"), *aff'd*, 764 F. App'x 127 (2d Cir. 2019); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278(DLC), 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009).

23

53.) Similarly, each investor call began by "remind[ing] all listeners" about these risks, using almost identical language. (*E.g.*, Ex. 9 at 4.) And FedEx referred investors to its "press releases and filings with the SEC" for further information. (*E.g.*, *id.*)

FedEx's disclosures also detailed specific risks that could cause actual results to differ from projections. As to the operating income improvement target, FedEx repeatedly cautioned that it "may not be able to achieve [its] profit improvement goal by the end of 2020," that its "ability to achieve this objective [was] dependent on a number of factors, including the TNT integration progressing as planned, the health of the global economy, stability in global trade [and] future customer demand," and that a number of factors "could . . . decrease or delay the expected accretive effect of the acquisition." (*E.g.*, Ex. 2 at 88, 86. ) FedEx even cataloged a long list of specific risks to the TNT integration in its FY18 10-K which, if they occurred, might "adversely affect our future results." (*Id.* at 85.) FedEx further warned that the integration was both complex, reaching over 200 countries, and "directly affected by the state of the economy and anti-trade measures." (*Id.* at 84.) The Company also advised that it was continuing to refine its integration plans, particularly in light of NotPetya, and that as a result, "the timing and amount of integration expenses and capital investments in any future period may change as we implement our plans." (Ex. 9 at 10.)

Such targeted risk disclosures are exemplars of meaningful cautionary language. Courts routinely dismiss securities fraud claims based on predictions of future performance where, as here, such predictions are surrounded with appropriately calibrated warnings. *See, e.g.*, *Lefkowitz v. Synacor, Inc.*, No. 18 Civ. 2979 (LGS), 2019 WL 4053956, at *7 (S.D.N.Y. Aug. 28, 2019) (statement that Synacor "expect[ed] accelerated revenue growth of about 30% this year" was

nonactionable opinion and forward-looking statement); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 237 (S.D.N.Y. 2018) (applying safe harbor to "projections of expected sales").[11]

### 5.    Numerous Statements Are Non-Actionable Opinions

The forward-looking statements described above also fail the pleading requirements for expressions of opinion set forth by the Supreme Court in *Omnicare*. Under this test, plaintiffs must allege facts sufficient to show either that "(1) 'the speaker d[oes] not hold the belief . . . professed'; (2) the 'fact[s] [] supplied' in support of the belief professed are 'untrue'; or (3) the speaker 'omits information' that 'makes the statement misleading to a reasonable investor.'" *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)); *see also Philip Morris*, 2020 WL 550769, at *13.

A plaintiff may not question the reasonableness of an opinion by "'offer[ing] bare "conclusory allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."'" *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 754 (S.D.N.Y. 2018) (alterations in original) (quoting *Omnicare*, 575 U.S. at 196). Thus, if proceeding under an omissions theory, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Tongue*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 194);

---

[11] *See also Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 361-63 (S.D.N.Y. 2019) (deeming non-actionable projections for an "accelerated growth trend"); *Int'l Ass'n of Heat v. IBM Corp.*, 205 F. Supp. 3d 527, 537 (S.D.N.Y. 2016) (projection that company would "deliver at least $20 of operating EPS" was not actionable); *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 38 (S.D.N.Y. 2016) (rejecting claim based on downward revision of guidance from profit to loss); *In re Seadrill Ltd. Sec. Litig.*, No. 14 Civ. 9642 (LGS), 2016 WL 3461311, at *9 (S.D.N.Y. June 20, 2016) (refusing to sustain claim based on projection of $4.1 billion revenues).

*accord Philip Morris*, 2020 WL 550769, at \*13. "[M]eeting th[is] standard . . . 'is no small task for an investor.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194).

