UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

In re FEDEX CORP. SECURITIES :   Civil Action No. 1:19-cv-05990-RA
LITIGATION :
                                  :   <u>CLASS ACTION</u>

——————————————————— :

This Document Relates To: :
                                  :
     ALL ACTIONS. :

——————————————————— x


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ...........................................................................3

    A.    FedEx Acquires TNT and Dramatically Increases Its European Operations .........3

    B.    NotPetya and Its Impact on FedEx ..........................................................4

    C.    The Impact of NotPetya Is Finally Revealed to the Market ...................................7

III.   ARGUMENT ..............................................................................................9

    A.    Applicable Legal Standards ...................................................................9

    B.    The Complaint Pleads Actionable Misrepresentations and Omissions .................9

        1.    Defendants' Misstatements Are Pled with Particularity............................10

            a.    Statements Regarding the Restoration of TNT's Operations and Services Were False and Misleading ......................................10

            b.    Statements Regarding FedEx Express's Customer Retention and Service Mix Were False and Misleading...............13

            c.    Statements Regarding FedEx's Integration of TNT Were False and Misleading ..................................................15

        2.    Defendants' Misstatements Were Material................................................16

        3.    Defendants Had a Duty to Disclose the Omitted Information...................19

        4.    The Challenged Statements Are Not Protected as Forward-Looking Statements ..........................................................................21

    C.    The Complaint Adequately Alleges Scienter................................................24

        1.    The Complaint Adequately Alleges the Individual Defendants' Conscious Disregard and/or Recklessness................................25

        2.    The CW Account Supports a Strong Inference of Scienter ......................27

        3.    The Core Operations Doctrine Further Supports a Strong Inference of Scienter ......................................................................29

        4.    Cunningham's Resignation Supports a Strong Inference of Scienter........31

**Page**

5.      FedEx's Pre-Acquisition Diligence Supports a Strong Inference of
        Scienter ...............................................................................................32

6.      The Complaint Adequately Alleges Corporate Scienter............................33

7.      The Inference of Scienter Arising from the Allegations Is as Least
        as Compelling, if Not More so, than Any Innocent Explanation...............34

D.      The Complaint Adequately Pleads Control Person Liability.................................35

IV.     CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994
(S.D.N.Y. Nov. 18, 2014) ........................................................................................24

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) .....................................................................17

*Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*,
620 F.3d 146 (2d Cir. 2010) ......................................................................................9

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010) .....................................................................14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) .....................................................................................17

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................10, 24, 27, 29

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
2020 WL 248729
(S.D.N.Y. Jan. 15, 2020) ...................................................................................26, 33

*Cruz v. TD Bank, N.A.*,
742 F.3d 520 (2d Cir. 2013) .....................................................................................35

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .....................................................................................24

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018) .....................................................................18

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .....................................................................31

*Galestan v. Onemain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...............................................................17, 22

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .....................................................................................24

**Page**

*Gauquie v. Albany Molecular Research, Inc.*,
   2016 WL 4007591
   (E.D.N.Y. July 26, 2016) ............................................................................................15, 27

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................32

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019)..............................................................18, 21, 27

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012)..........................................................................32

*Holbrook v. Trivago*,
   2019 WL 948809
   (S.D.N.Y. Feb. 26, 2019) .............................................................................................13

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..........................................................................14

*In re Alstom SA Sec. Litig.*,
   454 F. Supp. 2d 187 (S.D.N.Y. 2006)..........................................................................32

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000)............................................................................31

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)..........................................................................27

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)..........................................................................29

*In re Avon Sec. Litig.*,
   2019 WL 6115349
   (S.D.N.Y. Nov. 18, 2019) .......................................................................................28, 30

*In re Barrick Gold Sec. Litig.*,
   2015 U.S. Dist. LEXIS 71136
   (S.D.N.Y. June 2, 2015).................................................................................................10

*In re Barrick Gold Secs. Litig.*,
   2015 WL 1514597
   (S.D.N.Y. Apr. 1, 2015).................................................................................................35

**Page**

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)......................................................................29

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................18

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..................................................................................23

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................31

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006).......................................................................22

*In re Express Scripts Holdings Co. Sec. Litig.*,
773 F. App'x 9 (2d Cir. 2019) .................................................................................13

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)....................................................................17

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357
(S.D.N.Y. Aug. 19, 2015) .......................................................................................28

*In re Fleming Cos. Sec. & Derivative Litig.*,
2004 WL 5278716
(E.D. Tex. June 16, 2004) ........................................................................................31

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395
(S.D.N.Y. Mar. 28, 2019) ............................................................................. *passim*

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561
(S.D.N.Y. Dec. 2, 2013)...........................................................................................30

*In re Lihua Int'l, Inc. Sec. Litig.*,
2016 WL 1312104
(S.D.N.Y. Mar. 31, 2016) ........................................................................................35

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)....................................................................24

**Page**

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)..................................................................33

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
  541 F. Supp. 2d 986 (S.D. Ohio 2007) ................................................................32

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009)..................................................................24

*In re OSG Secs. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014)....................................................................33

*In re Oxford Health Plans, Inc., Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................19, 22

*In re Perrigo Co. PLC Sec. Litig.*,
  2020 WL 377881
  (S.D.N.Y. Jan. 23, 2020)........................................................................................9

*In re PetroChina Co. Ltd. Sec. Litig.*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015)..................................................................33

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  2020 WL 550769
  (S.D.N.Y. Feb. 4, 2020) ..................................................................................29, 31

*In re Ply Gem Holdings, Inc.*,
  2016 WL 5339541
  (S.D.N.Y. Sept. 23, 2016) .....................................................................................12

*In re Pretium Res. Inc. Sec. Litig.*,
  2020 WL 953609
  (S.D.N.Y. Feb. 27, 2020) ......................................................................................19

*In re ProShares Tr. Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)....................................................................................13

*In re Reserve Fund Sec. & Derivative Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010)..................................................................26

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341
  (S.D.N.Y. Apr. 22, 2016)......................................................................................22

**Page**

*In re ShengdaTech, Inc. Sec. Litig.*,
2014 WL 3928606
(S.D.N.Y. Aug. 12, 2014) ....................................................................................35

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889
(S.D.N.Y. Nov. 26, 2018) ...................................................................................16

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................32

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ...............................................................................20

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ..........................................................17, 23

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) .................................................................35

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) .................................................................................21

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...............................................................................27

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010) ...............................................................................22

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ...........................................................................................10

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236
(D.S.C. July 25, 2016) ...........................................................................14, 27, 31

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013) ...............................................................................20

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................13

**Page**

*Lefkowitz v. Synacor, Inc.*,
   2019 WL 4053956
   (S.D.N.Y. Aug. 28, 2019) ........................................................................................18

*Litwin v. Blackstone Grp.*,
   634 F.3d 706 (2d Cir. 2011)................................................................................20, 21

*Long Miao v. Fanhua, Inc.*,
   2020 WL 996602
   (S.D.N.Y. Mar. 2, 2020) ...........................................................................................15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).....................................................................................35

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)....................................................................................................20

*Meyer v. Jinksolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014).....................................................................................20

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
   2013 WL 1188050
   (D. Conn. Mar. 23, 2013)..........................................................................................28

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013).....................................................................................16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................ *passim*

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................................................................12, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)........................................................................................12, 18, 19

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of America Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................................33

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)...........................................................25, 28, 33

**Page**

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................................................21

*Ross v. Lloyds Banking Group, PLC*,
    2012 WL 4891759
    (S.D.N.Y. Oct. 16, 2012) ..........................................................................................12

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)........................................................................................11

*Schiro v. Cemex*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................................15

*Shenk v. Karmazin*,
    867 F. Supp. 2d 379 (S.D.N.Y. 2011)..................................................................25, 26

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)........................................................................................22

*South Carolina Retirement Systems Group Trust v. Eaton Corp. PLC*,
    791 F. App'x 230 (2d Cir. 2019) ................................................................................12

*Stadnick v. Vivint Solar, Inc.*,
    2015 WL 8492757
    (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017)....................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)........................................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................... *passim*

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013).........................................................................31

*Wallace v. IntraLinks*,
    2013 WL 1907685
    (S.D.N.Y. May 8, 2013)...............................................................................................26

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j(b).................................................................................................1, 10, 15, 20, 35
  §78u-4(b)(1)...........................................................................................................9
  §78t(a)...............................................................................................................1, 15

17 C.F.R.
  §77k......................................................................................................................12
  §§229.303(a)(3)(ii) and 229.303(b) ...............................................................20, 21
  §240.10b-5 ................................................................................................... *passim*

Federal Rules of Civil Procedure
  Rule 12(b)(6)....................................................................................................9, 11
  Rule 15.................................................................................................................35

Private Securities Litigation Reform Act...............................................................22, 23

Lead Plaintiff City of Bradford Metropolitan District Council as administering authority to the West Yorkshire Pension Fund ("Lead Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss (ECF No. 81, "MTD") the Consolidated Amended Complaint (ECF No. 64, "Complaint," cited as "¶_").[1]   The Complaint alleges claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder for the period from September 19, 2017 through December 18, 2018, inclusive.

