UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE FEDEX CORP. SECURITIES :  Case No.: 1:19-cv-05990 (RA)
LITIGATION         :
                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Jay B. Kasner
Susan L. Saltzstein
William J. O'Brien
Andrew R. Beatty
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
jay.kasner@skadden.com
susan.saltzstein@skadden.com
william.obrien@skadden.com
andrew.beatty@skadden.com

*Attorneys for FedEx Corporation
 and the Individual Defendants*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .............................................................................................1

ARGUMENT .......................................................................................................................4

I.    The Section 10(b) Claim Fails to Adequately Plead Falsity..................................4

      A.    Statements Concerning FedEx's Restoration of TNT Operations and
            Services ................................................................................................................4

      B.    Statements Concerning Customer Retention Efforts and International
            Service Mix ..........................................................................................................8

      C.    Statements Concerning FedEx's Integration of TNT ...........................................10

      D.    Numerous Statements Qualify for Safe Harbor and Bespeaks Caution
            Protection ............................................................................................................12

      E.    Numerous Statements Are Non-Actionable Opinions...........................................13

      F.    Numerous Statements Represent Non-Actionable Puffery....................................14

II.   Plaintiff Fails to Plead a Strong Inference of Scienter..........................................15

      A.    Plaintiff Fails To Plead Conscious Misbehavior or Recklessness........................15

      B.    Plaintiff's Remaining Allegations Do Not Contribute to an Inference Of
            Scienter ...............................................................................................................17

III.  Plaintiff Fails To State A Claim For Control Person Liability ..........................................17

CONCLUSION....................................................................................................................17

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Abramson v. NewLink Genetics Corporation*,
No. 19-642-cv, 2020 WL 3956263 (2d Cir. July 13, 2020) ...........................................14

*In re Adient plc Securities Litigation*,
No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ...................... passim

*Chapman v. Mueller Water Products, Inc.*,
No. 19-cv-3260 (LJL), 2020 WL 3100243 (S.D.N.Y. June 6, 2020)......................6, 15, 16

*City of Birmingham Firemen's & Policemen's Supplemental Pension System v. Ryanair Holdings plc*,
No. 18-CV-10330 (JPO), 2020 WL 2834857 (S.D.N.Y. June 1, 2020)...........................14

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................................................3

*In re FedEx Corporation Derivative Litigation*,
No. 19-1747-LPS (D. Del.), Transcript of Telephonic Oral Argument held on June 24, 2020 (Dkt. No. 42) ...................................................................................... passim

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) .....................................................................15

*In re Global Brokerage, Inc.*,
No. 1:17-cv-00916-RA, 2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019)...........................16

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018)...............................................................................8

*Hou Liu v. Intercept Pharmaceuticals, Inc.*,
No. 17-cv-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ..........................15

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020).........................................................................................16, 17

*In re Lehman Brothers Securities & ERISA Litigation*,
No. 10 Civ. 6637 (LAK), 2013 WL 3989066 (S.D.N.Y. July 31, 2013).........................16

*Marcu v. Cheetah Mobile Inc.*,
No. 18-CV-11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..........................4

*In re Morgan Stanley Information Fund Securities Litigation*,
 592 F.3d 347 (2d Cir. 2010) ........................................................................1

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
 423 F. Supp. 2d 364 (S.D.N.Y. 2006)...........................................................7

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
 367 F. Supp. 3d 16 (S.D.N.Y. 2019)..............................................................7

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
 575 U.S. 175 (2015)......................................................................................14

*Pearlstein v. BlackBerry Ltd.*,
 93 F. Supp. 3d 233 (S.D.N.Y. 2015).............................................................9

*In re Philip Morris International Securities Litigation*,
 473 F. Supp. 3d 329 (S.D.N.Y. Feb. 4, 2020) ...........................................17

*Sachdev v. Singh*,
 No. 15 Civ. 7114 (AJP), 2016 WL 768861 (S.D.N.Y. Feb. 26, 2016) ...........12

*Schiro v. Cemex, S.A.B. de C.V.*,
 396 F. Supp. 3d 283 (S.D.N.Y. 2019).......................................................4, 17

*In re Textron, Inc. Securities Litigation*,
 No. 19cv7881 (DLC), 2020 WL 4059179 (S.D.N.Y. July 20, 2020) .........10, 14

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016) .......................................................................14

*In re Vivendi Universal, S.A. Securities Litigation*,
 765 F. Supp. 2d 512 (S.D.N.Y. 2011)..........................................................13

*In re Wachovia Equity Securities Litigation*,
 753 F. Supp. 3d 326 (S.D.N.Y. 2011)..........................................................12

*In re Weight Watchers International, Inc. Securities Litigation*,
 No. 14-cv-1997 (LAK), 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ...........11

*Wilkov v. Ameriprise Financial Services, Inc.*,
 753 F. App'x 44 (2d Cir. 2018) ...................................................................12

**STATUTES**

15 U.S.C. § 78u-4(b)(2) ........................................................................3, 16

## PRELIMINARY STATEMENT

Plaintiff's opposition ("Opposition" or "Opp'n") confirms that the CAC lacks a particularized factual basis for suggesting that FedEx's disclosures over a 15-month period with regard to the NotPetya cyberattack and the Company's efforts to address its impact were the product of fraud. This is a quintessential example of what has become known as "event-driven" litigation. And like other opportunistic suits of this type, Plaintiff relies time and again on an all-too-familiar pleading tactic: mischaracterizing or ignoring disclosures that are unhelpful to its case. Disclosures, though, must be "taken together and in context," not through the distorted lens that Plaintiff presents. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