Plaintiff fails that test. As detailed above, Plaintiff challenges numerous opinions relating to the operating income improvement target, expectations for the TNT integration and FedEx's response to NotPetya.[12] The CAC, though, does not contest the accuracy of any "supporting facts" underlying Defendants' beliefs. Further, it alleges in pure boilerplate that Defendants "knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public." (*E.g.*, CAC ¶ 142.) This is dispositive, for "[w]ithout any facts to make this conclusion plausible," as here, it "is insufficient" to merely allege "that Defendants did not actually believe" what they said. *Lefkowitz*, 2019 WL 4053956, at \*7.

As to *Omnicare*'s third prong, Plaintiff inveighs that Defendants "lacked a reasonable basis for their positive statements about the Company and its prospects." (*E.g.*, CAC ¶ 63.) The CAC fails, however, to identify the "particular (and material)" omissions of fact demanded by *Omnicare* and *Sanofi*. For instance, Plaintiff claims that expectations for operating income and the TNT integration lacked a reasonable basis because TNT's international operations were "largely disabled" for six months after NotPetya struck. (*Id.*) But Plaintiff nowhere explains how this conclusory assertion, even if true, would have materially compromised FedEx's ability to meet future income improvement and integration forecasts set years into the future (i.e., 2020).

This lack of particularity is equally glaring for the operating income improvement projection, which was *not* just a "TNT Operating Income Target" (a term Plaintiff invents): it explicitly included "base business and other operational improvements across the global FedEx

---

[12] Statements about future economic performance are classic opinions. *See Lefkowitz*, 2019 WL 4053956, at \*7 (statement that Synacor "expect[ed] accelerated revenue growth of about 30% this year" qualified as opinion); *Frankfurt-Tr.*, 336 F. Supp. 3d at 227 (affirmations about potential growth and being "on track" were opinions).

Express network" (*id.* ¶ 61), of which TNT was only a part. Plaintiff pleads no facts addressing how these other key drivers might have impacted the reasonableness of FedEx's projections. (*See* Point I(A)(2), *supra*.) And even if it had, "plaintiffs must do more than show that the speaker knew or had access to countervailing information: they must show that the speaker's opinion did not 'fairly align[ ]' with all the information that was then available." *In re Pretium Res. Inc. Sec. Litig.*, No. 18 Civ. 8199, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020) (alteration in original) (quoting *Omnicare*, 575 U.S. at 189). Plaintiff does not come close to doing that here. *See id.* (dismissing claim where complaint failed to allege that "countervailing information" had "pushed the scale's needle so far as to render continued faith in [defendant's] . . . plan unreasonable"); *Frankfurt-Tr.*, 336 F. Supp. 3d at 230 (opinions about future earnings were non-actionable where plaintiff offered "scant" detail about omitted facts). And this conclusion applies with particular force since Defendants disclosed numerous facts about NotPetya and its impact on TNT through segment reporting and otherwise. (*See* Point I(A)(1)-(3), *supra*); *see also Lefkowitz*, 2019 WL 4053956, at *8 (rejecting claim where future income risks "were not hidden").

### 6.    Numerous Statements Are Non-Actionable Puffery

Plaintiff also fails to plead falsity with respect to certain statements because they are "so vague, broad and non-specific that a reasonable investor would not rely on [them]." *Philip Morris*, 2020 WL 550769, at *12 (citation omitted). Examples of this "puffery" abound throughout the CAC. (*See, e.g.*, CAC ¶¶ 60, 74, 83, 109 ("strong service levels"); *id.* ¶¶ 62, 77 ("favorable service mix"); *id.* ¶¶ 92, 109 ("solid revenue growth").)[13] Courts have held time and again that such