## I.   PRELIMINARY STATEMENT

This action arises from repeated false assurances by FedEx and its senior officers regarding the Company's recovery from the NotPetya cyberattack in June 2017 ("NotPetya").

One year before NotPetya, FedEx dramatically augmented its European operations with its $4.8 billion acquisition of TNT Express B.V.   The TNT acquisition was critical to FedEx's international expansion plan and Defendants touted the acquisition and made bullish estimates regarding the growth of FedEx Express, the business segment that absorbed TNT.   Defendants claimed that the TNT acquisition was "a key driver to FedEx Express FY20 operating income improvement target" and would add between $1.2 and $1.5 billion in operating income by fiscal 2020.   ¶35.   Defendants repeatedly affirmed these statements throughout the Class Period.

In June 2017, NotPetya, a computer virus originated by Russian military hackers, infected and destroyed significant portions of TNT's computer systems, crippling its European operations and disrupting the integration process.   Although FedEx disclosed the fact of the attack, the Company concealed the extent of its operational impact, claiming that TNT's systems had recovered quickly from NotPetya and that the Company was on track to reap the full benefits of the TNT integration.

The Complaint alleges with particularity that FedEx's statements regarding the restoration of TNT's operations, TNT's retention of its customers, the progress of the TNT integration, and the

---

[1]   Unless otherwise noted, all defined terms have the meaning provided in the Complaint.

feasibility of achieving the Company's income improvement target by 2020 were materially false and misleading when made because: (a) TNT's international service was largely disabled for six months due to NotPetya; (b) TNT was losing high-margin international customers due to these operational failures; (c) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express; and (d) as a result, the Defendants lacked a reasonable basis for their positive statements about the Company's ability to meet the income improvement target for fiscal 2020. *See generally* ¶¶53-113.

Investors only learned the extent of NotPetya's disastrous impact on TNT in a series of disclosures culminating in December 2018. The Company then announced that it would not meet its long-held $1.2 to $1.5 billion operating income target by fiscal 2020. And it was only then the market learned that, because of NotPetya and its aftermath, FedEx Express/TNT was struggling with low international shipment volume and an unfavorable shift toward lower margin international packages. These facts were at odds with Defendants' many prior statements and shocked the market when they finally emerged. *See generally* ¶¶48, 119-26.

The Court should reject Defendants' meritless bid for dismissal. The particularized allegations of the Complaint show that Defendants materially misled the investing public regarding the extent of damage NotPetya caused to FedEx's business in Europe – consistently communicating to the market that NotPetya's impact was minimal and their expectations for growth remained unchanged despite the cyberattack. Defendants' argument that their disclosures apprised investors of the pertinent risks is baseless and improperly asks the Court to construe their Class Period statements in a light most favorable to them. Defendants' assertion that their misleading statements are protected as forward-looking or as non-actionable opinions or puffery is likewise without merit, ignores Defendants' misrepresentation of historical or then-existing fact, and is belied by the case

law and the Complaint's well-pleaded allegations.

The Complaint also raises a strong inference of Defendants' scienter, including specific allegations showing their access to information contrary to their public statements and indicating that NotPetya had disabled TNT's international shipment services and disrupted the integration progress. The Complaint supports this compelling inference through direct evidence (such as a credible confidential witness account tying the integration problems to senior executives), robust circumstantial evidence (such as the sudden resignation of FedEx Express's CEO days before the end of the Class Period), and basic common sense dictating that FedEx's senior leadership could not have been unaware of the devastation within this highly material core operation frequently discussed in their public statements.

For these and other reasons discussed herein, Lead Plaintiff respectfully submits that Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    FedEx Acquires TNT and Dramatically Increases Its European Operations

FedEx describes itself as a global logistics company that provides a broad portfolio of transportation, e-commerce, and other related services in four business segments.  ¶¶25-27.  FedEx Express, an express shipping company responsible for the majority of the Company's total revenue, is the business segment at issue in this litigation.  ¶26.

On May 25, 2016, FedEx completed the largest acquisition in the Company's history by acquiring TNT, a Netherlands-headquartered package-delivery company with operations throughout Europe, the Middle East, Africa, Asia-Pacific and South America.  ¶¶4, 29-30.  FedEx added TNT into its FedEx Express segment, which increased the Company's international revenue from 24% of total reported revenue in fiscal 2016 to 33% of total reported revenue for fiscal 2017, and increased the Company's market share in Europe from 5% to 19%.  ¶¶31-32.  The acquisition also increased

FedEx's workforce by over 25% and the Company's overall revenue by nearly a third – with virtually all of this growth in Europe.  ¶4.

During the Class Period, FedEx repeatedly emphasized the importance of the TNT integration and stated in the Company's annual reports that it was the "***primary area of focus***" for the Company.  ¶¶5, 145.[2]  In a March 21, 2017 press release announcing results for the quarter ended February 28, 2017, FedEx positively described the addition of TNT, the progress of its integration and provided specific guidance that by fiscal 2020, the integration of TNT would increase FedEx Express's operating income by $1.2 to $1.5 billion.  ¶¶33-35.[3]

## B.  NotPetya and Its Impact on FedEx

On June 28, 2017, FedEx announced that TNT had been attacked by NotPetya, a computer virus planted by Russian hackers, which spread throughout Europe and beyond.  ¶¶3, 36.  The Company provided the market with an update on NotPetya in its September 19, 2017 quarterly earnings press release, when it represented that "most TNT Express services resumed during the quarter and ***substantially all TNT critical operations have been restored***."  ¶¶38, 53.  In the quarterly earnings call that day, Defendant Bronczek made the specific representation that "***service levels within Europe have been restored to precrisis levels***."  ¶60.  Likewise, during a December 19, 2017 quarterly earnings call, FedEx reiterated that TNT had recovered from NotPetya, and Defendant Bronczek stated that TNT was "seeing strong service levels, and ***operations are back to normal*** after the June cyberattack" adding that "***the IT recovery process is <u>complete</u>***."  ¶¶39, 74.

---

[2]  All emphasis is added unless otherwise stated and all internal citations and quotations are omitted.

[3]  Defendants criticize Plaintiff's use of the defined term "TNT Operating Income Improvement Target" although it echoes their own words.  *See* MTD at 1, 7.  Defendant Bronczek stated "the integration is a key driver to FedEx Express FY20 operating income improvement target, of between $1.2 billion and $1.5 billion."  ¶35.  And Defendant Smith stated "[t]he integration of TNT Express is proceeding smoothly, and we are targeting operating income improvement at the FedEx Express Group of $1.2 billion to $1.5 billion in FY20 versus FY17."  *See* FedEx Corporation, Earnings Call (March 21, 2017) at 3.

Defendants also positively described the progress of the TNT integration, with Defendant Carter remarking that "on the heels of the cyberattack, we've become much more aggressive about improving the security posture, reliability and ***speeding up* the integration** of the technology platforms." ¶75. FedEx's quarterly report on December 20, 2017, reinforced this message, stating: "***All*** of TNT Express's critical operational systems have now been ***fully restored***, critical business data has been recovered and ***shipping services and solutions are back in place***." ¶76.

These and other statements issued by Defendants throughout the Class Period gave the false impression that TNT's systems had been fully restored, that FedEx had retained its customers in Europe, and that the progress of the TNT integration was on track, if not ahead of schedule. *See generally* ¶¶53-112. Defendants further quelled any market concern regarding the condition of TNT/FedEx Express's business by reaffirming the Company's $1.2 to $1.5 billion operating income improvement target for FedEx Express ***more than a dozen times*** during the Class Period. *Id.*

Defendants' public statements concealed that NotPetya had devastated TNT operations in Europe by destroying significant portions of TNT's computer systems, crippling its international shipment operations, and driving TNT customers to its competitors. ¶2; *see also* ¶63. NotPetya also delayed, rather than accelerated, the integration of TNT into FedEx. ¶6. A confidential witness who served as a Senior Business Relationship Manager at TNT from June 2015 to April 2019 (the "CW"), provided specific details regarding NotPetya's severe and continuing impact on TNT's business and operations. ¶¶40-43. According to the CW, NotPetya disabled TNT's operations within seconds and wiped out 75 critical systems, 37,000 PCs (desktop computers) and between 4,000 and 9,000 Windows servers. ¶40. At that point, the integration of TNT into FedEx, which was set to take place over the course of four years, "***took a stop***." *Id.* According to the CW, to address the continuing threat posed by NotPetya, FedEx severed the link between the TNT and

FedEx Express computer networks and installed a firewall between the two operating systems, thereby further impeding the integration of the two businesses.  *Id.*  The CW recounted that the recovery of the systems disabled by NotPetya took approximately six months to complete and approximately ***25% of the affected programs were never restored***.  *Id.*

The CW also explained that NotPetya disabled TNT's "custom clearance system" which had an especially severe effect on TNT's international operations.  ¶41.  The "custom clearance system" is responsible for packaging, invoicing, and obtaining custom-clearance approval for shipment to various countries.  *Id.*  According to the CW, TNT's international services comprised approximately half of TNT's total revenue.  *Id.*  As explained by the CW, in the wake of NotPetya, because the "custom clearance system" was down, TNT's international shipments were largely disabled for at least six months, local delivery services were delayed, and TNT lost substantial business to its competitors because it could not track packages.  *Id.*  The CW estimated that approximately 10% of TNT's high-margin business (customers that generated between a 10% and 13% margin) abandoned TNT in favor of competitors.  *Id.*

Further, the CW explained that there was significant doubt within the Company about FedEx's ability to meet its income improvement target by fiscal 2020.  ¶42.  As the CW explained, the difficulty in achieving this target was due, in part, to the complexity of the integration, which involved combining operations in numerous countries and complying with various local laws and legal requirements.  *Id.*  The CW also reported that the benefits of the TNT acquisition were delayed because U.S. customers could not utilize the TNT ground operations for European shipments – services which had still not "matured" by the time the CW left the Company in April 2019.  *Id.*  Consistent with the CW's account, FedEx now projects that the TNT integration will not be complete until fiscal 2022 and currently estimates the integration costs will total $1.7 billion – which

is **more than double** the Company's initial estimate of $800 million.  ¶¶43, 137.