Applying this broader frame reveals that there are no false or misleading statements. Indeed, what emerges from an objective and faithful read of FedEx's full (not edited, not cropped, not taken out of context) disclosures is a textbook example of how a company ought to address a crisis. FedEx's statements during the putative Class Period paint the picture of a management team that provided accurate, timely, and meaningful information to investors amid fallout from an historic cyberattack. Indeed, Chief Judge Leonard P. Stark of the District of Delaware dismissed with prejudice a derivative suit against certain of FedEx's current and former officers and directors that appeared to recite, nearly verbatim, certain of the CAC's factual allegations. Examining FedEx's disclosures "in full context," the court held that the derivative plaintiffs had "fail[ed] to identify materially false or misleading statements," and thus "[had] not met the heightened pleading standard of the PSLRA." *In re FedEx Corp. Derivative Litig.*, No. 19-1747-LPS (D. Del.), Transcript of Telephonic Oral Argument held on June 24, 2020 (Dkt. No. 42) ("FedEx Deriv. Tr."), at 72, 75-76 (attached hereto as Ex. A).[1] The same result should be reached here.

---

[1] The time to appeal Chief Judge Stark's decision expired on July 24, 2020.

***First***, Plaintiff fails to plead with particularity an actionable misrepresentation or omission concerning FedEx's recovery from the NotPetya cyberattack, the TNT integration, or the Company's forward-looking projections for the Express three-year operating income improvement target. In this regard, Plaintiff claims that FedEx "misled the market" into believing "business was back to normal." (Opp'n 11.) But in pressing this theory, Plaintiff misstates or ignores the Company's actual disclosures, which plainly described its recovery from NotPetya as ongoing and evolving. For instance, Plaintiff accuses then-Chief Operating Officer David Bronczek of falsely representing "that shipping services [were] 'back in place'" (Opp'n 11) as of September 2017, when Mr. Bronczek only offered that "***core*** shipping services [were] back in place." (CAC ¶ 59 (emphasis added).) At the same time, Plaintiff downplays FedEx's disclosures, including its acknowledgment that "not all customers [were] shipping at pre-attack volume levels," and that it was "continuing to engage in related recovery efforts." (Ex. 11 at 50.) In his ruling, Chief Judge Stark explicitly relied on these two statements. (*See* FedEx Deriv. Tr. at 74.) As another example, Plaintiff similarly complains that FedEx obscured "the depth of the problems at TNT and the resulting impact on the integration of TNT into FedEx." (Opp'n 16.) Yet this glosses over FedEx's SEC filings during the putative Class Period, which not only reported NotPetya-related losses of ***$400 million*** in just the first two quarters of FY18 "due to decreased shipments in the TNT Express network" (Ex. 18, at 24; Ex. 11, at 28), but also disclosed a $700 million ***increase*** in projected integration costs, from $800 million to $1.5 billion (Ex. 12 at 2; Ex. 26 at 61.)

***Second***, Plaintiff does not plead with specificity that any of the Individual Defendants or FedEx acted with the requisite strong inference of scienter—that is, with a mental state embracing an intent to deceive, manipulate, or defraud. Plaintiff concedes that it is has not pled (and is not pursuing) a motive-based theory of fraud against any Defendant (*see* Opp'n 24-25), which means

2

that its allegations of conscious misbehavior or recklessness must be "correspondingly greater" as a result, *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (citation omitted). Plaintiff, though, does not even try to establish scienter on an individual-by-individual and statement-by-statement basis, as the law demands. *See* 15 U.S.C. § 78u-4(b)(2) (inquiry is whether, "with respect to each act or omission . . . the defendant acted with the required state of mind").

Further, the generalized allegations that Plaintiff does muster are vague and unremarkable. To take one example, citing its lone CW, Plaintiff claims that "FedEx's senior management was in regular contact with TNT executives, took an active role in the integration of TNT into . . . Express and was involved in the recovery efforts following NotPetya." (Opp'n 25; *see also* CAC ¶ 147.) This supposedly included sending "FedEx Senior Vice Presidents and Vice Presidents . . . to Amsterdam to participate in briefings with TNT on IT issues" and "provid[ing] TNT with experts" from Microsoft. (Opp'n 25-26.) Plaintiff touts this allegation as one of its best. (*See id.*) But no facts are pled connecting an Individual Defendant (or any other FedEx executive) to these unidentified "contact[s]" and "briefings." And in any event, one would expect management teams from FedEx and TNT to be communicating about integration activities and IT-related issues following a cyberattack. Wholly lacking from the CW's assertions are facts indicating, among other things, that these unnamed "TNT executives" conveyed anything that contradicted the accuracy of FedEx's disclosures. All the CW (and CAC) offers is an innocuous account that executives were involved in integration and recovery efforts—facts that not only fail to show conscious misbehavior but are consistent with Defendants' public statements.