---

[13] (*See also* CAC ¶ 55 ("significant progress"); *id.* ¶ 58 ("converting adversity into advantage"); *id.* ¶ 60 ("returning to near-normal capabilities"); *id.* ¶ 62 ("favorable service mix"); *id.* ¶¶ 69-70 ("solid demand trends"; "success in restoring business"); *id.* ¶ 72 ("very proud of the progress"); *id.* ¶ 75 ("we've become much more aggressive"); *id.* ¶ 77 ("favorable exchange rates and favorable service mix"); *id.* ¶ 85 ("unbelievable job of recovering from this attack"); *id.* ¶ 93 ("recovery of the business . . . has been remarkable"); *id.* ¶ 105 ("extremely well positioned"; "pleased with the progress"; "progressing well on the integration"; "very excited to [] see the progress"); *id.* ¶ 109 (integration of

statements are "too general" to be actionable. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted). This Court should do the same.

### 7. There Was No Duty, Under Item 303 of Regulation S-K or Otherwise, to Disclose Any Purported Omissions

Plaintiff also attempts to reframe its misstatement claims as omissions. (*See* CAC ¶¶ 50-52.) But "an omission is 'actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" *Philip Morris*, 2020 WL 550769, at *11 (citation omitted). Plaintiff here complains about a purported failure to disclose two so-called "adverse trends and/or uncertainties" under Rule 10b-5 and Item 303 of Regulation of S-K, 17 C.F.R. § 229.303: (1) "that TNT's operations were effectively disabled in the wake of NotPetya," thereby leading to "a material reduction in TNT's high-margin customers, revenue and growth"; and (2) "increased costs to remediate the impact of NotPetya and effectuate the integration of TNT." (CAC ¶ 52.) But to plead an actionable omission under Item 303, for instance, Plaintiff must allege facts demonstrating that a trend was "both (1) known to management and (2) 'reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (citation omitted). Neither prong is satisfied here.

First, as detailed below (*see* Point I(B), *infra*), Plaintiff has not pled that any of the Defendants acted with scienter. It therefore follows *a fortiori* that Plaintiff cannot state an Item 303 violation. *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (Under Item 303, "Plaintiffs were required adequately to plead each element of a 10b-5 securities fraud claim[, including scienter.]"); *Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*,

---

TNT "is progressing rapidly"; "emerging from this challenge stronger than ever"); *id.* ¶ 111 ("[A]s we get into the home stretch of completing the TNT integration here . . . , that's going to drive tremendous value . . . ."); *id.* ¶ 112 ("[D]espite the cyberattack, the customers stuck with us. So that's what gives us the confidence and the basis that . . . this is going to drive even value beyond the immediate of what we're targeting here [for] FY '20.").)

No. 18-CV-3021 (JMF), 2020 WL 127546, at *9 (S.D.N.Y. Jan. 10, 2020) ("Plaintiffs' clear failure to plead scienter doom[ed]" claims under Item 303).

Second, Plaintiff fails to specify adequately the existence of a trend or uncertainty that was material, adverse and undisclosed. Consider for instance Plaintiff's allegation about the so-called exodus of a "significant portion" of FedEx's "high-margin customers." (CAC ¶ 63.) FedEx *disclosed* not only that the cyberattack had negatively impacted customer retention and associated volumes, but also that the fallout had reached "high-yielding customers." (*Id.* ¶ 37.) (*See* Point I(A)(2), *supra*.) Similarly, the CAC confirms that FedEx both updated investors repeatedly as estimated integration and recovery costs grew and cautioned that these costs might increase even more. (*See* Point I(A)(3), *supra*.) Plaintiff, moreover, fails to identify with specificity an undisclosed fact that was materially inconsistent with these disclosures, let alone one that was known to any Defendant. *See* 17 C.F.R. § 229.303. Given the foregoing, it is just not credible to claim investors were misled. *See Vivint Solar*, 861 F.3d at 39 (dismissing omissions claims where issuer's "registration included ample warning").