      **C.**      **The Impact of NotPetya Is Finally Revealed to the Market**

      On June 19, 2018, FedEx reported integration expenses of $136 million for the quarter ended May 31, 2018, and $477 million for fiscal 2018.  ¶44.  This news signaled significantly greater integration problems than had been previously disclosed by the Company, causing FedEx's stock price to decline $6.96 per share, down 2.7%, to close at $251.43 on June 20, 2018.  *Id.*  On September 17, 2018, FedEx continued to report negative developments in the TNT integration.  ¶45. In the Company's quarterly report, it disclosed that FedEx had incurred "integration expenses totaling $121 million . . . in the first quarter of 2019, a $9 million increase from the first quarter of 2018."  ¶102.  Additionally, during the quarterly earnings call that followed, Defendant Graf disclosed that the Company's operating income was "partially offset by [a] **shifting service mix**. . . ." ¶¶45, 106.  The market reacted sharply to the Company's announcement of the increased integration costs and negative service mix and FedEx's stock price fell $14.15 per share, down 5.5%, to close at $241.58 on September 18, 2018.  ¶¶45, 108.

      The negative news continued on December 7, 2018, when FedEx announced that Defendant Cunningham had entered into a separation agreement with the Company on December 3, 2018 and would depart his position as CEO of FedEx Express by December 31, 2018.  ¶¶46, 114.  Analysts understood that Defendant Cunningham's unexpected departure reflected the negative performance of the FedEx Express segment and noted that this announcement cast doubt on the viability of the income improvement target for fiscal 2020.  ¶¶46, 115, 116.  FedEx's stock price dropped further, falling $13.31 per share, or 6.1%, as a result.  ¶117.

      Finally, on December 18, 2018, FedEx reported disappointing results for the quarter ended November 30, 2018, and belatedly disclosed the far-reaching damage NotPetya had caused the Company, and in particular, the FedEx Express/TNT segment.  ¶47.  The Company announced

lower-than-expected international revenue and a negative change to FedEx Express's business mix due to low growth in high-margin yielding services.  ¶118.  FedEx also disclosed that it would not achieve its long-touted income improvement target by fiscal 2020, explaining that "lower-than-expected express package volume due to European weakness that accelerated during the quarter and is expected to continue, and *a change in service mix following the June 2017 cyberattack on TNT*, will delay the anticipated realization of these benefits."  ¶¶47, 118.  Analysts expressed dismay at the Company's belated revelation that NotPetya had driven down international revenue and would cause FedEx to miss its projected income improvement target.  ¶¶4, 125-26.  On these negative developments, FedEx's stock price declined a precipitous $22.50 per share, down 12.2%, closing at $162.51 on December 19, 2018.  ¶¶49, 124.

The adverse but undisclosed business conditions caused by the NotPetya attack continued to impact the Company after the Class Period.  ¶¶127-37.  On February 28, 2019, FedEx's leadership team was again re-shuffled when Defendant Bronczek resigned from his role as President and COO and was replaced by Defendant Subramaniam.  ¶127.  Then, on March 19, 2019, FedEx announced disappointing earnings and revenue results for the quarter ended February 28, 2019, and reduced its full-year guidance for fiscal 2019.  *Id.*  Further, FedEx disclosed the rapidly mounting TNT integration costs, which it then expected to *exceed* the previously projected $1.5 billion.  *Id.*  On the quarterly earnings call that followed this announcement, Defendant Graf made clear, that with regard to the TNT integration, the Company was only *then* seeing improved service levels as well as the return of TNT legacy customers, stating, in pertinent part: "we're now finally getting service improvements at lower cost."  ¶130.

The Company continued to disclose integration problems nearly one year after the end of the Class Period.  On December 17, 2019, FedEx announced reduced operating results for the quarter

ended November 30, 2019, and lowered the Company's guidance and projections for fiscal 2020.

¶136.  In FedEx's quarterly report that followed this announcement, the Company reported that the

costs associated with integrating TNT continued to balloon, with total expenses estimated to be $1.7

billion – 112.5% higher than the Company's estimate of $800 million in September 2017 (the start

of the Class Period).  *Id.*

## III.    ARGUMENT

### A.    Applicable Legal Standards

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead

'enough facts to state a claim to relief that is plausible on its face.'"  *In re Glob. Brokerage, Inc.*,

2019 WL 1428395, at *7 (S.D.N.Y. Mar. 28, 2019) (Abrams, J.).  "'A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged.'"  *Id.*  Dismissal is appropriate "only if the

plaintiff fails to provide factual allegations sufficient to raise a right to relief above the speculative

level."  *Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).  In

evaluating a motion to dismiss, a court must construe the complaint liberally, "accept[ing] all factual

allegations in the complaint as true" and viewing them in the light most favorable to the plaintiff.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also In re Perrigo Co.*

*PLC Sec. Litig.*, 2020 WL 377881, at *3 (S.D.N.Y. Jan. 23, 2020) (same).

### B.    The Complaint Pleads Actionable Misrepresentations and Omissions

A plaintiff is required to "specify each statement alleged to have been misleading [and] the

reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1).  To do so, a plaintiff

must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were

fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  Importantly, "'whether a

reasonable investor would find a particular statement misleading . . . is usually a matter reserved for the trier of fact.'" *Glob. Brokerage*, 2019 WL 1428395, at *9.

### 1. Defendants' Misstatements Are Pled with Particularity

The Complaint pleads Defendants' misstatements with the requisite particularity by identifying the statements, who made them, when and where they were made, and explaining in detail why those statements were materially false and/or misleading when made. *See* ¶¶53-113. Defendants divide the misstatements alleged in the Complaint into three categories and claim that these statements are insufficiently pled, or are inactionable as a result of other disclosures. *See* MTD at 13-22. As discussed below, however, each of Defendants' challenges fail.[4]

### a. Statements Regarding the Restoration of TNT's Operations and Services Were False and Misleading

The Complaint shows that Defendants' statements about TNT's recovery from NotPetya were false and misleading and evidence from the CW contradicts Defendants' Class Period statements and demonstrates their falsity. Defendants attempt to twist this evidence, claiming it is somehow consistent with their falsehoods. *See* MTD at 16-17. But the plain meaning of the CW's statements refutes Defendants' Class Period statements and underscores the divergence between the truth and the Company's public statements.

For example, on September 19, 2017, FedEx stated that "[m]ost TNT Express services resumed during the quarter and ***substantially all TNT Express critical operational systems have***

---

[4] Citing *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), Defendants contend that the Individual Defendants cannot be held liable if they did not make a challenged statement alleged to be false and misleading. *See* MTD at 12 n.3. But *Janus* concerns whether one legal entity can be held liable under Section 10(b) for the statements made by a separate legal entity – a subject with absolutely no bearing here. *See* 564 U.S. at 137; *see also In re Barrick Gold Sec. Litig.*, 2015 U.S. Dist. LEXIS 71136, at *6 n.11 (S.D.N.Y. June 2, 2015) (*Janus* "has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability") (citing *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012). Indeed, all the Individual Defendants were senior executives at FedEx who made false or misleading statements during the Class Period, as alleged in the Complaint.

*been restored*." ¶53; *see also* ¶57 ("we have restored the TNT systems to a near-normal state, with *virtually all* critical systems up and available"); ¶60 ("our service levels within Europe have been *restored to precrisis levels*").  In contrast, the CW explained that the NotPetya attack crippled TNT operations wiping out 75 critical systems, including the "custom clearance system" which was responsible for international shipments.  *See* ¶¶40-41.  And the Company ultimately confirmed the CW's version of events.  *See e.g.*, ¶¶114-26.  The logical and reasonable inference arising from these facts is that Defendants misled the market by creating the false impression that TNT operations were up and running and its business was back to normal when they clearly were not.  *See Tellabs*, 551 U.S. at 314 (courts consider only inferences "rationally drawn from the facts alleged").[5]

Defendants next attempt to argue that their statements regarding the restoration of TNT's operations and services were not false and misleading in light of other disclosures.  *See* MTD at 13-15.  In particular, Defendants note that the Company informed investors that it had been "significantly affected" by NotPetya, that shipments were not at pre-attack levels, and that their positive statements were qualified (*e.g.*, FedEx stated that "most" services had resumed and that only "critical operations" had been restored).  *Id.*  Defendants do not try to reconcile this language with the facts alleged in the Complaint or explain how approximately half of TNT's revenue can be considered not "critical."  *See* ¶41.  Nor do they grapple with their statement that shipping services are "***back in place***" given that TNT's international shipment was disabled for six months.  *Id.* at ¶59.