***Third***, as the above example illustrates, many of Plaintiff's contentions are based exclusively on the apparent recollections of its sole witness. Not one of the CW's assertions

3

contradicts FedEx's disclosures. And regardless, there are no allegations that the CW ever met, spoke to, or otherwise communicated with any Individual Defendant, *see In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at \*27 (S.D.N.Y. Apr. 2, 2020) (Abrams, J.),[2] or that his or her observations otherwise "made their way up the entire corporate hierarchy to the Individual Defendants," *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019). This pleading infirmity, which the Opposition tacitly concedes (*see* Opp'n 28), defies any suggestion of scienter. *See Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at \*7 (S.D.N.Y. July 16, 2020) (no scienter where CW allegations failed to "show that individual defendants *actually possessed* the knowledge" (citation omitted)).

## ARGUMENT

## I.    THE SECTION 10(B) CLAIM FAILS TO ADEQUATELY PLEAD FALSITY

## A.    Statements Concerning FedEx's Restoration of TNT Operations and Services

Plaintiff's main argument is that Defendants misled investors into believing TNT's "business was back to normal" post-cyberattack when it "clearly [was] not." (Opp'n 11.) But FedEx's disclosures fatally undermine this theory. For instance, invoking the CW, Plaintiff accuses the Company of concealing that "TNT's international shipments were largely disabled for at least 6 months" due to a "custom[s] [*sic*] clearance system" that "could not function." (CAC ¶ 41; *see* Opp'n 2, 3, 6, 11, 12, 19, 20.)[3] During FedEx's September 2017 earnings call, however, Chief Financial Officer Alan Graf warned that "[i]t [was] taking longer to restore our international business due to the complexity of clearance systems." (Ex. 9 at 5.) In other words, FedEx *disclosed* that clearance systems were impacting international operations.

---

[2] *Adient*, which was issued nearly two months before the Opposition was filed, is nowhere mentioned by Plaintiff.

[3] Plaintiff misleadingly removes the word "largely" from this quote on two occasions. (*See* Opp'n 11 ("TNT's international shipment was disabled for six months."); *see also id.* at 20 (same).)

This allegation fails for other reasons. There is, to start with, no basis for inferring that the CW, as a "Senior Business Relationship Manager" (a marketing position), was qualified to opine on TNT's international shipments. Indeed, the CAC offers no insight into how the CW would have been privy to details about TNT's systems and/or international shipments—apart from a cursory reference to "meetings with TNT senior executives who were involved in the recovery and the TNT integration." (CAC ¶ 40 n.2.)[4] The CAC says nothing about who these "mystery" executives were, what they did, the nature of these meetings, and the specifics of (and factual basis for) any information they might have furnished. Moreover, it is impossible to know what Plaintiff means by "largely disabled." Were shipments occurring but at a lower level of functionality? And if so, what was that level (80%, 60%, etc.)? Relatedly, the CW supposedly claims that 75 "critical systems" were "wip[ed] out" when NotPetya struck in late June 2017. Yet it identifies only one by name (the "custom[s] [*sic*] clearance system") and pleads no facts about how long the other 74 systems may have been down or when each one was restored or retired. (Opp'n 11.) The particularity requirements demand more. *See Adient*, 2020 WL 1644018, at *29 (discounting "vague [CW] allegations" that "fail[ed] to meet the heightened pleading requirements").

Regardless, these allegations are not inconsistent with FedEx's disclosures. Take for instance former COO Bronczek's remarks during the September 2017 earnings call. (Opp'n 10-11.) Mr. Bronczek only advised that "substantially all . . . critical operational systems" had been restored—a description which signaled that both ***non***-critical and certain ***critical*** systems remained non-operational. (CAC ¶ 53.) Plaintiff's attempt to obscure this distinction is hardly trivial: the CW only claims to link one purportedly "critical" system (i.e., customs clearance) to the alleged

---

[4] For similar reasons, there are no facts to suggest that the CW was in a position to opine on the feasibility of achieving the three-year operating income improvement target.

disruptions affecting international shipments. And again, Mr. Graf noted during this same call that the clearance system was still adversely impacting FedEx. Simply put, because Mr. Bronczek's comments are in alignment with the CW's allegations, they cannot support a misstatement claim.

Similarly, Plaintiff accuses Defendants of failing to "grapple with their statement that shipping services [were] 'back in place' [as of September 19, 2017] given that TNT's international shipment was disabled for six months." (Opp'n 11.) But the speaker, Mr. Bronczek, did not represent that *all* shipping services had been restored—only that "*core* shipping services [were] back in place." (CAC ¶ 59 (emphasis added).) Further, the CAC allegation to which Plaintiff refers only claims that TNT's international shipments were "*largely* disabled," not completely "disabled" as Plaintiff implies. (*Id.* ¶ 41 (emphasis added).) This sleight of hand cannot underpin a misrepresentation claim. *See Chapman v. Mueller Water Prods., Inc.*, No. 19-cv-3260 (LJL), 2020 WL 3100243, at *12 (S.D.N.Y. June 11, 2020) (dismissing argument that "mischaracterize[d] [plaintiffs'] own allegations and the documents upon which those allegations rely").