**B.      Plaintiff's Section 10(b) Claim Should be Dismissed
for Failure to Plead a Strong (or Plausible) Inference of Scienter**

There are demanding and well-established standards for pleading scienter. *See Philip Morris*, 2020 WL 550769, at *10, 18-19 (describing, *inter alia*, PSLRA's "strong inference" test). These standards require a plaintiff to plead, at minimum, specific facts "(1) [showing both] motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Tr.*, 553 F.3d at 198; *accord Philip Morris*, 2020 WL 550769, at *18. For forward-looking statements, the bar is even higher: Plaintiff must demonstrate that Defendants had "actual knowledge." *Id.* at *17 (citation omitted).

29

### 1.    No Attempt is Made by Plaintiff to Plead Motive

Plaintiff fails to plead that any Defendant had a motive to commit fraud. At most, the CAC alleges facts reflecting "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation." *ECA*, 553 F.3d at 198. Such generic desires are not enough to "constitute 'motive' for purposes of [this Circuit's scienter] inquiry." *Id.* (citation omitted). Rather, a complaint must plead particularized facts showing that a defendant "benefitted in some concrete and personal way from the purported fraud." *Id.* (citation omitted). No such facts are alleged here. None of the Individual Defendants are accused of making suspicious trades *at all*. And FedEx bought back nearly $2.2 billion worth of its stock during the Class Period (*see* Ex. 2 at 28), a fact that "negate[s] a finding of scienter," since "it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Tr.*, 336 F. Supp. 3d at 225 (citation omitted).

### 2.    Plaintiff Fails to Plead Conscious Misbehavior or Recklessness

This failure to allege motive makes Plaintiff's pleading burden even *heavier*: though it can try to establish "strong circumstantial evidence of conscious misbehavior or recklessness," the "strength of the circumstantial allegations must be correspondingly greater if there is no motive." *ECA*, 553 F.3d at 198-99; *accord Philip Morris*, 2020 WL 550769, at *18. Recklessness in this context "'mean[s] "conscious recklessness—i.e., a state of mind *approximating actual intent*, and not merely a heightened form of negligence."'" *Id.* at *20 (citation omitted).

#### (a)    Allegations About Corporate Positions and Access Are Conclusory

Plaintiff's generalized allegations are based overwhelmingly on the Individual Defendants' corporate positions. (*See, e.g.*, CAC ¶¶ 139-41.) "'It is well established,' however, 'that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient,' standing alone, 'to plead scienter.'"

30

*Philip Morris*, 2020 WL 550769, at *20 (citation omitted). Instead, plaintiffs must allege "that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 774 (S.D.N.Y. 2019) (citation omitted). This means, at minimum, that they must "specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *accord Shetty v. Trivago NV*, No. 19-0766, 2019 WL 6834250, at *3 (2d Cir. Dec. 16, 2019).

Here, the CAC pleads no facts from which to infer that any of the Individual Defendants (or anyone whose intent may be imputed to FedEx) [14] had access to specific information—whether in the form of an internal report, email, oral communication or otherwise—that might be construed as undercutting the reasonableness of FedEx's forecasts for Express's operating income and the TNT integration; contradicting its public statements about the recovery from NotPetya; or otherwise rendering any of the challenged statements false or misleading. Instead, what the CAC offers are the kinds of vague and generic appeals to "insider access" that courts routinely deem insufficient under the PSLRA and Rule 9(b).

A paradigmatic example is Plaintiff's suggestion that scienter may be inferred from FedEx's "pre-acquisition diligence" of TNT, which purportedly exposed "TNT's weakness 'in IT and in operations.'" (CAC ¶ 146.) As Plaintiff concedes, FedEx publicly *disclosed this exact information* before the cyberattack. (*Id.* (quoting Defendant Graf's statement from a March 21, 2017 earnings call).) This fact alone makes it of no use to Plaintiff. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("[P]laintiffs cannot rely on information generally known