None of these disclosures changed the message that FedEx communicated to the market –

---

[5]  Defendants further claim that their reporting of international revenue in the Company's quarterly fillings adequately disclosed the performance of TNT's business.  *See* MTD at 15-16.  First, as Defendants concede, the data provided in these reports does not break out TNT's performance – the business that was damaged by NotPetya.  As a result, investors were unable to appreciate the significant risk to TNT that resulted from the disabled systems critical to its international operations. Further, the extent to which the market understood the risk to the TNT business based on the raw data in FedEx's quarterly filings is a question of fact not appropriately determined at the motion to dismiss stage.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact").

that the NotPetya attack was not a cause of major concern because critical operations systems were supposedly restored and running. *See, e.g.*, ¶¶53, 57, 69, 72, 74, 76, 86, 88, 98. Defendants' qualifiers do not alter that conclusion. In truth, TNT was experiencing severe problems as a result of NotPetya, as TNT's systems for international shipments were largely disabled for at least six months. ¶41. Defendants' misstatements are actionable here because a statement to the investing public is false or misleading where a defendant company discloses some degree of risk without disclosing the "outsized impact" of that risk. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 34 (S.D.N.Y. 2019) ("the general disclosure of a phenomenon's existence, without describing its outsize rate of occurrence or the potential impact on an important source of revenue (here, EMEA), could be materially misleading"); *see also In re Ply Gem Holdings, Inc.*, 2016 WL 5339541, at *5-*6 (S.D.N.Y. Sept. 23, 2016) (finding Section 11 liability for statements that fail to "provide clarity on the extent of the expected effect" of risk).

Defendants' partial hedges and minor qualifiers are not, as they suggest, "equally vivid" risk disclosures that undo the impact of the Company's false representations that FedEx had recovered, or largely recovered, from NotPetya. *See* MTD at 13-15.[6] When viewed in their totality, Defendants' statements gave the false impression that the Company had fully recovered from NotPetya and that business was back to normal. *Omnicare, Inc. v. Laborers Dist. Council Constr.*

---

[6] Lead Plaintiff's allegations are not improperly selective and *South Carolina Retirement Systems Group Trust v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) and *Ross v. Lloyds Banking Group, PLC*, 2012 WL 4891759, at *7 (S.D.N.Y. Oct. 16, 2012) are inapposite. *See* MTD at 14-15. In *South Carolina Retirement Systems*, the court noted that given that the company made clear that it had no active plans to transact a spin off, its failure to disclose the tax ramification of that transaction were not actionable. 791 F. App'x at 234. Here, the omitted risks were not speculative as NotPetya had already damaged the TNT business. For similar reasons, *Ross* is not analogous. There, although the company had represented that "there has been no significant change in the financial or trading position," the company included additional specific disclosures regarding impairment charges and the sale of certain assets. 2012 WL 4891759, at *7. As alleged in the Complaint, Defendants provided no specific disclosures regarding the known problems to TNT following NotPetya. *See, e.g.*, ¶63.

- 12 -

*Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (finding that statements must be viewed in the "full context" in which they are made).

The contention that Lead Plaintiff's claims improperly demand that Defendants adopt a "pejorative spin on the degree to which TNT's services had been disrupted" is a strawman's argument. *See* MTD at 16. Defendants are not compelled to take a negative view of the state of their business – just a realistic and honest one. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (finding that while defendants need not adopt an overly negative view, optimistic statements may be actionable). Defendants' Class Period representations regarding TNT operations gave investors the false and misleading impression that operations and services were essentially back to normal which they decidedly were not.[7]

### b.   Statements Regarding FedEx Express's Customer Retention and Service Mix Were False and Misleading

Defendants assert that FedEx's disclosures regarding the restoration of the TNT customer base render their positive statements on this topic inactionable. *See* MTD at 17-18 (citing statements). But Defendants' position rests on a strained reading of FedEx's public statements. *See,*

---

[7] Thus, the cases relied on by Defendants are off point. *See* MTD at 16 (citing *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019), *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013), and *Holbrook v. Trivago*, 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)). The court in *Express Scripts* established that so long as public statements are consistent with data, officers need not be "overly gloomy or cautious." 773 F. App'x at 15. Similarly, in *ProShares* and *Trivago*, the court held that defendants were not obliged to adopt the so-called linguistic preferences of the plaintiff. *ProShares*, 728 F.3d at 103 (no cause of action where plaintiff argued that defendants should have used the word "loss," instead of "diverge significantly," when comparing certain investments to their underlying index); *Trivago*, 2019 WL 948809, at *19 (no cause of action where plaintiff argued that the words "deceleration," "reacted," and "normalized," were not forceful enough to describe the true state of defendants' financial results). Here, Lead Plaintiff is not quibbling over word choice. Lead Plaintiff's claim lies in Defendants' decision to provide a misleading picture of the TNT operations and service recovery progress in the face of specific and contrary knowledge. *See* ¶¶53-113. For example, Defendants' specific statements in the quarterly conference call on September 19, 2017 that "our service levels within Europe have been restored to precrisis levels" was false in light of the fact that TNT's international shipment was largely disabled for at least the six months following the NotPetya attack. *C.f.* ¶¶40-42, 60.

*e.g.*, ¶¶85, 112.  While FedEx disclosed *some* customer loss, *see* MTD 18, on the whole, the information it provided to the market did not comport with the risks that Defendants knew.  *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *11 (D.S.C. July 25, 2016) (disclosures were not made with such "'intensity and credibility' that it counter-balanced any alleged misleading information given by the Company earlier").[8]

With respect to Defendants' misstatements regarding the Company's service mix, Defendants again argue that because the Company's quarterly reports break out the financial performance and volume of FedEx Express's network parcel and freight services business, investors had all the information they needed to form their own opinions about the service mix.  *See* MTD at 18.  But "'[a]n investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances.'"  *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010) (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 n.11 (S.D.N.Y. 2005)).  Besides, the raw data regarding the FedEx Express segment could not have informed investors that TNT's international shipment was not functioning due to failure of critical systems and that this would, in turn, inevitably cause revenue reduction.  *See, e.g.*, ¶41.  These were facts understood by and known to Company insiders such as the Individual Defendants and the CW.  And, when the truth about the service mix was

---

[8]  Defendants attempt to paint all of their Class Period statements with a broad stroke claiming that these statements were qualified and contained meaningful risk disclosures.  Specifically, Defendants argue that the Company disclosed its "ongoing efforts to restore the TNT customer base and associated shipping volumes to pre-attack level."  *See* MTD at 17-18.  However, Defendants only cite to such qualified statements as late as March 20, 2018.  The statements made after March 20, 2018 were not limited by such qualifying language that would signal that the Company's efforts were ongoing and instead indicated that the service had been restored.  *See, e.g.*, ¶85 ("But it's – we're not seeing [a] decline in Express traffic and the fourth quarter we will have recovered most of the NotPetya volume from TNT now."); ¶112 ("Well, similarly now we're experiencing that well – as well, that despite the cyberattack, the customers stuck with us.").  These statements were false.  In fact, on March 19, 2019, in discussing the Company's quarterly results, Defendant Graf confirmed that FedEx was only ***then*** seeing improved service levels.  ¶130.

revealed, the investing public reacted with shock, driving down the price of FedEx's stock.  *See* ¶¶48, 119-26.