But even if it could, Plaintiff's argument makes no sense. The term "shipping services" represents the shipping options offered to customers (e.g., International Priority, International Economy), whereas the term "shipments" represents the quantity of services being purchased. (*See* https://www.fedex.com/content/dam/fedex/us-united-states/services/Service_Guide_2020.pdf (service guide).) Thus, Mr. Bronczek was not contending that volumes had been restored, only that FedEx was now able to offer core service options. Also, there is no allegation that the inability to offer certain services had depressed international shipments, or that "core shipping services" were *not* "back in place" as of September 19, 2017. (*See* CAC ¶ 59.)[5]

---

[5] Plaintiff's other examples are just as unhelpful. (*See* Opp'n 10-11.) Mr. Carter's excerpted remarks—including his description of systems as "near-normal" and his reference to "virtually all critical systems"—plainly communicated, consistent with FedEx's other disclosures, that certain systems were *not* yet back to normal. (Ex. 9 at 6.) And this

FedEx's disclosures also defeat Plaintiff's final falsity argument—that the Company downplayed NotPetya's "outsized impact" through "partial" and "minor" half-truths. (Opp'n 12.) These disclosures included: (i) that FedEx had incurred NotPetya-related losses of *$400 million* during the first half of FY18 "*due to decreased shipments in the TNT Express network*" (Ex. 18 at 24; Ex. 11 at 28 (emphasis added)); (ii) that during Q2 FY18, "TNT Express revenues, volumes and profits remain[ed] below pre-attack levels" (Ex. 18 at 29); and (iii) that recovery efforts were continuing as of December 2017 (*see* Ex. 11 at 50 ("[N]ot all customers are shipping at pre-attack volume levels and we are continuing to engage in related recovery efforts."))[6]

Moreover, as Plaintiff admits (Opp'n 11 n.5), FedEx separately reported the results for Express's international business, of which TNT is a part. Plaintiff complains that investors would not have "appreciate[d] the significance" of these results unless FedEx more narrowly broke out the performance of TNT's legacy operations. But even if this were possible (FedEx, as Plaintiff notes, had already spent over a year *combining* operations), it was not required, since the securities laws "are not intended to attribute to investors a child-like simplicity." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (citation omitted). In short, it strains credulity to claim that FedEx's disclosures were "partial," "minor," and not "specific." (*Id.* at 12, n.6.) Chief Judge Stark, in fact, cited this segment data as a partial ground for dismissal. (*See*

---

conclusion is reinforced by Mr. Carter's next statement (omitted by Plaintiff), which clarified that FedEx was still working on "restor[ing] . . . certain key customer-specific solutions and systems." (*Id.*) As for Mr. Bronczek's statement about "service levels" being restored (Opp'n 11, 13 n.7), it addressed a specific measurement: whether "service levels" within Europe "were . . . above those a year ago in August of 2016." (CAC ¶ 60.) The CAC pleads no facts about what those levels were in August 2016, let alone how any alleged disruptions to Express's international shipments might have affected this figure as of September 2017, when Mr. Bronczek made his statement.

[6] By contrast, the disclosures in Plaintiff's cases were less detailed and contrary to alleged actions. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33-34 (S.D.N.Y. 2019) (plaintiffs alleged specific "price harmonization actions" that defendants had concealed and which contradicted statements that price harmonization "was expected to decline"). (Opp'n 12.)

FedEx Deriv. Tr. at 74 (noting, *inter alia*, that "defendants . . . broke down the financial performance of the company's freight and parcel services, both domestic and international").)

## B.    Statements Concerning Customer Retention Efforts and International Service Mix

Plaintiff inveighs that FedEx's statements about its customers "did not comport with the risks that Defendants knew." (Opp'n 14.) But Plaintiff cannot dispute that as of March 2018 (over eight months after NotPetya), FedEx disclosed both that TNT's "existing customer base ha[d] not been fully restored" and that "[t]he cyberattack [was continuing] to have a lingering effect in the third quarter" of FY18. (*See* Ex. 19 at 16; *see also* Opp'n 13-14 (admitting "FedEx disclosed *some* customer loss").) Chief Judge Stark cited these same disclosures in holding that plaintiffs "[had] not met the heightened pleading standard of the PSLRA." (FedEx Deriv. Tr. 74-76.)

Plaintiff offers just as little support for its claim that "TNT lost substantial business to competitors because TNT could not track customers' packages without a functioning custom[s] [*sic*] clearance system." (CAC ¶ 41.) Again (MTD 19-20), this CW statement is silent about *when* any customer defections may have occurred or if the customers returned once the clearance system was restored. The CW does not even say how many customers were lost "as a result of NotPetya" (as opposed to economic weakness or other reasons), conceding that such a figure is "difficult to estimate." (CAC ¶ 41.) These temporal and substantive gaps are dispositive—especially since Defendants *disclosed* customer loss. *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018) (rejecting CW allegations that were "unmoored in time").