---

[14] "Scienter may not be alleged through group pleading." *Ross*, 2012 WL 4891759, at *10. Rather, a complaint must "allege facts that adequately address the scienter element with respect to each of the Individual Defendants." *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975(RPP), 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012). Plaintiff has not done that here. (*See* CAC ¶¶ 138-47 (identifying only one Individual Defendant by name and treating the rest collectively).) Accordingly, the CAC must be dismissed against the Individual Defendants on this basis alone.

or available to the public to support to support [*sic*] circumstantial scienter allegations."); *see also*

*In re Xunlei Ltd. Sec. Litig.*, No. 18 Civ. 467 (PAC), 2019 WL 4276607, at *12 (S.D.N.Y. Sept. 10, 2019) (plaintiff could not "cobble an inference of scienter together" from, among other things, defendants' alleged knowledge of public information). Notably, Plaintiff does not allege the existence of other, undisclosed "weakness[es]" or conditions that conflicted with FedEx's disclosures. Moreover, it is hard to comprehend how this allegation could support scienter: defendants intent on committing fraud typically conceal negative information rather than disclose it. In short, this claim—which Plaintiff touts as one of its best—negates scienter.

### (b)      The Confidential Witness Allegations Are Equally Vague

Plaintiff's confidential witness allegations are just as thin. For instance, Plaintiff contends, based on alleged "reports" from its one CW, that FedEx not only sent unnamed "Senior Vice Presidents and Vice Presidents . . . to Amsterdam to participate in briefings with TNT on IT issues," but also "provided experts and flew in Microsoft employees to assist in restoring TNT's impacted platforms in the wake of NotPetya." (CAC ¶ 147.) First, there is no allegation that the CW ever communicated with or had access to the Individual Defendants, or any other member of FedEx senior management. There is, therefore, no basis for ascribing knowledge of these events to any Defendant. *See In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP), 2015 WL 4931357, at *18 (S.D.N.Y. Aug. 19, 2015) ("[N]one of the CWs . . . allege that they communicated their concerns to defendants . . ."). Also, the CAC does not detail what was learned during these "briefings," or explain how such information might have contradicted a challenged statement. And stepping back, it is scarcely surprising—or suspicious—that FedEx had deployed executives to Europe to oversee integration-related projects or had solicited advice from "experts" in the wake of a cyberattack. If anything, the fact that FedEx was investigating these matters cuts against scienter. *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir.

32

2010) ("Ordering an investigation as soon as they learned [of a problem] . . . 'weakens rather than strengthens an inference of scienter.'" (citation omitted)).

Plaintiff's other CW allegations are no more probative. A telling illustration is his or her claim "that there was significant doubt within the Company about its ability to meet the target by 2020." (CAC ¶ 42.) The CAC sheds no light on who among FedEx's workforce of 475,000 employees had these doubts, when they were acquired, or whether these individuals played any role in developing the projections. The CW claims no such involvement—a disabling flaw. *See NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 3:09-CV-01740 (VLB), 2013 WL 1188050, at \*36 (D. Conn. Mar. 23, 2013) (rejecting allegation from CW not "alleged to have had any connection to" projections). Nor does the CW attempt to ascribe these supposed doubts to an Individual Defendant or any other senior executive whose intent could be imputed to FedEx.

Further, in labeling these doubts "significant" (itself a vague and undefined term), the CW does nothing more than make a sweeping reference to the "complexity of the integration" (CAC ¶ 42)—an almost self-evident fact which FedEx acknowledged in every one of its quarterly and annual SEC filings during the Class Period; and which, without more, would not undercut the reasonableness of FedEx's projections. The PSLRA and Rule 9(b) demand more than this. *See Schiro v. Cemex, S.A.B. de C.V.*, No. 18-CV-2352 (VEC), 2020 WL 635705, at \*3 n.2 (S.D.N.Y. Feb. 10, 2020) (CW allegations cannot be "vague, speculative and conclusory" (citation omitted)).