Further, although Defendants assert that the CW's supposed "lack of precision and certitude is fatal," *see* MTD at 20, the legal authority on which Defendants rely does not undermine the CW's account.  For example, in *Schiro v. Cemex*, 396 F. Supp. 3d 283 (S.D.N.Y. 2019), *see* MTD at 19, the court declined to credit a former security guard who claimed that he accompanied company officials to pay bribes at town hall meetings, despite having no *specific* information related to such bribes.  *Id.* at 305.  Here, by contrast, the CW detailed the exact nature of the problems regarding the NotPetya recovery, how the CW gained this knowledge, and why FedEx senior management would have been aware of such problems.  ¶¶40-42.[9]

### c.    Statements Regarding FedEx's Integration of TNT Were False and Misleading

Defendants assert that their statements regarding the TNT integration did not convey to the market that the integration would be completed ahead of time.  *See* MTD at 20 (FedEx "was speeding up its integration *efforts* (as opposed to the overall timeline)").  Defendants gloss over the representations that they actually made regarding the integration, including that it would be "expedited" or "accelerated."  *See, e.g.*, ¶¶58, 69, 75, 85, 97, 105.  In fact, on the Company's earnings call on March 20, 2018, Defendant Bronczek stated that "[t]he integration of our global

---

[9]  Similarly, *Long Miao v. Fanhua, Inc.*, 2020 WL 996602 (S.D.N.Y. Mar. 2, 2020), *see* MTD at 19, is inapplicable because in that case, the pleading provided no information about the confidential witness and was "entirely unmoored in time."  *Id.* at *20.  Here, Lead Plaintiff alleged detailed information about the CW and the basis of his or her knowledge regarding the TNT integration and recovery.  ¶¶40-42.  Finally, the court's holding in *Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017), *see* MTD at 20, does not weaken the CW's account.  *Id.* at *14.  *Vivint* dealt with inconsistent accounts of confidential witnesses.  ¶¶40-42.  The CW's account is not contradicted by other accounts and is consistent with the Company's revelations at the end of the Class Period.  *See* ¶118; *Gauquie v. Albany Molecular Research, Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (upholding Sections 10(b) and 20(a) claims based on allegations from one un-contradicted confidential witness).

sales force, originally expected to be complete in fiscal 2020, is now scheduled to be complete *1 full year early*." ¶84.  Defendants' attempts at re-characterizing their own statements regarding the pace of the TNT integration are not supported by the Complaint and do not form a basis for avoiding liability here.  *See* MTD at 21.  The Court should also reject Defendants' argument that their disclosures regarding the costs associated with the integration of TNT adequately notified the public regarding the pertinent risks.  *Id*. at 21-22.  Defendants ignore that their statements were, at a minimum, misleading because they failed to disclose the depth of the problems at TNT and the resulting impact on the integration of TNT into FedEx.  Barebones estimates of integration costs were misleading in the absence of additional known information regarding the disabling of TNT's international shipments and the disruption of the integration process.

### 2.    Defendants' Misstatements Were Material

"For a misstatement or omission to qualify as material, 'there must be a substantial likelihood that' a complete and truthful disclosure 'would have been viewed by [a] reasonable investor as having significantly altered the "total mix" of information made available.'" *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013).  To defeat allegations of materiality, Defendants must demonstrate that the omitted facts were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018); *see also Carpenters Health*, 709 F.3d at 126.  Here, Defendants' misstatements concerned TNT/FedEx Express, a topic which was unquestionably material to investors as this business segment accounted for 54% of the Company's total revenue.  ¶26.  Moreover, the Company acknowledged that TNT provided "extensive benefits to FedEx" and its integration was "a key driver" of the income improvement expected in the FedEx Express business by fiscal 2020.  ¶35. Further, the strong market reaction to the disclosure of the stalled progress of the integration and the

reduced service levels caused by NotPetya further support materiality here.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013) ("The market reaction . . . supports the adequacy of the materiality allegations.").[10]

Faced with these allegations, Defendants attempt to characterize the false and misleading statements as immaterial puffery.  *See* MTD 27-28.  But "[p]uffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law."  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011).  Accordingly, Courts "must exercise great caution" when considering a puffery defense at the "motion to dismiss stage" because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury."  *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012).  Contrary to Defendants' protestations, FedEx's misstatements regarding TNT's integration, the Company's service mix in its international business, and recovery from NotPetya (*see* MTD at 27-28) are not protected as puffery as they directly implicate FedEx's opportunities for achieving continued success.[11]  *See, e.g.*, *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (statements regarding progress of integration not puffery).

Relatedly, Defendants' decision to repeatedly address the integration and restoration of TNT

---

[10]  FedEx's stock price dropped and analysts expressed shock when the Company ultimately revealed the significant problems resulting from the NotPetya virus that were impacting TNT and causing the Company to report reduced revenues and miss the income improvement target.  *See* ¶¶48, 96,108, 124-26.

[11]  Defendants cite inapposite cases to argue that their false and misleading statements are puffery.  *See* MTD at 28 (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)).  For example, in *City of Pontiac*, the court found that general statements about reputation, integrity, and compliance were inactionable puffery.  *City of Pontiac*, 752 F.3d at 183.  The misstatements here, however, relate to concrete matters regarding FedEx's operations – *i.e.*, how the Company was recovering from NotPetya, the progress of the TNT integration (which it repeatedly referred to as its "**primary area of focus**") and whether the Company would meet the income improvement target for the FedEx Express business by fiscal 2020.

services in their communications to investors further underscores the materiality of these topics. Indeed, when statements are "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (collecting cases). Because the Complaint alleges that Defendants repeatedly spoke on the impact of NotPetya, the acceleration of the TNT integration, TNT's favorable service mix, and the recovered service levels, these statements cannot be discarded as immaterial puffery.

Nor is there merit to Defendants' contention that the false and misleading statements in the Complaint are protected as statements of opinion. *See* MTD at 25-27. A statement of opinion is actionable if the opinion *omits* a fact that renders it misleading to an ordinary investor. *See Omnicare*, 575 U.S. at 189-90. Here, the Complaint alleges that many of Defendants' statements were false and/or misleading due to what they *omitted*. Specifically, the Complaint alleges that FedEx failed to disclose specific facts relating to the disastrous impact of NotPetya – *i.e.*, the disruption to TNT's international shipments, the negative impact on the Company's service mix, and the delays to the TNT integration. *See, e.g.*, ¶¶63, 78, 89, 95, 100, 107, 110, 113; *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 844 (S.D.N.Y. 2019) (statements regarding plans to renovate theatre not protected as opinion where there was a "conflict with what a reasonable investor would take from the statement itself.").[12] Moreover, the

---

[12] The holding in *Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018), *see* MTD at 27, does not compel a different conclusion. There, the court concluded that statements regarding future earnings were non-actionable where the complaint failed to allege nearly any details about the omitted facts. *Id.* at 230. Here, on the other hand, the Complaint specifies the information that Defendants knew, ¶¶40-43, but was undisclosed to the market. ¶¶63, 78, 89, 95, 100, 107, 110, 111. Likewise, in *Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019), *see* MTD at 27, the court found that where there were adequate risk disclosures regarding future income, defendant-company's statements were non-actionable. *Id.* at *8. But here, unlike in *Lefkowitz* and *Frankfurt,* Defendants failed to disclose the specific risks surrounding the TNT integration, the Company's continued operations, or the income improvement

account of the CW – who explained, *inter alia*, that the TNT international operations were largely disabled for at least six months – clearly contradicts FedEx's public statements that TNT's service restoration in the wake of NotPetya was successful. *C.f.*, *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020); *see* MTD at 27. The Complaint also includes allegations that FedEx senior management attended internal meetings that addressed the TNT recovery and related topics. *See* ¶¶40 n.2, 147.

Further, the bulk of the misstatements alleged in the Complaint are undeniably phrased as statements of fact. As the Supreme Court observed in *Omnicare*, investors recognize opinions by the presence of certain signals – expressions such as "I believe" or "I think" – which are absent in Defendants' statements. *Omnicare*, 575 U.S. at 187; *see, c.f.*, ¶56 (". . . we reaffirm our commitment to improve operating income at FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017."); ¶57 (". . . we have restored the TNT systems to a near-normal state, with virtually all critical systems up and available."); ¶60 ("Our service levels within Europe have been restored to precrisis levels."); ¶74 (". . . at TNT, we are seeing strong service levels, and operations are back to normal after the June cyberattack. The IT recovery process is complete."); ¶83 (". . . at TNT, we are seeing strong service levels and the integration is accelerating.").[13]

### 3.   Defendants Had a Duty to Disclose the Omitted Information

As detailed above, Lead Plaintiff has adequately pled that Defendants misrepresented the

_____

margin – opting instead to represent that the TNT integration was ahead of schedule, that business had essentially returned to normal, and that the Company was on track to meet the income improvement margin target on time. *See, e.g.*, ¶¶53, 55-61, 69-76, 83-88, 92-93, 97-99, 101, 104-05, 111-12.

[13] Courts have also held that "[i]t is disingenuous to suggest that factual assertions are puffery and opinion . . . simply because [defendant] claims only to have stated that it believes in their truth." *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Instead, courts look to the underlying representation to determine whether a statement is fact or opinion. *Id.* Because the false and misleading statements alleged in the Complaint related to concrete facts regarding TNT's integration, the Company's service mix, and recovery from NotPetya, even if Defendants had tacked on the phrases "I think" or "I believe," they would not be relieved of liability.

state of FedEx's business and omitted material facts regarding the effect of NotPetya on TNT. While Defendants maintain that they did not have a duty to disclose the omitted information, *see* MTD at 28-29, they ignore that Section 10(b) imposes a duty to disclose omitted facts when they are "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Stated differently, a defendant can be liable for securities fraud if it issues "an actual *statement* . . . that is either untrue outright or misleading by virtue of what it omits to state" – that is, a "half-truth." *Glob. Brokerage*, 2019 WL 1428395, at *8, *9 (emphasis in original quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016)).  Thus, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinksolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014).  And, the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead" investors. *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013).  As alleged, Defendants' message – that TNT had largely recovered from NotPetya – when, in fact, TNT's international shipments were disabled and the integration of TNT had been slowed, constituted a critical omission that misled rather than accurately informed the market.