Unable to plead around FedEx's disclosures as of March 20, 2018, Plaintiff argues in the alternative that updates issued *from this date forward* misled investors into believing TNT customer volumes "had been restored" to pre-cyberattack levels. (Opp'n 14 n.8.) Plaintiff's two cited disclosures, however, say no such thing. The first remark, made by Chief Executive Officer Smith during a Q3 FY18 earnings call, contradicts Plaintiff's theory by clarifying that FedEx's

8

efforts to recover TNT customer volumes were **ongoing** as of Q4 FY18. (*See* Ex. 19 at 16 ("in the fourth quarter we **will have** recovered most of the NotPetya volume" (emphasis added)).) And the second disclosure, a statement by then-Treasurer Lenz about how "the customers stuck with us," is just a generic expression of enthusiasm about TNT's loyal customer base, to which he alludes earlier in the same conference. (Ex. 23 at 7); *see also Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 240-41 (S.D.N.Y. 2015) (statements about customers "embracing" product despite poor sales were "at most, puffery"). Regardless, Plaintiff pleads no contradictory facts about TNT's customer base as of November 7, 2018, when Mr. Lenz made his statement.[7]

Finally, Plaintiff fails to rescue its service mix (parcel v. freight) allegations. Forced to admit that "the Company's quarterly reports [broke] out the financial performance and volume of FedEx Express's network parcel and freight services business" (Opp'n 14), Plaintiff counters that this segment data was "buried" and would have required investors to "piece together . . . information from distinct parts of [FedEx's] financial statements" (*id.* (citation omitted)). But this assertion is not credible: FedEx's 10-Qs not only presented Express parcel and freight data in two **contiguous**, easy-to-follow charts, they broke out this data for Express's international division, of which TNT is a part. (*E.g.*, Ex. 18 at 33-34.) It is, therefore, implausible to suggest that investors wishing to understand service mix would have needed to excavate disparate strands of data from different parts of the 10-Q, or that making sense of it would have required anything more than basic math. (*See* FedEx Deriv. Tr. at 74 (noting that FedEx's "filing[s] . . . broke down the financial

---

[7] Equally meritless is Plaintiff's claim that during FedEx's March 19, 2019 earnings call (three months **after** the Class Period), Mr. Graf "confirmed that FedEx was only then seeing improved service levels." (Opp'n 14 n.8.) This is another distortion. What Mr. Graf said in relation to service was that Express had achieved a new milestone: it had been able to "speed[] up" its intra-European shipment times by a full business day "on 40% of traffic." (CAC ¶ 130.) As Mr. Subramanian explained earlier in the call, in an excerpt that Plaintiff omits, this was a **new** service enhancement that had been made possible by integrating the "legacy FedEx Express intra-European shipments into the TNT European road network." (Ex. 28 at 2.) In other words, this discussion has nothing to do with NotPetya.

performance of the company's freight and parcel services, both domestic and international," and thus "provide[d] a disclosure over the relevant time period as to the service mix involved").)

## C.   Statements Concerning FedEx's Integration of TNT

FedEx never represented that the TNT integration as a whole would be completed earlier or cost less. (*See* MTD 20-21.) Instead, it merely advised that certain discrete integration projects would be expedited and certain expenditures would be made earlier. (*Id.*) Plaintiff claims this distinction "gloss[es] over . . . [Defendants'] representations." (Opp'n 15.) But the only example Plaintiff cites, a statement by Mr. Bronczek that FedEx expected to finish combining "our global sales force . . . 1 full year early," offers no support. (Opp'n 15-16.) As previously shown, the CAC nowhere alleges that this project did not occur within the represented timeframe. (*See* MTD 21.) The Opposition does not even respond to Defendants' argument, nor does it explain how a statement about a single element of the integration could have possibly misled investors about the timeline for the entire integration of Express and TNT.

Plaintiff fares no better with its omissions theory: that FedEx failed to disclose facts about the degree to which NotPetya had "disrupt[ed] . . . the integration process." (Opp'n 16.) For instance, Plaintiff posits that FedEx's publicly disclosed decision to raise estimated integration costs by nearly 100% (i.e., from $800 million to more than $1.5 billion) deceived investors because it supposedly concealed "the depth of the problems at TNT." (*Id.*) This argument—that FedEx hid the impact of NotPetya by timely and appropriately updating its cost projections quarterly—is illogical on its face. And it ignores other disclosures that spoke not only to NotPetya's "significant[]" impact but also to the complexity and uncertainty surrounding the integration project as a whole. (*See* MTD 16, 21-22; Ex. 2 at 85-86 (integration risk factors)); *see also In re Textron, Inc. Sec. Litig.*, No. 19cv7881 (DLC), 2020 WL 4059179, at *12 (S.D.N.Y. July 20, 2020) (rejecting integration-related misstatements when disclosures were "considered as a whole").

10

Another weakness in Plaintiff's theory is that it rests on its CW allegations, which do nothing to identify inaccurate statements or material omissions. One exemplar is the claim that NotPetya "crippled TNT's operations within seconds and wiped out 75 critical systems," causing "the progress of the integration [to take] a stop." (CAC ¶ 40; Opp'n 5, 34.) There is no basis to infer that the CW was qualified to opine on how NotPetya had impacted an integration spanning over 200 countries. Regardless, FedEx disclosed "in the first 24 hours" that it had been forced to engage in "manual processes for pickup, sort, and delivery" just to keep its "doors open." (Ex. 9 at 7.) Also, the CW's allegation only speaks to conditions immediately after NotPetya struck in late June 2017, which FedEx disclosed in an 8-K within a day. (Ex. 7.) There is not even a hint that any integration "stop" extended beyond the beginning of the Class Period in September 2017.