### (c)    The "Core Operations" Theory Has No Application Here

Plaintiff posits that the Individual Defendants "would have been aware of key facts" about the purported fraud because it "relate[d] to the core business and operations of FedEx." (CAC ¶¶ 143-44.) But "[t]he current viability of the core operations theory . . . is uncertain" within the Second Circuit. *Philip Morris*, 2020 WL 550769, at \*20 (alterations in original) (citation omitted). And regardless, "'core operations' allegations are insufficient—standing alone—to establish

33

scienter." *Gagnon*, 368 F. Supp. 3d at 775 (citation omitted) (collecting cases). This means that Plaintiff cannot use core operations to prop up insufficient allegations. *See Holbrook v. Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26, 2019) (rejecting core operations given "absence of . . . other evidence of fraudulent intent").

Also, "[w]hen applying the doctrine, 'courts have required that the operation in question constitute nearly all of a company's business before finding scienter.'" *Frankfurt-Tr.*, 336 F. Supp. 3d at 225 (citation omitted). Here, the CAC alleges only that Express was "responsible for 54% of the Company's total revenue." (CAC ¶ 144.) This figure is nowhere close to being "nearly all" of FedEx, which includes other operating companies beyond Express, such as FedEx Ground and FedEx Freight. Additionally, the CAC admits that TNT, the relevant business, only "increased . . . the revenues of [FedEx's] largest business segment [i.e., Express] by nearly a third" (CAC ¶ 4), resulting in a figure of 17.8% (i.e., 33% of 54%). What is more, some of this revenue would have been generated by the non-European parts of TNT, to which the CAC makes no allegations. Indeed, the CAC admits that TNT only increased FedEx's workforce by 25%. (*Id.* ¶ 4.)

### 3.    The More Cogent and Compelling Inference is a Nonculpable One

"[A] court must [also] consider plausible, nonculpable explanations for the defendant's conduct." *Philip Morris*, 2020 WL 550769, at *19 (citing *Tellabs*, 551 U.S. at 323-24). Here, the substance and sheer volume of FedEx's disclosures—from its abundant risk factors, to its detailed management updates, to its segmented financial reporting—paint the picture of a management team that was trying, in real time, to provide the most accurate, timely and meaningful information available in the context of a "complex" integration with a three-year target and a quickly changing global economy. Indeed, Defendant Graf explained these events: "Global trade has slowed in *recent* months and leading indicators point to ongoing deceleration in global trade near-term . . . . These trends, coupled with the change in service mix at FedEx Express, are negatively impacting

34

the segment's financial results." (Ex. 20 at 3 (emphasis added).) Also, if FedEx had been conspiring to cover up problems that were growing uncontrollably within Express, it would not have provided a detailed breakdown of the group's financial results every quarter. That it furnished such information raises a far more compelling inference of nonculpable behavior. *See, e.g.*, *Holbrook*, 2019 WL 948809, at *22 (ruling that "inference of fraudulent intent raised by plaintiffs [was] rendered implausible by Trivago's numerous and fulsome disclosures").

## II.      PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

"[T]o bring a § 20(a) claim, a plaintiff at a minimum must allege (1) a primary violation by the controlled person, . . . (2) control of the primary violator by the targeted defendant," and (3) "culpable participation." *In re Lihua Int'l. Inc. Sec. Litig.*, No. 14-CV-5037 (RA), 2016 WL 1312104, at *17-18 (S.D.N.Y. Mar. 31, 2016) (Abrams, J.) (citation omitted). Here, because Plaintiff has failed to plead a primary violation (*Philip Morris*, 2020 WL 550769, at *21) or culpable participation, its claim for control person liability by the 20(a) Defendants also fails.

### <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the CAC in its entirety with prejudice.

Dated:   New York, New York
       March 13, 2020

Respectfully submitted,

/s/ Jay B. Kasner
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
jay.kasner@skadden.com
susan.saltzstein@skadden.com

*Attorneys for Defendant FedEx Corporation*
*and the Individual Defendants*

35