Defendants also violated a separate statutory duty under Item 303 of Regulation S-K ("Item 303"), which requires disclosure of any known trends or uncertainties reasonably expected to have a material impact on net sales, revenues or income. *See* 17 C.F.R. §§229.303(a)(3)(ii) and 229.303(b); *Litwin v. Blackstone Grp.*, 634 F.3d 706, 721 (2d Cir. 2011).  The Complaint establishes that Defendants had a clear obligation to disclose facts related to trends or uncertainties resulting from NotPetya, including that TNT's operations were effectively disabled in its wake, thereby causing a material reduction in TNT's customers, revenues and growth.  ¶52.

Defendants contest their disclosure obligations under Item 303 on two bases.  First, Defendants contend that the Complaint has not adequately pled Defendants' knowledge of these trends or uncertainties.  *See* MTD at 28-29.  But as discussed in detail below, the Individual Defendants had knowledge of or, at a minimum, recklessly disregarded, information that was contrary to their public statements.  *See* §III.C.1; *Lexmark*, 367 F. Supp. 3d at 35 (finding an Item 303 violation adequately pled where individual defendants' scienter established); *see also Litwin*, 634 F.3d at 716 (finding Item 303 liability when "Plaintiffs allege that the downward trend in the real estate market was already known and existing at the time of the IPO. . . .").  In any event, scienter of an individual defendant is not required to find a violation of Item 303.  *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (finding scienter against defendant-company that failed to disclose information in accordance with Item 303, without making a finding of scienter as to any individual).

Second, Defendants assert that any trend or uncertainty related to NotPetya or the integration of TNT was in fact disclosed by the Company.  *See* MTD at 29.  Defendants boldly conclude "it is just not credible to claim investors were misled."  *Id.*  The Complaint, however, details specific adverse facts that were not disclosed in FedEx's various statements.  The warnings that Defendants lean on were inadequate because they failed to indicate that the risks warned of ***had actually materialized***.  *See, e.g.*, *id*; *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *AMC*, 422 F. Supp. 3d at 847 ("As courts in the Second Circuit have advised, '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'").  Thus, neither of these grounds rebut the Complaint's strong allegations of an Item 303 violation.

### 4.    The Challenged Statements Are Not Protected as Forward-Looking Statements

Defendants further attempt to escape liability by characterizing many of their misleading

statements as forward-looking.  Under the PSLRA, forward-looking statements are protected "only to the extent that [defendants] can show that: (1) the statements were accompanied by meaningful cautionary language; (2) the statements were immaterial; or (3) the plaintiff failed to prove the statements were made with actual knowledge that they were false or misleading."  *OneMain*, 348 F. Supp. 3d at 297 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).  As the Second Circuit has explained, Defendants bear the burden of demonstrating that the "cautionary language was not boilerplate and conveyed substantive information."  *Slayton*, 604 F.3d at 772.  Courts have held that "[t]o be meaningful, cautionary language 'must precisely address the substance of the specific statement or omission that is challenged.'"  *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006).  Further, "[t]he safe harbor . . . does not protect material omissions."  *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016).

As a threshold matter, Defendants cannot avail themselves of the PSLRA's safe harbor provision because many of the statements at issue implicated matters of historical fact.  *See also Oxford*, 187 F.R.D. at 141 ("[P]laintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements.  The safe harbor and bespeaks caution doctrines do not apply to these omissions."); *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (bespeaks caution doctrine does not apply to "alleged omissions of information concerning existing financial and operational difficulties").  These statements include, without limitation: "[m]ost TNT Express services resumed during the quarter and substantially ***all TNT Express critical operational systems <u>have been restored</u>*.*" (¶53); "Leveraging every other available resource, *we <u>have restored</u> the TNT systems to a near-normal state, with virtually all critical systems <u>up and</u>*

- 22 -

*available*." (¶57); "***Key assets in the recovery have been the FedEx air network and the TNT***

***European road network, which*** *have allowed us to retain* ***a significant portion of our TNT***

***customer base***." (¶59); "***Our service levels within Europe*** *have been restored* ***to precrisis levels***."

(¶60); "***The company*** *is accelerating* ***the integration process and increasing investments to move***

***TNT Express information technology and operational infrastructure to FedEx infrastructure due***

***to the recent cyberattack at TNT Express***." (¶69).

Defendants' statements regarding the achievability of the income improvement target by

fiscal 2020 also implicated historical facts. Indeed, the allegations of the Complaint do not rest on

the fact that the Company's income improvement target was not ultimately met by fiscal 2020;

rather, Defendants are liable for failing to disclose important negative facts about the state of

FedEx's business that undercut this publicly-stated target. *See* MTD at 27. *Vivendi* is instructive on

this point. There, Judge Holwell found that projections are not always protected as forward-looking,

explaining, in pertinent part:

> plaintiffs have never argued that Vivendi's 35% EBITDA growth projection or any
> other projections made by Vivendi were misleading because the company failed to
> achieve its targets. Under plaintiffs' theory of the case, whether Vivendi actually
> achieved its 35% target or not is irrelevant. According to plaintiffs, it is the
> announcement of the target itself that is misleading ***as a matter of present fact*** in that
> Vivendi failed to disclose that a huge one-time purchase accounting benefit was built
> into the projection – a benefit that existing internal, undisclosed documents showed
> would account for almost 50% of EBITDA growth.

765 F. Supp. 2d at 569 (emphasis in original).

Based on this reasoning, the court in *Vivendi* concluded that because "the misleading nature

of the statement could be verified the moment it was made, and did not depend on any future

events," the statement was not protected by the PSLRA's safe harbor. *Id.* at 569-70; *see also In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) ("[I]f a company

voluntarily chooses to disclose a [] projection, that disclosure is susceptible to attack on the ground

that it was issued without a reasonable basis."). Here, the Complaint's allegations stem from Defendants' failure to disclose facts that undercut the income improvement target; specifically, that the Company was experiencing severe problems as a result of NotPetya, including that FedEx had lost customers and that the business had not returned to normal. *See generally* ¶¶53-112.

### C.      The Complaint Adequately Alleges Scienter

A plaintiff may plead scienter "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak,* 216 F.3d at 307. The analysis weighs "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322-23 (emphasis in original); *see also Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("A court . . . must assess the complaint in its entirety, and not scrutinize each allegation."). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference." *Tellabs,* 551 U.S. at 324; *cf. Lockheed*, 875 F. Supp. 2d at 372 ("a tie . . . goes to the plaintiff").

Moreover, "the absence of a motive allegation is not fatal" as scienter may be based on conscious disregard or recklessness. *Tellabs,* 551 U.S. at 325; *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 319 (S.D.N.Y. 2013) (same); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) (when presented with allegations demonstrating "conscious or reckless misbehavior, [a court] need not also consider" motive). "The Second Circuit has further clarified that scienter may be demonstrated by proof that defendants 'knew facts or had access to information suggesting that their public statements were not accurate; or []failed to check information they had a duty to monitor.'" *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *10 (S.D.N.Y. Nov. 18, 2014) (quoting *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272,

298 (S.D.N.Y. 2009).

Here, the Complaint cogently alleges that Defendants recklessly, if not consciously, issued false and misleading statements and omitted material facts during the Class Period regarding the impact of NotPetya on TNT and FedEx's business. The competing inference that Defendants propose – that Defendants were unaware of the true extent of NotPetya's impact – is implausible, unpersuasive, and undermined by the facts alleged in the Complaint.

### 1. The Complaint Adequately Alleges the Individual Defendants' Conscious Disregard and/or Recklessness

"Plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had 'knowledge of facts or access to information contradicting their public statements.'" *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015); *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011) (finding officers recklessly disregarded the truth when their company made, and failed to correct, statements that contradicted reasonably available data concerning the heart of their businesses). Here, the Individual Defendants had contemporaneous access to information regarding the depth of the damage that NotPetya caused to TNT's business and operations, but did not disclose these facts to the market. *See generally* ¶¶40-43. The Individual Defendants were also aware, but failed to disclose, that the integration of TNT into FedEx – which was described as a "***primary area of focus***" for the Company (¶35) – was halted and otherwise delayed. ¶¶40-43. Specifically, the CW recounted that FedEx's senior management was in regular contact with TNT executives, took an active role in the integration of TNT into FedEx Express and was involved in the recovery efforts following NotPetya. ¶147. As the CW explained, FedEx Senior Vice Presidents and Vice Presidents traveled to Amsterdam to participate in briefings with TNT on IT issues and FedEx provided TNT with experts, including Microsoft employees, to assist in restoring TNT's platforms in

the wake of NotPetya.  *Id.*  The CW also explained that there was significant doubt within the Company as to whether FedEx would be able to meet the income improvement target of growing FedEx Express between $1.2 and $1.5 billion by fiscal 2020.  ¶42.  These allegations, viewed collectively with the other indicia of scienter, demonstrate that the Individual Defendants "knew facts" demonstrating that the Company's portrayal of FedEx/TNT's operations, the integration, and the feasibility of the income improvement target were "not accurate."  *Glob. Brokerage*, 2019 WL 1428395, at *15 (citing *Novak*, 216 F.3d at 311).