And even if the CAC could be interpreted in this way, Plaintiff pleads no facts to support it. Indeed, FedEx's disclosures, which the CAC and Opposition omit, make clear that FedEx continued to incur integration expenditures on a consistent basis—even after NotPetya:

| Quarterly TNT Integration Expenses Reported (in millions)[8] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Q4 FY17 | Q1 FY18 | Q2 FY18 | Q3 FY18 | Q4 FY18 | Q1 FY19 | Q2 FY19 | Q3 FY19 |
| $124 | $112 | $122 | $106 | $136 | $121 | $114 | $69 |

These undisputed figures hardly support the notion of a "stop" (whatever that phrase means in this context). And even if you credit the CW's hyperbole, the CAC pleads nothing about the duration or severity of this supposed disruption, let alone how it might have clashed with Defendants' publicly reported expectations for an integration that was projected to last until at least the end of FY20. *See In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-cv-1997 (LAK), 2016 WL 2757760, at *7 (S.D.N.Y. May 11, 2016) (rejecting "grandiose and hyperbolic assertion" as "a characterization or opinion of the witness, not an objectively testable statement of fact").

---

[8] (*See* Ex. 27 at 117; Ex. 18 at 24; Ex. 11 at 29; Ex. 14 at 29; Ex. 26 at 133; Ex. 24 at 28; Ex. 16 at 31; Ex. 25 at 33.)

Similar flaws abound in another integration allegation ascribed to the CW: that in response to NotPetya, "FedEx severed the link between the TNT computer network and the FedEx Express computer network by installing a firewall," thereby "imped[ing] the progress of the IT integration." (CAC ¶ 40; Opp'n 5-6.) The "firewall" to which the CW refers was a crucial immediate measure implemented to prevent the virus from spreading to Express systems, which would have exacerbated the scope and impact of the cyberattack. *See Sachdev v. Singh*, No. 15 Civ. 7114 (AJP), 2016 WL 768861, at \*6 (S.D.N.Y. Feb. 26, 2016) (noting that a firewall can be installed as "a measure . . . to 'resecure [computer] system[s] in the wake of a hacking attack'") (citation omitted). More fundamentally, though, no facts are pled as to ***how long*** the firewall was maintained or ***how severely*** the integration was purportedly "impeded." Plaintiff also does not explain how the installation contradicts disclosures about the integration's progress, timing, or cost. Indeed, Plaintiff does not even purport to claim that any firewall-related interruptions continued into the putative Class Period. These holes as to timing, duration, and severity make this allegation worthless. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (rejecting CW allegations that were "undated or pegged to an indefinite time period" because they "render[ed] the task of matching CW allegations to contrary public statements all but impossible").

D.    **Numerous Statements Qualify for Safe Harbor and Bespeaks Caution Protection**

Plaintiff responds to Defendants' safe harbor and bespeaks caution doctrine arguments by (i) failing to address six statements challenged in the Motion[9] and (ii) contesting, for unexplained reasons, statements that Defendants did ***not*** identify as forward-looking.[10] To the extent Plaintiff

---

[9] Plaintiff ignores statements relating to Defendants' expectations for the integration (CAC ¶¶ 58, 84, 105, 111) and future economic performance (*id.* ¶¶ 85, 106) and, therefore, concedes dismissal of those claims. *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018) (affirming dismissal of claims as "'abandoned'").

[10] Of the five statements Plaintiff examines, two (CAC ¶¶ 53, 57) were not identified as forward-looking. (*See* Opp'n 22-23.) For two others, Plaintiff cites the correct paragraph but the wrong excerpt. (*Id.* (citing CAC ¶¶ 60, 69).)

joins issue at all, it does so on the operating income target, arguing that statements about this figure were not forward-looking because they purportedly "implicated historical facts." (Opp'n 23.) Plaintiff, though, never identifies any "historical facts" that "undercut the income improvement target" (*see* I (A)-(C), *infra*); instead, it just points generally to 60 paragraphs of the CAC. (Opp'n 23-24.) This lack of specificity is dispositive, since projections of future economic performance are quintessentially forward-looking. *See Adient*, 2020 WL 1644018, at \*18 (citing cases; holding that "[s]tatements about Adient's projected margin expansion and how . . . to achieve that goal [were] forward-looking"). This includes statements that FedEx remained on track to meet its goal. *See id.* at \*19 (citing cases; noting that "[e]ven statements about Adient being 'on track'" with respect to "margin expansion are 'forward-looking'. . . and not statements of 'present fact'").[11]

Plaintiff also falls short under the safe harbor's other two prongs. The Opposition does not even argue that Plaintiff has met the actual knowledge standard. And as the Motion (*see* MTD 23-24) and this reply demonstrate, Plaintiff cannot plausibly dismiss FedEx's "cautionary language . . . [as] boilerplate." (Opp'n 22; *see also* FedEx Deriv. Tr. at 73 (rejecting premise that disclosures were "'general boilerplate words of caution'" (citation omitted)).) Crucially, Plaintiff's failure in either respect "is sufficient to confer safe harbor protection." *Adient*, 2020 WL 1644018, at \*20.

## E.    Numerous Statements Are Non-Actionable Opinions

Plaintiff proceeds solely under *Omnicare*'s omissions prong (Opp'n 18-19.) But as previously shown (*see* I (A)-(C), *infra*), it does not allege with specificity undisclosed facts calling into question Defendants' opinions about the operating income target, the TNT integration, or the NotPetya recovery. And even if, *arguendo*, Plaintiff could plead such facts, "a statement of opinion

---

[11] *Vivendi* alleges egregious facts absent here. (Opp'n 23.) There it was claimed that Vivendi never planned to achieve a 35% EBITDA growth rate because company officials knew from the outset that 50% of this figure was based on "a huge one-time purchase accounting benefit." *In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011); *see also id.* at 541 (company referred to adjustment internally as "accounting magic").