The Complaint's allegations regarding FedEx's senior management's involvement in TNT's operations establishes that the Individual Defendants would "have easily uncovered the falsity" of their statements that the Company had recovered from NotPetya because they "had a duty to monitor the information that would have disproved the allegedly false and incredibly important claims" made.  *Shenk*, 867 F. Supp. 2d at 386-87; *see also Novak*, 216 F.3d at 308 (scienter exists where "defendants failed to review or check information that they had a duty to monitor"); *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 2020 WL 248729, at *20 (S.D.N.Y. Jan. 15, 2020) (finding scienter where defendants "knew facts or had access to information suggesting that [defendants'] public statement[s were] not accurate"); *Glob. Brokerage*, 2019 WL 1428395, at *15 (scienter based on defendants' access to information); *Wallace v. IntraLinks*, 2013 WL 1907685, at *8-*9 (S.D.N.Y. May 8, 2013) (fact that "CEO and CFO . . . would likely remain informed about developments with a crucial part of [the Company's] business" provided "additional evidence" of scienter); *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 322 (S.D.N.Y. 2010) (failure "'to check information [defendants'] had a duty to monitor' may also give rise to a strong inference of recklessness.").

The inference of scienter here is further bolstered by the Individual Defendants' decision to

communicate frequently and in specific terms with the market about the status of the Company's supposed recovery from NotPetya, the progress of the integration of TNT into FedEx, and the retention of TNT customers.  *See, e.g.*, ¶¶53, 55-61, 64, 69-70, 72-77, 83-88, 92-94, 97-99, 101, 104-05, 109, 111-12; *Albany Molecular*, 2016 WL 4007591, at *2-*3 ("Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to it."); *Lockheed*, 875 F. Supp. 2d at 372 ("specificity" of statements was "strong circumstantial evidence" executives "were receiving some form of specific information"); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269-71 (3d Cir. 2009).  Indeed, the "Individual Defendants knew about these core operations" and "spoke on these issues at conferences, on conference calls, and in press releases."  *KBC Asset Mgmt.*, 2016 WL 3981236, at *9.[14]

### 2.      The CW Account Supports a Strong Inference of Scienter

In assessing the account of a confidential witness, the Court must determine whether the allegations have "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314; *AMC*, 422 F. Supp. 3d at 851 (same).  As the Complaint alleges, the CW worked as both a Senior Business System Manager and a Senior Business Relationship Manager at TNT and was positioned to understand the effect that NotPetya was having on operations of the Company and the integration of TNT into FedEx during the Class Period.  ¶¶40-43.  Further, the Complaint provides the CW's title and role within the Company as well as the length of the CW's employment with FedEx/TNT.  *Id.* Such information allows the Court to evaluate the probability that the CW possessed the information

---

[14]  The Complaint also includes allegations that internal meetings with FedEx senior management addressed the TNT recovery and related topics, which raises a strong inference of scienter.  *See* ¶¶40 n.2, 147; *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 221-22 (S.D.N.Y. 2004) (scienter met based on defendant's position and attendance at meetings discussing relevant issues).

alleged.  The Second Circuit requires nothing more.  *See Novak*, 216 F.3d at 314.

Defendants argue that Lead Plaintiff cannot rely on the CW's account because the Complaint does not include allegations that the CW communicated with the Individual Defendants.  *See* MTD at 32 (citing *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *18 (S.D.N.Y. Aug. 19, 2015)).  Defendants' argument rests on the imposition of an improper requirement for pleading a confidential witness account.  A confidential witness need not have direct contact with management for the CW's account to be reliable.  *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("The notion that the [confidential witnesses] cannot be believed because none had direct contact with any individual Defendant is contrary to law."); *Orthofix*, 89 F. Supp. 3d at 615-16 (finding "there is no baseline requirement of such contact").  Defendants' argument also ignores the allegations of the Complaint establishing the basis for the CW's knowledge, including that: (i) the CW's account was based on information from meetings with ***TNT Senior Executives***, who were directly responsible for the integration (¶40 n.2); (ii) the CW reported directly to a managing director of TNT (*id.*); (iii) "the Individual Defendants[] were in regular communication with TNT executives in Europe and took an active role in the integration of TNT into FedEx Express and the recovery efforts" after the NotPetya attack (¶147); and (iv) the Senior Vice Presidents and Vice Presidents of FedEx traveled to Amsterdam to participate with TNT in briefings on IT issues (*id.*).

The remainder of Defendants' challenges to the CW account fare no better.  *See* MTD at 33.  Defendants first argue that the CW's evidence is unreliable because the CW did not claim involvement in developing FedEx's projections.  *See* MTD at 33.[15]  But the CW's knowledge is

---

[15]  In *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050 (D. Conn. Mar. 23, 2013), cited by Defendants, the court found that numerous flaws in the confidential witnesses accounts discredited them.  *Id.* at *36; *see* MTD at 33.  Significantly, unlike the allegations of the CW, the witnesses in *Pitney* failed to specify a date range of the problems they recounted.

based on, among other things, the CW's first-hand meetings with TNT Senior Executives.  ¶40 n.2. That the CW knew information regarding FedEx's internal structure and practices – which outsiders could not have known – further bolsters the CW's reliability.  The Court should likewise reject Defendants' objection to the term "significant" in the Complaint's description of the doubts surrounding the income improvement target.  *See* MTD at 33.  As detailed in the Complaint, the doubts identified by the CW were based on material negative facts regarding TNT's operations known but not disclosed by management.  *See* ¶¶40-43, 147.

Finally, contrary to Defendants' suggestions, the CW provided *specific* information about NotPetya and its effect, the TNT integration, and the income improvement target (¶¶40-43) – internal information that only insiders would know.  *See In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767-68 (S.D.N.Y. 2012) (crediting witnesses who "describe[d] the systematic disregard of underwriting standards").  For example, the CW recounted which computer systems were disabled by NotPetya, how long these systems were non-operational, and described in detail the problems relating to the "custom clearance system." *See* ¶¶40-43.  Thus, the account of the CW is credible and supports a finding of scienter.

### 3. The Core Operations Doctrine Further Supports a Strong Inference of Scienter

The Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter." *Lockheed*, 875 F. Supp. 2d at 371.[16]  The doctrine holds that "[k]nowledge . . . can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's . . . statements were false when issued." *In re Atlas Air Worldwide Holdings, Inc. Sec.*

---

[16]  Although this Court has recently indicated that the "viability of the core operations theory . . . is *uncertain*," Defendants can point to no authority abolishing the "core operations doctrine" in the Second Circuit because none exists.  *In re Philip Morris Int'l Inc. Sec. Litig.*, 2020 WL 550769, at *20 (S.D.N.Y. Feb. 4, 2020); *see* MTD at 33-34.

*Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004); *see also Avon*, 2019 WL 6115349, at *20 ("The 'core operations doctrine' permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, even without specific allegations that senior management had actual knowledge of such information."); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("[t]o fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business.").

Here, the Individual Defendants were "key officers" with significant responsibilities for overseeing the FedEx Express segment, including taking an active role in the integration of TNT into FedEx Express and the recovery efforts following NotPetya. ¶¶26, 147. Further, FedEx Express – the business segment at issue in this litigation – accounted for 54% of the Company's revenue. ¶26. Thus, it is difficult to imagine that the Individual Defendants were unaware of the disastrous impact NotPetya had on the Company, FedEx Express, or the TNT integration, especially considering that FedEx described the TNT integration as a "***primary area of focus***." ¶¶144-45; *see also* MTD at 34. The core operations doctrine further supports scienter here because sales from FedEx Express represented a "significant source of [the company's] income," and the segment was "critical [to the] long term viability" of the Company. *Hi-Crush Partners*, 2013 WL 6233561, at *26 (finding core operations supported scienter where, like here, 18% of the company's revenues were at issue).[17]

The Individual Defendants' frequent communications with the market about TNT's recovery from NotPetya and the TNT integration also supports their knowledge of the falsity of their

---

[17] Defendants' assertion that TNT's business was not large enough to qualify it for the core operations doctrine is misplaced. *See* MTD at 34. Defendants calculate that the increase of FedEx Express's revenue by a third accounted for an increase of 17.8% of the Company's total revenue. *Id.* Thus, even by Defendants' calculations, FedEx Express meets the test from *Hi-Crush Partners* to apply the doctrine. 2013 WL 6233561, at *26.

statements.  *See KBC Asset Mgmt.*, 2016 WL 3981236, at *9 (scienter bolstered when individual defendants frequently spoke on the relevant issues at conferences, on conference calls, and in press releases); *see also* Section III.C.1.  Given these statements, it would be illogical to conclude that the Individual Defendants did not possess or have access to information regarding the extent of the damage done to TNT's systems, operations, and customer mix, as well as to the TNT integration and, by extension, the income improvement target.[18]

### 4.    Cunningham's Resignation Supports a Strong Inference of Scienter

As alleged in the Complaint, Defendant Cunningham served as FedEx Express's President and CEO until, suddenly and unexpectedly on December 7, 2018, just 11 days before the end of the Class Period and revelation of the truth, FedEx announced that Defendant Cunningham would depart his role by year-end.  *Id.*  Indeed, the market understood Defendant Cunningham's departure to be the result of the poor performance of FedEx Express.  *See* ¶¶115-16.