'is not necessarily misleading when [a speaker] knows, but fails to disclose, some fact cutting the other way.'" *Adient*, 2020 WL 1644018, at *16 (citation omitted). Indeed, *Omnicare* "cautioned against an overly expansive reading" of the omissions prong and emphasized that meeting it would be "'no small task for an investor.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)). The test is whether Defendants "[made] statements that 'fairly align[ed] with the information in the issuer's possession at the time.'" *Sanofi*, 816 F.3d at 212 (quoting *Omnicare*, 575 U.S. at 189). Plaintiff here never identifies with particularity an omitted fact that might be construed as creating such a disconnect and thus meeting this demanding standard. *See id.*[12]

## F.   Numerous Statements Represent Non-Actionable Puffery

Plaintiff claims that none of the alleged misstatements can "be discarded as immaterial puffery" because they addressed "TNT/FedEx Express, a topic which was," in its words, "unquestionably material." (Opp'n 16, 18.) But the importance of a topic does not "perforce establish the materiality of any statement" about it. *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 18-CV-10330 (JPO), 2020 WL 2834857, at *6 (S.D.N.Y. June 1, 2020). Rather, the test "is whether the particular statement significantly altered the 'total mix'" *Id.* (citation omitted). Here, Defendants cited twenty-three "particular" examples of puffery (MTD 27-28, n.13), yet Plaintiff does not address even one.[13]

---

[12] Unlike here, in *Abramson v. NewLink Genetics Corp.*, No. 19-642-cv, 2020 WL 3956263, at *7 (2d Cir. July 13, 2020), plaintiff alleged a clear discrepancy between, on the one hand, a CEO's "confident statement" that no competing drug study had found a pancreatic cancer survival rate of more than 20 months, and, on the other, "his omission of noted studies' findings" from competitors, which had produced survival rates well in excess of 20 months. *Id.* at *7. This divide led the court to conclude that defendants' *Omnicare* arguments "were a bridge too far." *Id.*

[13] Plaintiff is wrong to suggest (*see* Opp'n 17) that puffery cannot be decided on a motion to dismiss. *See, e.g.*, *NewLink*, 2020 WL 3956263, at *4 (affirming dismissal as to certain statements that were puffery and citing cases); *see also Textron*, 2020 WL 4059179, at *9 (citing *NewLink*).

14

## II.     PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

### A.     Plaintiff Fails To Plead Conscious Misbehavior or Recklessness

Plaintiff concedes that it has not pled motive or opportunity as a basis for scienter. (*See* Opp'n 24.) Indeed, Plaintiff completely ignores that FedEx bought back nearly $2.2 billion worth of its stock during the proposed Class Period (Ex. 2 at 28), a fact that negates a finding of scienter. (*See* MTD 30 (citing *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018)).) This gaping hole in the CAC means that its allegations of conscious misbehavior or recklessness "must be correspondingly greater." *Adient*, 2020 WL 1644018, at \*26 (citation omitted). Here, such allegations are totally absent.

Take for instance Plaintiff's lead (and CW-sourced) allegation, "that 'FedEx's senior management . . . regular[ly] contact[ed] . . . TNT executives, took an active role in the integration of TNT . . . and was involved in the recovery efforts following NotPetya.'" (Opp'n 25; *see also id* (arguing that "FedEx Senior Vice Presidents and Vice Presidents" were sent to Amsterdam at some unspecified time to "participate in briefings with TNT on IT issues").) First, there is nothing in the CAC to suggest that these "TNT executives" communicated warnings during these "contacts"— or even that they had negative information to furnish. Indeed, Plaintiff offers no clues about ***what*** (if anything) was learned; ***when*** this information was acquired; ***where*** it came from (i.e., report, email, etc.); or ***how*** it contradicted a challenged statement. This absence of detail is fatal, regardless of the theory under which it is pursued. *See Mueller Water Prods.*, 2020 WL 3100243, at \*10, \*22 (plaintiffs failed to "'specifically identify the reports or statements' that [were] contradictory to the statements made' by Defendants . . . or 'provide specific instances in which Defendants received information that was contrary to their public declarations'" (citation omitted)); *see also Adient*, 2020 WL 1644018, at \*26 (same); *Hou Liu v. Intercept Pharm., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831, at \*18 (S.D.N.Y. Mar. 26, 2020) ("[P]laintiffs must do more than plead

15

that defendants . . . had a general responsibility to monitor . . . .").[14] And this vagueness is all the more destructive to claims against the Individual Defendants, since it prevents Plaintiff from pleading scienter on a defendant-by-defendant and statement-by-statement basis, as the PSLRA requires. *See* 15 U.S.C. § 78u-4(b)(2) (inquiry is whether, "with respect to each act or omission . . . the defendant acted with the required state of mind").[15]