The suspicious timing of the resignation of Defendant Cunningham, who led FedEx Express – the business segment impacted by the NotPetya attack – lends further support to the strong inference of scienter here.  *See, e.g.*, *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (resignation contributes to an inference of scienter); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("[T]he resignation and retirement of company insiders alleged to have been involved in the scheme . . . all contribute to the inference of

---

[18]  The Court's decision in *Phillip Morris* concluded that corporate position *alone* does not establish scienter.  *See* 2020 WL 550769, at *20.  Here, the Complaint's allegations of scienter do not rest on the Individual Defendants' position alone.   Regardless, courts have repeatedly held that a defendant's position, experience, and financial acumen *can* lend additional support to a strong inference of scienter.  *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) ("It thoroughly strains credulity to imagine that the individual defendants, by virtue of their [executive] positions . . . were ignorant."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (scienter allegation sufficient as to CFO when, because of his position, he was "uniquely situated" to control the revenue recognition procedures of the company); *In re Fleming Cos. Sec. & Derivative Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004) (defendants' "positions and experience" considered as evidence of scienter).

scienter."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (executive resignation supported inference of scienter); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (resignations support scienter "when independent facts indicate that the resignation was somehow tied to the fraud alleged").  Here, "[a]t the very least, the timing of [Cunningham's departure] might suggest that the Company believed [he] had been involved in wrongdoing . . . ." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *see also In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 (S.D.N.Y. 2006).

### 5.    FedEx's Pre-Acquisition Diligence Supports a Strong Inference of Scienter

As alleged in the Complaint, through pre-acquisition diligence, Defendants learned that TNT had weaknesses in "IT and in operations," that would require additional investments from FedEx to correct.  ¶146.  Also, as described above (Section III.C.3), the Individual Defendants were in regular communication with TNT Executives and took an active role in the TNT integration.  ¶147.  Thus, when the Company's IT systems were compromised and disrupted by NotPetya, Defendants were on notice that the recovery from NotPetya – given the weakened TNT legacy IT system – would be particularly challenging.  Stated differently, the pre-acquisition diligence, combined with their active role in TNT and its integration, provided Defendants with more than enough information to alert them of the need to closely monitor the recovery of TNT systems.  *See In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1003 (S.D. Ohio 2007) ("Even if the allegations about the due diligence review, standing alone, do not create a strong inference of scienter, the Court must consider [the complaint] as a whole. . . .  All of the[] allegations, when combined with the due diligence allegations, create a strong inference of scienter.").

Defendants' challenges to the allegations regarding the pre-acquisition diligence misconstrue them.  *See* MTD at 31.  This case does not arise from undisclosed vulnerabilities in TNT's legacy

systems. *See id.* Rather, as alleged in the Complaint, given the known weaknesses in these systems, Defendants had a duty to monitor the recovery from NotPetya with particular care. *See* ¶146. These facts further support scienter and undercut Defendants' contention that they were ignorant of the true facts concerning FedEx's challenging recovery from NotPetya.

### 6.      The Complaint Adequately Alleges Corporate Scienter

Though "[t]here is no formulaic method or seniority prerequisite, . . . scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009). "In most cases, the most straightforward way to raise . . . an inference [of scienter] for a corporate defendant will be to plead it for an individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

Because the Complaint pleads a strong inference of scienter as to the Individual Defendants, it has done so for FedEx as well. *See CBS Corp.*, 2020 WL 248729, at *21 (corporate scienter alleged based on scienter of company's CEO); *Glob. Brokerage*, 2019 WL 1428395, at *16 (corporate scienter alleged based on scienter of company's CEO and chief dealer); *In re OSG Secs. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014) (corporate scienter alleged based on scienter of company's CEO and CFO); *Orthofix*, 89 F. Supp. 3d at 619 (corporate scienter alleged through "three key officer[]" defendants).[19] Indeed, the Complaint adequately alleges facts showing that the Individual Defendants' statements regarding FedEx's recovery from NotPetya or the status of the integration of TNT were made as agents and representatives of FedEx. *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 361 (S.D.N.Y. 2015) ("[a] plaintiff can raise an inference of

---

[19]   Although "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue," *Pennsylvania Public School Employees' Retirement System v. Bank of America Corp.*, 874 F. Supp. 2d 341 (S.D.N.Y. 2012), here, each Individual Defendant made false and misleading statements during the Class Period. *Id.* at 372.

corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment."). Thus, the Complaint adequately alleges corporate scienter.

### 7.    The Inference of Scienter Arising from the Allegations Is as Least as Compelling, if Not More so, than Any Innocent Explanation

Defendants urge the Court to credit their non-culpable inference – *i.e.*, that the Company provided adequate disclosures about a "'complex' integration with a three-year target and a quickly changing global economy," only to find that their projection did not come to fruition. *See* MTD at 34-35.  Although Lead Plaintiff's competing inference of culpability need only be "at least as compelling" as Defendants', *Tellabs*, 551 U.S. at 324, it is by far the more compelling.  This is especially so when assessing "all the allegations holistically" and asking, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id*. at 326.

The totality of the allegations of the Complaint indicate that, at a minimum, Defendants recklessly misrepresented the impact of NotPetya and the state of the TNT integration.  Defendants represented that "***substantially all TNT critical operations have been restored***" (*see* ¶38), that the integration had been "accelerated" (*see, e.g.*, ¶¶69, 73), that the Company was on pace to meet the income improvement target (*see, e.g.*, ¶¶53, 56, 70, 72-73, 82, 99, 101, 109), and that "operations [were] back to normal" (*see, e.g.*, ¶¶39, 74).  In truth, NotPetya crippled TNT's operations within seconds, wiping out desktop computers and Windows servers (¶40) and disabling approximately 75 global systems critical to TNT's international business, including the "custom clearance system," which took six months to correct (¶¶40-41).  As a result, "the progress of the integration took a stop" and was ultimately not completed in time (¶40), FedEx lost approximately 10% of its high-margin business to competitors (¶41), and there was significant reason to doubt that the Company would reach its stated income improvement target (¶42).  When the truth emerged, analysts covering the Company reacted with shock and FedEx's stock plummeted as a result.  *See generally* ¶¶48, 119-26.

- 34 -

Viewing the allegations as a whole, Defendants' proposed inference that the individuals responsible for the management, accounting, reporting, and disclosure functions of FedEx knew nothing about the true effects that NotPetya had on TNT's business and the integration – which they touted as a "primary area of focus" for the Company (¶35) – is not credible and cannot outweigh the more compelling inference of Defendants' scienter.

### D.    The Complaint Adequately Pleads Control Person Liability

Liability under Section 20(a) requires only that a plaintiff demonstrate: (1) a primary violation by the controlled person; and (2) control of the primary violator by the Section 20(a) defendant.  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 413-15 (S.D.N.Y. 2003).  First, Lead Plaintiff has alleged a primary violation such that the control-person allegations should be sustained.  *Glob. Brokerage*, 2019 WL 1428395, at *18 (sustaining Section 20(a) claims where underlying Section 10(b) claims sustained).  Second, because Lead Plaintiff has adequately pled scienter under Section 10(b) for the 20(a) Defendants with particularity, culpable participation has been adequately alleged for the Section 20 claims (if so required).[20]  *In re Barrick Gold Secs. Litig.*, 2015 WL 1514597, at *16 (S.D.N.Y. Apr. 1, 2015) (holding that even "sparse" allegations suffice).

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety.[21]

---

[20]   Although this Court has found that culpable participation is required to establish a Section 20(a) claim, contrary to other district courts in this circuit (*In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (compiling cases)), it has acknowledged that the issue remains unresolved by the Second Circuit.  *In re Lihua Int'l, Inc. Sec. Litig.*, 2016 WL 1312104, at *17 (S.D.N.Y. Mar. 31, 2016).

[21]   Should the Court determine that any part of the Complaint is deficient, Lead Plaintiff respectfully requests leave to amend.  As the Second Circuit has held, "it is the usual practice upon granting a motion to dismiss to allow leave to replead."  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (reaffirming "liberal standard" of Rule 15 and recognizing that, "[w]ithout the *benefit of a ruling*, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

DATED:  May 27, 2020          Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS

*/s/ Chad Johnson*
CHAD JOHNSON

125 Park Avenue, 25th Floor
New York, NY  10017
Telephone:  212/791-0567
619/231-7423 (fax)
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
WILLIAM J. GEDDISH
AVITAL O. MALINA
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
wgeddish@rgrdlaw.com
amalina@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK W. DANIELS (admitted *pro hac vice*)
NATHAN W. BEAR (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
patrickd@rgrdlaw.com
nbear@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 27, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Chad Johnson*
CHAD JOHNSON

ROBBINS GELLER RUDMAN
  & DOWD LLP
125 Park Avenue, 25th Floor
New York, NY  10017
Telephone:  212/791-0567
619/231-7423 (fax)
chadj@rgrdlaw.com