Second, even if Plaintiff had pled contradictory facts, there are no allegations that the ***Individual Defendants*** (or any other executive whose scienter might be imputed to FedEx) participated in these "contact[s]" or "briefings." *See Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) ("[G]eneral allegations of warnings made to unidentified senior executives . . . are not sufficiently particularized to raise a strong inference of scienter against any individual, much less one whose knowledge may be imputed . . . .").[16] Nor is there a single allegation that the CW—or anyone else with purported knowledge of "problems"—played a role in disseminating a challenged statement. *Id.* (even if anonymous executives knew of contradictory facts, complaint failed because it "provide[d] no connective tissue between those employees and the alleged misstatements"). Nor is there a basis to infer that the CW had contact with any Individual Defendant, *see Adient*, 2020 WL 1644018, at *27 (discounting CW allegations where no facts were pled "that any CW ever

---

[14] *In re Global Brokerage, Inc.* (Opp'n 26) is not to the contrary. There it was alleged that defendants engaged in a scheme to mislead investors into believing that they had removed all conflicts of interest from a new business model. This Court sustained scienter allegations for two individual defendants who were "heavily involved" in the scheme, "something that Defendants d[id] not appear to deny"—and for which they had been fined by the CFTC. *In re Glob. Brokerage, Inc.*, No. 1:17-cv-00916-RA, 2019 WL 1428395, at *3, *15-16 (S.D.N.Y. Mar. 28, 2019) (Abrams, J.). By contrast, the Court rejected scienter allegations leveled against the CFO because they were, like those here, based on the defendant's "executive position" and a conclusory allegation from one CW. *Id.* at *16 (citation omitted).

[15] Further, the CAC concedes that the CW's "account" is based primarily, if not entirely, on secondhand information from individuals with whom Plaintiff never spoke, a fatal defect. *See In re Lehman Bros. Sec. & ERISA Litig.*, No. 10 Civ. 6637(LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (rejecting CW account where there was "no suggestion that counsel . . . ha[d] spoken with these [other] confidential witnesses or even [knew] who they [were]").

[16] *See also Mueller Water Prods.*, 2020 WL 3100243, at *11 (discounting CW allegation that "fail[ed] to identify the 'senior management' on" emails discussing alleged product defects).

16

told" individual defendants about problems), or that the CW's concerns otherwise "made their way up the entire corporate hierarchy to the Individual Defendants," *Cemex*, 396 F. Supp. 3d at 305.

## B.    Plaintiff's Remaining Allegations Do Not Contribute to an Inference Of Scienter

Finally, Plaintiff offers four arguments (Opp'n 29-33), none of which have merit:

**Core Operations:** Plaintiff suggests that core operations applies because "FedEx described the TNT integration as a 'primary area of focus.'" (Opp'n 30.) As noted (*see* MTD 33-34), the viability of core operations "is uncertain." *In re Philip Morris Int'l Sec. Litig.*, 437 F. Supp. 3d 329, 361(S.D.N.Y. 2020) (citation omitted). But even if it could apply, large companies must, by their nature, pursue *multiple* strategic priorities at once. And that was all the more true for FedEx, a global company with over $65 billion in annual revenues (as of FY18). (Ex. 26 at 52.)

**Corporate Scienter:** The "'most straightforward' way to raise a strong inference of corporate scienter is to impute it from an individual defendant." *Abernathy*, 960 F.3d at 98 (citation omitted). Here, because Plaintiff does not and cannot plead scienter against any Individual Defendant, this avenue for imposing liability is foreclosed. Further, Plaintiff offers no factual basis for "how or why the Court should find corporate scienter based on another executive's statements." *Adient*, 2020 WL 1644018, at *30.

**Cunningham's Resignation:** Plaintiff alleges not one fact to support the speculative notion that Mr. Cunningham resigned due to suspicions within FedEx that he "had been involved in wrongdoing." (Opp'n 32.) In fact, Plaintiff sabotages its own theory by suggesting a non-fraudulent reason for the departure—"poor performance." (*Id.* at 31.) This Court rejected a similar claim in *Adient* and should do the same here. *See* 2020 WL 1644018, at *29 (rejecting theory where plaintiff failed to "provide[] factual support").

**Due Diligence of TNT:** Plaintiff argues that scienter is supported by FedEx's discovery of "weaknesses" in TNT's "IT and operations." (Opp'n 32.) But Plaintiff fails to connect these "weaknesses," which FedEx *disclosed* months before NotPetya, to integration-related problems that occurred after the attack—let alone problems that would have exposed the falsity of a challenged statement. The allegation, moreover, is internally inconsistent: The fact that FedEx disclosed its assessment of TNT's "IT and operations" shows that senior management *was* discharging its monitoring duties, not shirking them.

## III.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

Plaintiff fails to plead a primary violation by FedEx or culpable participation by the 20(a) Defendants. Thus, there can be no Section 20(a) liability. *See Adient*, 2020 WL 1644018, at *30.

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed in its entirety with prejudice.

17

Dated:  New York, New York
   July 27, 2020

           Respectfully submitted,

           /s/ Jay B. Kasner
           Jay B. Kasner
           Susan L. Saltzstein
           William J. O'Brien
           Andrew R. Beatty
           SKADDEN, ARPS, SLATE,
            MEAGHER & FLOM LLP
           One Manhattan West
           New York, NY 10001
           Phone: (212) 735-3000
           jay.kasner@skadden.com
           susan.saltzstein@skadden.com
           william.obrien@skadden.com
           andrew.beatty@skadden.com

           *Attorneys for Defendant FedEx Corporation*
            *and the Individual Defendants*